**SO ORDERED.**

**SIGNED October 31, 2024.**



_____
**STEPHEN D. WHEELIS**
**UNITED STATES BANKRUPTCY JUDGE**

_____

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | |
|---|---|
| **IN RE: GEORGE MARTIN** | **CASE NO. 19-31260** |
|     Debtor | |
| | |
| **DAVID W. ASBACH** | |
|     Plaintiff | |
| | |
| **VERSUS** | **ADVERSARY NO. 21-3017** |
| | |
| **KAREN P. KEALY, ET AL.** | |
|     Defendants | |

**REASONS FOR DECISION REGARDING MOTIONS FOR JUDGMENT ON THE PLEADINGS**
**(ECF NOS. 327, 329 AND 333)**

The Plaintiff, the United States Trustee, filed this Adversary Proceeding against Karen P. Kealy, also known as Karen P. Kisch; the Kealy Law Firm, PLLC; the Kisch Law Firm, PLLC; Steven Nahas; NVA Financial Services, LLC; US Auto Liquidators LLC; Jay Kruege;, Jeffrey Giordano; All Provizions Inc. ; Denise Rodriguez; Halima T. Narcisse, also known as Halima Narcisse Smith; and the Law Office of Halima Narcisse Smith, LLC.  In its Third Amended Complaint, the United States Trustee seeks to Impose Fines, Sanctions and Injunctive Relief

against the Defendants for Violations of 11 U.S.C. §§ 110, 329, 526, 528 and for Abuse of Bankruptcy Process actionable under § 105(a). (ECF No. 240.)

Before the Court are the following dispositive motions: the Motion for Judgment on the Pleadings (ECF No. 327) filed by Karen P. Kealy, Kealy Law Firm, PLLC and Kisch Law Firm, PLLC; the Motion for Judgment on the Pleadings (ECF No. 329) filed by Jay Krueger; and the Motion to Dismiss Adversary Proceeding on the Pleadings (ECF No. 333) filed by NVA Financial Services, LLC.

This Court has jurisdiction under 28 U.S.C. § 1334(a), Federal Rule of Bankruptcy Procedure 7001(1) and (7) and by virtue of the reference by the United States District Court for the Western District of Louisiana pursuant to 11 U.S.C. § 157(a) and Local District Court Rule 83.4.1. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) & (E). The claims for relief in this Adversary Proceeding arise under the Bankruptcy Code, 11 U.S.C. Sections 105, 110, 329, 526, 528. All parties appearing herein have consented to this Court's constitutional authority to enter final orders and/or judgments in this matter pursuant to *Wellness Intl Network, Ltd. v. Sharif*, 575 U.S. 665, 135 S.Ct. 1932 (2015). (*See* ECF No. 130, *and* ECF No. 126 (Withdrawal of Motion for Summary Judgment ECF No. 126 on behalf of NVA Financial Services, LLC, Steven Nahas).)[1]

---

[1] NVA and Nahas have again alleged in their Answer to the Third Amended Complaint that they do not consent to the bankruptcy court entering an order or judgment as to the specific requests for relief sought by the Plaintiff. (ECF No. 249, pgs. 2-3.) To the extent this is an objection to the Court's authority to enter final orders/judgment in this case under *Stern v. Marshall*, 564 U.S. 462 (2011), that issue was raised in the Answer to Amended Complaint (ECF No. 111) and in a prior Motion for Summary Judgment by NVA at ECF No. 126 Despite the fact that the claims for relief alleged herein arise in and under the Bankruptcy Code and are therefore, not *Stern* claims, because the Motion for Summary Judgement was filed, the Court raised the issue at a preliminary pretrial conference on February 28, 2023, and pursuant to that conference, issued an Order permitting all parties to file and notice for a hearing on April 4, 2023 pleadings to Object to this Court's constitutional authority to enter final orders and/or judgments in this matter pursuant to *Wellness Intl Network, Ltd. v. Sharif*, 575 U.S. 665, 135 S.Ct. 1932 (2015), and warned that failure to timely raise the objection would be deemed consent to this Court's authority to enter final orders and judgments subject to the Federal Rules of Appellate Procedure and the Federal Rules of Bankruptcy Procedure. (ECF No. 130.) No party filed a pleading to raise such an objection and Counsel for NVA and Nahas subsequently filed a Notice of Withdrawal of its Motion for Summary Judgment at ECF No. 136. Accordingly, despite the objection being repeated in the NVA and Nahas Answer to Third Amended Complaint, the Court finds NVA and Nahas have knowingly and voluntarily waived this issue by express (the Notice of Withdrawal) and implied consent to adjudication by the bankruptcy court under *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. at 679 (2015).

The deadline for filing dispositive motions having passed, the Court conducted hearings on these Motions on October 23, 2024. As the arguments raised in the Motions urge many common grounds for relief, the Court issues Reasons for Decision in one document. For reasons orally stated and for the following reasons, the Court denies the Motions for Judgment on the Pleadings.

**The Complaint**

The United States Trustee ("UST") alleges eight counts of Bankruptcy Code violations against this group of Defendants for their alleged collective role in connection with events leading up to the filing of a deficient Petition for Relief under Chapter 13 by Debtor, George Martin, and its eventual dismissal without relief in the related bankruptcy case and in connection with the filing of his second bankruptcy case. In short, the Complaint alleges Martin filed a deficient "pro se" Petition for Relief to stop an impending foreclosure on his home after he was unsuccessful in his prolonged pre-petition efforts to obtain home mortgage arrearage relief from one or more of the Defendants to avoid foreclosure. The UST alleges the Defendants violated 11 U.S.C. Sections 110, 329, 526, 528 and abused the Bankruptcy process for which it seeks disgorgement of fees, imposition of fines and sanctions, and assessment of damages against the Defendants. The UST also seeks an injunction permanently enjoying Defendants, and any person or entity acting in concert with them, from providing debt relief services or bankruptcy assistance, acting as bankruptcy petition preparers, filing bankruptcy petitions, or providing any services relating to preparation of documents to be filed in the United States Bankruptcy Court for the Western District of Louisiana.

Because these Motions challenge the sufficiency of the UST pleading, the Court includes herein the allegations of the Third Amended Complaint (hereinafter, "the Complaint"), which set forth the general allegations regarding the fraudulent scheme as follows:

> 21. Kealy Law Firm previously known as Kealy Law Center, PLLC, [through] Kealy has provided debt relief services to distressed homeowners in Colorado, Texas, Ohio, Kansas Georgia and Louisiana. Kealy Law Firm acts in concert with NVA, and in 2017 they shared the same business location at 9300 West Courthouse Rd., Ste. 301, Manassas, VA 20110. Kealy Law Firm and NVA advertise to consumers via internet and on social networking apps such as Facebook and make automated phone calls to distressed homeowners. Once contacted by a distressed homeowner, they professed to offer legal services by a local attorney.

22. Thereafter, Kealy Law Firm, and NVA induce distressed homeowners to enter into contracts with local attorneys. Subsequently, they collect a retainer fee and reoccurring monthly payments in various amounts for an undetermined period until they purportedly negotiate a mortgage modification. The local practitioners typically do not render any legal services to the distressed homeowners. Once the foreclosure date is set, Kealy Law Firm, and NVA—to prolong the scheme—have on multiple occasions arranged for bankruptcy filings prepared by either Dallas Xavier Evans or Jeffrey Giordano—bankruptcy petition preparers who have been sanctioned and enjoined from acting as petition preparers in multiple jurisdictions. Kealy's activities are substantial in scale. She reported to the Internal Revenue Service that in 2019 Kealy Law Firm earned $2, 218,342.00 in gross income. (Ex. 8 at 2).

. . .

35. Along with other "local counsel" attorneys and bankruptcy petition preparers, the Defendants have since 2017 operated a joint enterprise and partnership promising foreclosure assistance and mortgage modification services to individuals nationwide. Defendants' joint enterprise and partnership has acted as a debt relief agency as that term is defined under § 101(12A) and have provided bankruptcy petition preparer services as defined under § 110.

36. Particularly, in 2017 Mr. Nahas and Ms. Kealy decided to change NVA's existing mortgage-assistance-relief-service-business model and going forward—instead of NVA, Ms. Kealy in her capacity as managing counsel, through her entities would provide a contractual relationship with the local attorneys. These agreements provided that Ms. Kealy's entity and her employees would provide intake and mortgage modification services for homeowners who reside in local counsel's state for a 90% fee of any payments received from homeowners and 10% to local counsel.

37. Yet unbeknownst to local counsel neither Ms. Kealy nor her entities had any employees. Instead, individuals such as Mr. Krueger and Ms. Rodriguez handled all the work. Mr. Krueger's entity, U.S. Auto Liquidators and Ms. Rodrigues' entity Provizions were paid for this work by NVA. NVA had no contractual relationship with local counsel.

38. Withholding the truth in this arrangement made the local counsel more comfortable because Ms. Kealy as a licensed attorney in the state of Texas added legitimacy to the otherwise fraudulent scheme and made the local counsel less hesitant to participate therein. Luring local counsel to the scheme and using their name to generate mortgage-assistance-relief-service- business from homeowners in the state where local counsel practice was necessary to evade numerous provisions of Mortgage Assistance Relief Services (MARS) Rule, 12 CFR 1015.

39. For instance, the MARS Rule prohibits charging homeowners any upfront fees until a homeowner is given a written offer for a loan modification or other relief from the lender or servicer and a homeowner accepts the offer. However, the MARS Rule has special provisions for attorneys who can charge clients fees in advance if a number of conditions are met. None of the conditions here were satisfied. Once a relationship with a local counsel was established the Defendants reached out to struggling homeowners and offered services of local counsel to lure the homeowners into paying the prohibited upfront fees for

mortgage-assistance-relief-services and bankruptcy assistance provided by non-attorneys. Unbeknownst to the homeowners, local counsel provided little to no services to the homeowners despite the fact that individuals such as Ms. Rodrigues and Mr. Krueger claimed that they were working for local counsel.

(ECF No. 240, pg.10, 15-16.) The Complaint provides some history of the UST's prior litigation in other Districts against the Kealy, Giordano and NVA entities, giving additional historical context to the alleged fraudulent foreclosure defense scheme. More particularly, the Complaint alleges the following specific alleged acts of each Defendant regarding the filing of the related bankruptcy case of George Martin (19-31260):

> 40. The Debtor—who owns a residential property located at 103 Hilltop Drive, Monroe LA, 71291 (the "Property") and fell behind on his mortgage payments—became a victim of Kealy, Kealy Law Firm, Nahas, and NVA's fraudulent foreclosure defense scheme. (Ex. 3 at 3, 6).
>
> 41. To save the Property from foreclosure, the Debtor called a 1-800 number obtained from a mortgage-relief-program TV advertisement. (Ex. 3 at 7-9). Once the Debtor called the number, he spoke to an individual named Kelly Spann about his upcoming foreclosure sale. (Ex. 3 at 10-11).
>
> 42. Spann requested that the Debtor email her the notices and the "mortgage papers". (Ex 3. at 11-12, 15). In addition, Spann advised that she could stop the foreclosure sale and assured that the foreclosure defense would be handled by a law firm. Id.
>
> 43. Following this phone conversation, on May 21, 2019, Spann emailed the Debtor the following documents: i) Third-Party Authorization Form (the "May 21, 2019 Authorization"); ii) Foreclosure Defense Agreement, iii) Service Fee Agreement, iv) Service Payment Authorization Form; and v) Electronic Funds Transfer EFT Authorization to Debit Bank Account requesting that the Debtor execute these documents and fax them to (703) 260-6220. (Ex. 4 at 2).
>
> 44. The May 21, 2019 Authorization provides that the Debtor applied for foreclosure defense and loss mitigation services at Ms. Narcisse's law firm. (Ex. 4 at 3). By signing the form, the Debtor authorized his mortgage processor—Gateway Mortgage—to release any information not only to Ms. Narcisse's law firm, but also to Commonwealth Processing Center located at 9300 West Courthouse Rd., Ste. 301, Manassas, VA 20110. (Ex. 4 at 3). As mentioned above Commonwealth Processing Center is an unincorporated entity and serves as a façade to disguise the involvement of NVA, located at the same address. While the Authorization Form is printed with the Ms. Narcisse's firm's letter head, it provides that the firm could be reached at the address and contact information of the Commonwealth Processing Center. (Ex. 4 at 3).
>
> 45. The Foreclosure Defense Agreement (the "Agreement") provides that Ms. Narcisse's law firm was engaged to represent the Debtor based upon the experience, resources, and expertise thereof and their personnel and affiliates. (Ex. 4 at 14). The Agreement portends to define the scope of Ms. Narcisse's representation of Debtor.

5

46. Particularly, Ms. Narcisse's law firm was to provide services "for the express and implied purpose of providing Foreclosure Defense and Loss Mitigation Services." (Ex. 4 at 3). The purported representation includes an initial consultation and counseling of the Debtor's rights and options regarding the foreclosure action and correspondence with the court. (Ex. 4 at 8).

47. The loss mitigation, on the other hand, included, inter alia, discussion regarding the options to obtain, among others a "suspension of a foreclosure date." (Ex. 4 at 9) (emphasis in original). Notwithstanding the foregoing and in an apparent self-contradiction, the Agreement then provides that the foreclosure defense and loss mitigation services somehow do not include or involve bankruptcy. (Ex. 4 at 10).

48. In addition, the Agreement also provides that the Debtor is agreeing to pay the fees for other "(non-legal) services by outside servicing Agents, all of whom shall be engaged, compensated and supervised" by Ms. Narcisse's law firm. (Ex. 4 at 10).

49. In an attempt to rationalize the length of the process, the Agreement cautions that Ms. Narcisse's law firm is unable to estimate the time required for their services leading to a successful result. (Ex. 4 at 14). Yet, it discloses that it "may encompass more than one year" purportedly due to lenders' and processors'—who are routinely understaffed and overburdened— common failure to comply with their various statutory duties. (Ex. 4 at 14).

50. Pursuant to the Service Fee Agreement, the Debtor agreed to pay an initial fee of $1,100.00 in exchange for the services. (Ex. 4 at 12). Thereafter, beginning from June 22, 2019 and all subsequent months—while the file is active—the Debtor was obligated to pay a "residual fee" of $500.00. Id. The Service Payment Authorization Form supplements the Service Fee Agreement and provides for recurring payments authorization not only to the Smith Law Firm, but also "Kealy Law Center/ Law Pay, EPPS, LLC." purportedly just to process the payments provided for under the Agreement. (Ex. 4 at 17).

51. Lastly, the "Electronic Funds Transfer Authorization to Debit Bank Account" allowed "EPPS, LLC and/or its service providers" to withdraw the funds directly from the Debtor's Regions Bank account. Once a withdrawal was finalized, "EPPS-Ph# 800-215-3484" would appear on the Debtor's bank statement in reference to services. (Ex. 4 at 18).

52. Ms. Narcisse and her law firm did not use EPPS as a payment processor at this time or at any other relevant time.

53. A payment reminder was to be sent via text messaging prior to each scheduled payment. Id. None of the documents explain that the initial $1,100 retainer would be transferred to the Kealy Law Center and the recurring payments would be transferred to NVA. Instead, the forms misleadingly indicate that Kealy Law Center and other non-existing entities are merely payment processors for the Ms. Narcisse's firm, while the involvement of the NVA is hidden entirely.

54. On the same date—May 21, 2019—Jay Krueger acting as a purported attorney liaison, reached out to Ms. Narcisse indicating that she has a new client and provided, inter alia, the Debtor's mortgage and contact information. (Ex. 7 at 2-3).

6

55. The Debtor signed the documents on May 21, 2019 and faxed them as requested, which is substantiated by the foreclosure defense scheme's file activity log. (Ex. 5 at 2, Ex. 3 at 12; Ex. 4 at 24). The Debtor also furnished his one-time debit card information for purposes of the $1,100 retainer payment and his Regions Bank account number ending in 7095 for the direct withdrawal of reoccurring $500 payments. (Ex. 3 at 19-22). Unbeknownst to the Debtor, Ms. Narcisse never received the $1,100 retainer.

56. It was the Debtor's understanding that his foreclosure defense was going to be handled by Ms. Narcisse. (Ex. 3 at 14-16). In fact, in all of his dealings with Defendants, the Debtor believed he was assisted by an attorney, notwithstanding the fact that he does not recall ever speaking to Halima Narcisse. (Ex. 3 at 16).

57. On May 22, 2019, an individual identifying herself as Janet Delgado called the Debtor and left a voicemail message indicating the Debtor's $1,100 payment could not be processed due the Debtor's insufficient funds. (Ex. 4 at 24). Delgado indicated during the voicemail message that she was calling on behalf Halima Law Firm. (Ex. 4 at 24).

58. A day later, on May 22, 2019, Delgado updated the activity log indicating that she attempted to reach the Debtor and left a voicemail as well as a text message due to their inability to process the $1,100 payment. (Ex. 4 at 25). Delgado also indicated that she was calling on behalf of "Halima Smith" requesting that the Debtor call her back at: (516) 778-5711. (Ex. 4 at 24-25).

59. The activity log further shows that Delgado was successful in reaching the Debtor who assured her that the funds were sufficient in his account. Id. In addition, the Debtor gave Delgado his one-time debit-card information and $1,100.00 payment was processed and transferred to Kealy Law Center. (Ex. 4 at 24-25).

60. The activity-log notes are corroborated by the Debtor's bank account statements. Particularly, pursuant to the Debtor's Ouachita Valley Federal Credit Union Statement of Account, on May 23, 2019, Kealy Law Center made a $1,100 withdrawal. (Ex. 5 at 4, Ex. 3 at 20). The $500 reoccurring payments were however transferred to NVA. Pursuant to the Debtor's October 2019 Regions Bank Account Statement on October 22, 2019, NVA withdrew $500. (Ex. 5 at 13).

61. Notwithstanding the fact that the Debtor's signed and faxed all documents, on May 30, 2019, the Debtor received another email from an individual identifying herself as Beth Ann reminding him to sign the May 21, 2019 Authorization. (Ex. 4 at 19). Thereafter, Beth Ann followed up with a phone call and left a voicemail message. (Ex. 6 at 2). Pursuant to this voicemail message recording, Beth Ann indicated that she was "work[ing] for [the Debtor's] attorney. The Law Office of Halima Narcisse & Smith" and was following up on her May 30, 2019 email. (Ex. 6 at 2).

62. A month later, on June 21, 2019, the Debtor received an automated email requesting a number of documents including any correspondence from the mortgage lender or the lender's foreclosure attorney. (Ex. 4 at 21).

63. The Debtor also continued receiving emails and text messages reminding him of this reoccurring $500 payments. (Ex. 4 at 23, 88). For instance, on June 21, 2019, the Debtor

received an email indicating that Kelly Nahas updated the activity log indicating that the June payment would be processed on June 25. (Ex. 4 at 22, 24).

64. In light of an upcoming August 7, 2019 sale date, on July 30, 2019, Denise Rodriguez from "Commonwealth Processing" reached out by email indicating that she has been assigned to the Debtor's file and requested that the Debtor execute a number of forms and furnish a number of documents. (Ex. 4 at 28). To indicate the importance of this correspondence, Rodriguez emphasized that the Debtor has "a sale date of 8/7 so time is of the essence if we want them to place that date on hold." Id. In addition, Rodriguez promised to call the Debtor and his lender every Tuesday. Id. The Debtor incorrectly believed that Rodriguez was an attorney working for Ms. Narcisse. (Ex. 3 at 43-44).

65. Sometime thereafter, Rodriguez called the Debtor and left a voicemail claiming that she was "from the law office" and requesting that the Debtor forward her paystubs and bank account statements from July through August along with a 2018 income tax return. (Ex. 6 at 3). While it is not entirely clear as to when—during one of these phone conversations—Rodriguez informed the Debtor that it was going to be necessary to initiate a bankruptcy case and that he would be hearing from Jeffrey Giordano regarding the bankruptcy filing. (Ex. 3 at 39-40).

66. On August 5, 2019, the Debtor received an email from Giordano at bestdebtconsulting@gmail.com, forwarding the Debtor a chapter 13 petition, Schedule D, Application for Individuals to Pay the Filing Fee in Installments, and a Copy of Proposed Order approving the Application and a Statement About the Debtor's social security number ("Bankruptcy Forms"). (Ex. 4 at 36-51).

67. The Bankruptcy Forms were completed by Mr. Giordano before they were sent to the Debtor, with the Debtor's information Mr. Giordano received from Mr. Krueger. Id. In the email, Giordano informed that the Bankruptcy Forms are "all the needed forms" and requested that the Debtor print them out. (Ex. 4 at 36). In case the Debtor had any questions, Giordano indicated he could be reached at: 1 800 595-2916 or at www.stop-foreclosure.net. Id.

68. Giordano also instructed the Debtor to sign the Bankruptcy Forms and file them with the clerk of court. (Ex. 3 at 32). Following the filing, the Debtor was instructed to call Giordano back and provide him with his case number. (Ex. 3 at 33-33).

69. On August 6, 2019, Rodriguez called the Debtor and left another voicemail emphasizing that the foreclosure sale date was set for August 7, 2021 and that she "need[ed] the documents today to try to get it in to try to stop the sale of your home." (Ex. 6 at 2). While Rodriguez was evasive in indicating what she was referring to she repeated that "it has to be taken care of today" and requested that the Debtor call her. (Ex. 6 at 2-3).

70. On the same date, August 6, 2019, the Debtor filed a Chapter 13 petition thereby initiating a case styled In Re Martin, Case No. 19-31260 (Bankr. W.D. La. 2019). The Bankruptcy Forms on the docket, filed by the Debtor, mirror the Bankruptcy Forms emailed by Giordano with one distinction—they bear the Debtor's signature. (See generally Bankr. Case No. 19-31260, D.E. 1, 2, 3). None of the Bankruptcy Forms disclose Giordano's involvement as a bankruptcy petition preparer and fail to make mandatory §

110 disclosures. In addition, the Bankruptcy Forms were signed by the Debtor on August 6, 2019, the date of the frantic voicemail left by Rodriguez. (Bankr. Case No. 19-31260 D.E. 1 at 8).

71. The Debtor filed the petition because he was led to believe it was going to stop the August 7, 2019 foreclosure sale. (Ex. 3 at 33-34). The Debtor believed that Giordano was a member of the foreclosure defense team. (Ex. 3 at 34-35). Once the Debtor filed the petition, he called Giordano, gave him his bankruptcy case number and paid him over the phone either $150 or $250. (Ex. 3 at 35-36). The Debtor's August 2019 Regions Bank Account Statement shows that Jeffrey R. Giordano was paid $195 on August 12, 2019. (Ex. 5 at 9).

72. Unfortunately, because the Debtor believed that his bankruptcy case was being taken care of by Ms. Narcisse, he did not even realize that, on September 17, 2019, the Court dismissed his first bankruptcy case with a 11 U.S.C. § 109(g) finding. (Ex. 3 at 51-53).

73. On October 1, 2019, Rodriguez emailed the Debtor that the processing of the mortgage at issue was transferred to Rushmore Loan Management Services ("Rushmore") and that a new Authorization will be needed (the "October 1, 2019 Authorization"). (Ex. 4 at 53). The October 1, 2019 Authorization mirrored the May 21, 2019 Authorization with one exception. (Ex. 6 at 55). Particularly, therein the Debtor authorized the "Law offices of Halima Narcisse Smith, LLC, Commonwealth Processing Center and all in house servicers, Agents and of Counsel Attorneys to the Firm" to contact Rushmore. (Ex. 6 at 55). After the Debtor reviewed the October 1, 2019 Authorization, he had no reason to believe that Ms. Narcisse's law firm was going to discontinue representing him in the ongoing foreclosure defense process and signed it and faxed it back. (Ex. 3 at 41.)

74. Thereafter, despite the fact that the Debtor had already executed the October 1, 2019 Authorization, Rodriguez followed up with the Debtor on October 8, 2019 and October 29, 2019 (Ex. 4 at 56). Sometime thereafter, Rodriguez called the Debtor and left another voicemail message—again representing that she was "calling from the law office." (Ex. 6 at 3).

75. In this voicemail recording, Rodriguez requested that the Debtor execute and sign the October 1, 2019 Authorization and get her these documents as soon as possible because the Debtor's "account [was] getting ready to get a sale date." (Ex. 6 at 3).

76. On November 12, 2019, Rodriguez emailed again indicating that Rushmore requested a number of documents from the Debtor and emphasized that his "account has been flagged to be issued a sale date." (Ex. 4 at 57).

77. Therefore, the requested documents—Rodriguez emphasized—had to be submitted as soon as possible. (Ex. 4 at 57). Rodriguez followed up on her correspondence on November 19, 2019, December 3, 2019, and December 31, 2019 (Ex. 4 at 84-87).

78. Thereafter, Rodriguez left another voicemail claiming that she was calling "from the Law Office of Halima Smith" and again requesting the executed October 1, 2019 Authorization because the "account has been flagged to be issued a sale date." (Ex. 6 at 3-4).

9

79. On February 25, 2020, Rodriguez emailed the Debtor marking the message, "URGENT Sale Date 3/11/2020" again requesting that the Debtor furnish a number of documents because his "lender has issued another sale date" and that they were "going to try to postpone that sale date." (Ex. 4 at 90).

80. After the "sheriff brought the papers out," the Debtor was not sure as to what has transpired and spoke with Rodriguez, who informed him that she was "going to go in and resubmit it . . . . to go into [the] bankruptcy case and fix something." (Ex. 3 at 52-53). At some point thereafter, Giordano again reached out to the Debtor and left a voicemail. (Ex. 6 at 5). In this voicemail recording, Giordano reminded the Debtor that he had assisted the Debtor with his first August 2019 bankruptcy filing and indicated that Rodriguez emailed him regarding a March 11, 2020 sale date. (Ex. 6 at 5). Emphasizing that the Debtor had to file another bankruptcy case, Giordano requested that the Debtor get a hold of him so that Giordano could update the bankruptcy forms. (Ex. 6 at 5).

81. Because the Debtor ignored Giordano's voicemail, on March 10, 2020, Giordano left another voicemail. (Ex. 6 at 5-6). Giordano begun from explaining that he called a week ago and emphasized that the foreclosure sale was scheduled for tomorrow. (Ex. 6 at 5-6). Assuring that his fee "would not be as much as last time," he maintained that he would merely need to update the forms. (Ex. 6 at 5-6). For this reason, Giordano assured that "we can stop" the foreclosure sale if he contacts him. (Ex. 6 at 5-6).

82. However, after being served with more "papers from the sheriff" the Debtor became upset and reached out to E. Orum Young Law Offices located in Monroe, LA (the "Young Law Firm"). (Ex. 3 at 54). On March 10, 2020, the Debtor filed a petition seeking relief under Chapter 13 of the Bankruptcy Code thereby initiating a case styled as In re Martin, Case No. 20-30325 (Bankr. W.D. La. 2020), this time with the assistance from Young Law Firm.

83. Once the Debtor informed Rodriguez that he retained Young Law Firm, she "got kind of mad . . . and her boss got mad" and attempted to persuade him to discontinue using the Young Law Firm services. (Ex. 3 at 55-56). Rodriguez also offered to provide the foreclosure defense free of charge going forward if the Debtor discontinues using Young Law Firm services. (Ex. 3 at 56).

84. This conversation was followed up by a phone call from an individual named Jay— Jay Krueger—who worked with Rodriguez calling on behalf of the Debtor's "attorney's office Ms. Halima Smith." (Ex. 6 at 4-5). Krueger left a voicemail assuring the Debtor that, notwithstanding the fact that he had filed another chapter 13 bankruptcy with assistance from Young Law Firm, the foreclosure defense scheme was "willing to see the file through without any further charge at all." (Ex. 6 at 4). Such an attempt to obtain a mortgage modification through the foreclosure defense scheme—Krueger kept explaining— would allow the Debtor not to complete "the rest of [his] bankruptcy." (Ex. 6 at 4).

85. Despite these attempts to keep the Debtor in the foreclosure defense scheme, the Debtor chose to use Young Law Firm services and requested that Rodriguez stop withdrawing any other funds from his account. (Ex. 3 at 55-56). Unbeknownst to Mr. Martin, Ms. Narcisse rendered no services to him and had no knowledge that Mr. Martin believed he was her client.

(ECF No. 240, pgs. 16-27(footnotes omitted).) In its effort to show the alleged facts in the Martin case are part of an alleged pattern and larger scheme to defraud consumers who are protected by the Bankruptcy Code under 11 U.S.C. Sections 110, 329, 526 and 528, the UST included in the Complaint a list of 50 Louisiana homeowners who were also "directed/advised and in many instances allegedly pressured, to file bankruptcies, which resulted in at least 39 bankruptcy filings between 2017 and 2020, with some debtors filing multiple cases. In at least 27 of these cases, debtors filed pro se cases prepared by the petition preparers alleged to be working in partnership with the other Defendants." (ECF No. 240, pgs. 27-28.) Pursuant to the foregoing allegations of fact, the UST alleges eight separate counts against the Defendants. While the above allegations listed do not comprise the entirety of the Complaint, as Amended, they are illustrative of the detail of the allegations raised, including specificity.

## Applicable Law

After the pleading stage, a party "may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). As shown above, the Complaint herein "recites a complex set of detailed factual allegations and sets out [eight] separate causes of action under which [the UST] insists that it is entitled to relief" against the Defendants. *Matter of Life Partners Holdings, Inc.*, 926 F.3d 103, 117 (5th Cir. 2019). Rule 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). To satisfy Rule 8(a), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A pleaded claim is plausible if the allegations in the complaint permit the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*, *Matter of Life Partners Holdings, Inc*., 926 F.3d 103, 116 (5th Cir. 2019).

Rule 9(b) imposes a heightened pleading standard in cases where the plaintiff alleges fraud or mistake: particularity. Fed. R. Civ. P. 9(b). The complaint must contain factual allegations stating the "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." *Id*., at 116-117, citing *Tuchman v. DSC Commc'ns Corp*., 14 F.3d 1061, 1068 (5th Cir. 1994) (alteration in original)

(citation omitted). In other words, to properly allege fraud under Rule 9(b), the plaintiff must plead the who, what, when, where, and why as to the fraudulent conduct. *Id*.

The Motions were filed after extensive discovery and on the deadline for filing dispositive motions. It should be noted that the Court allowed these Motions to be filed and heard almost three years into the litigation. Despite the timing, however, the three Motions for Judgment on the Pleadings focus solely on the sufficiency of the allegations in the Complaint. The Complaint, as Amended, attaches 218 pages of exhibits and contains citations to those exhibits throughout.

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). . . . [But] " 'the mere submission of extraneous materials does not by itself convert a Rule [12(c) ] motion into a motion for summary judgment.' " *Delhomme v. Caremark Rx Inc.*, 232 F.R.D. 573, 578 (N.D.Tex.2005), quoting *Finley Lines Joint Protective Bd. v. Norfolk S. Corp.*, 109 F.3d 993, 996 (4th Cir.1997).

When parties submit matters outside the pleadings in support or in opposition to a Rule 12(c) motion, courts are granted "complete" discretion to accept and consider those materials, but they are not required to do so. *United States ex rel. Long v. GSD & M Idea City LLC*, No. 3:11-CV-1154-O, 2014 WL 11321670, at *3 (N.D. Tex. Aug. 8, 2014), quoting *Isquith ex rel. Isquith v. Middle S. Utilities, Inc.*, 847 F.2d 186, 196 (5th Cir.1988). If a court considers extraneous material, it must treat a Rule 12(b)(6) or Rule 12(c) motion as a motion for summary judgment, but if the court refuses to consider the materials, then the motion "remains intact and may be disposed of on its merits under the appropriate standard of review." *Delhomme*, 232 F.R.D. at 578.

For the purpose of these Motions for Judgment on the Pleadings, the Court declines to consider the materials beyond the Motions and the Complaint itself, particularly because the Motions generally, with one exception, do not point to attachments or references to discovery responses in challenging the sufficiency of the Complaint's allegations. Therefore, the Court herein determines whether the Complaint on its own contains sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *York v. Welch*, No. 20-40580, 2024 WL 775179, at *2 (5th Cir. Feb. 26, 2024). Further, no party requested that the Court look beyond the pleadings and convert the motions to motions for summary judgment.

The Court has reviewed the extensive Complaint, as amended, consisting of some 137 paragraphs, 8 Counts and 37 pages. Further, the Court heard over two hours of argument in support of and against the Motions. Considering the Motions for Judgment on the Pleadings, under the standard set forth by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, the Complaint survives the Motions, because it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *York v. Welch*, No. 20-40580, 2024 WL 775179, at *2 (5th Cir. Feb. 26, 2024). This Complaint is not an example of one that contains "threadbare recitals of the elements of a cause of action supported by mere conclusory statements." Further, the Court finds the UST has adequately alleged each Defendant's role in the alleged foreclosure relief scheme regarding the Homeowner Contracts to meet the requirements of Rule 9(b), as the allegations are sufficiently specific to place each of the Defendants on notice of their alleged involvement or lack thereof, in the allegedly fraudulent scheme described. The highly detailed alleged facts in this Adversary Complaint, as Amended, have been stated with extensive background and context sufficient to survive a Motion to Dismiss under the plausibility standard.

Again, the highly detailed factual allegations of the Complaint are set forth above in contrast to the Motion's specific grounds for relief - that the Complaint lacks sufficient facts to "allege who, what, when and where" or "the particulars of time, place and contents of the false representations as well as the identity of the person making the representation and what he obtained thereby." The 5th Circuit's assessment of the third amended complaint in *Matter of Life Partners Holdings, Inc.*, bears repeating as equally applicable in this case: "It can hardly be argued that the third amended complaint fails to allege an actual intent to defraud on the part of the [Defendants]— the complaint **is replete with allegations to this effect, including facts corresponding directly**" to their coordination of efforts to coordinate and prolong a fraudulent foreclosure defense scheme. *Matter of Life Partners Holdings, Inc.*, 926 F.3d at 119 (emphasis supplied).

The Court will enter a separate Order consistent with these reasons.