**SO ORDERED.**

**SIGNED August 28, 2025.**



_____
**STEPHEN D. WHEELIS**
**UNITED STATES BANKRUPTCY JUDGE**

---

## UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

IN RE: GEORGE MARTIN                                    CASE NO. 19-31260
      Debtor


DAVID W. ASBACH
      Plaintiff

VERSUS                                                  ADVERSARY NO. 21-3017

KAREN P. KEALY, ET AL.
      Defendants


## MEMORANDUM OPINION

# Contents

MEMORANDUM OPINION ............................................................................................0

The Complaint ........................................................................................................3

    Jurisdiction ........................................................................................................4

  Venue ..................................................................................................................5

    Pre Trial Proceedings and Preliminary Motions..............................................7

  Dispositive Motions ...........................................................................................7

    The Motions in Limine........................................................................................7

    Motions for Judgment by Default .....................................................................8

    Jeffrey Giordano ................................................................................................9

    Denise Rodriguez .............................................................................................10

    All Provizions Inc. ............................................................................................10

  Summary of the Evidence Adduced at Trial ...................................................11

    The Plaintiff, the Defendants and the Debtor ...............................................12

  United States Trustee, the Plaintiff .................................................................12

  The Defendants ................................................................................................12

  George Martin, the Debtor ..............................................................................15

  Legal Analysis and Conclusions of Law ..........................................................20

  Burden of Proof ...............................................................................................20

  The Defense that the UST Claims are Time Barred.........................................20

  The Defense of Absence of a Joint Venture or Enterprise ............................22

  11 USC § 110 – Penalty for persons who negligently or fraudulently prepare bankruptcy petitions ...........................................................................................................25

  Debt Relief Agencies ........................................................................................28

  Debtor, George Martin, is an "assisted person" under 11 USC 101(3)........30

  The Broader Scale of the Foreclosure Defense Scheme................................33

  Evidence of Efforts to Conceal the Foreclosure Defense Scheme................46

  Defendants' Liability under Section 329(b)....................................................48

    Karen P. Kisch .................................................................................................52

    Halima Narcisse Smith....................................................................................58

Mr. Krueger and Ms. Rodriguez ............................................................................66

    The Defendants are all found to be Bankruptcy Petition Preparers and Debt Relief Agencies, Individually and Collectively .................................................................68

  Bankruptcy Petition Preparers .......................................................................68

1

**Defendants are a Debt Relief Agency**..................................................................72

**Damages, Penalties, Sanctions and Injunctive Relief** .................................76

**Violations and Damages under §110**.............................................................80

**Damages, Sanctions and Civil Penalties Under Sections 526, 527 and 528**.....................................83

**Defendants Violated Section 528**..................................................................84

**Damages under § 526(c)(2)** .........................................................................84

**Civil Penalties under § 526(c)(5)(B)** ...........................................................86

**Alternative Relief Sought for Abuse of the Bankruptcy Process** ...................93

**A Word about MARS** .....................................................................................94

**The Nationwide Pattern of Conduct and Abuse**..........................................95

**Conclusion**....................................................................................................96

**Appendix 1 – UST Ex. 187, ECF No. 437-39, pp. 32-51** .............................97

**Appendix 2** ....................................................................................................99

**UST Ex. 147, ECF No. 443-1**.......................................................................99

## The Complaint

The United States Trustee filed an Adversary Complaint against Karen P. Kealy, also known as Karen P. Kisch, the Kealy Law Firm, PLLC, the Kisch Law Firm, PLLC, Steven Nahas, NVA Financial Services, LLC, US Auto Liquidators LLC, Jay Krueger, Jeffrey Giordano, All Provizions Inc., Denise Rodriguez, Halima T. Narcisse also known as Halima Narcisse Smith, and the Law Office of Halima Narcisse Smith, LLC.[1][2][3]  The United States Trustee ("UST") alleged eight counts of Bankruptcy Code violations against this group of Defendants for their individual and/or collective roles in connection with events leading up to the filing of a deficient Petition for Relief under Chapter 13 by Debtor, George Martin.  The case was dismissed without relief, and following some administrative issues, was reopened on Motion of the UST.[4]

The UST alleged that Defendants caused Martin to file a deficient "*pro se*" Petition for Relief to stop an impending foreclosure on his home after they were unsuccessful in prolonged pre-petition services to obtain home mortgage arrearage relief.  The UST alleged this was not an isolated practice but was rather an extensive nationwide foreclosure defense scheme beginning in 2017, by which the Defendants abused the Bankruptcy process by directing hundreds of their distressed homeowner clients to file incomplete *pro se* bankruptcy petitions using the Defendants' designated typists/petition preparers solely to prolong the Defendants client billing under the pretense of gaining additional time to complete the loan modification process and avoid foreclosure.  The UST alleged that since 2017, the Defendants caused Martin and 9 other debtors to file 12 putative *pro se* Petitions in the Western District of Louisiana; and by doing so, they violated 11 U.S.C. §§ 110, 329, 526, 528 and abused the Bankruptcy process for which the UST seeks disgorgement of fees, imposition of fines and sanctions, and assessment of damages against the Defendants. The UST also seeks an injunction permanently enjoining Defendants, and any person or entity acting in concert with them, from providing debt relief services or bankruptcy assistance, acting as bankruptcy petition preparers, filing bankruptcy petitions, or providing any

---

[1] The Complaint was Amended 3 times. ECF Nos. 36, 96 and 240. Herein, "the Complaint," refers to the Third Amended Complaint at ECF No. 240.
[2] At the time of this trial, Karen P. Kealy uses her married name, Karen P. Kisch.  She also changed the name of her legal entities several times during the time period relevant to this Adversary Proceeding.  Although her name may appear as "Kealy" in referenced exhibits in evidence, the Court for the purposes of this opinion will hereinafter refer to this Defendant as "Ms. Kisch."
[3] Since the filing of this Adversary Proceeding, Halima T. Narcisse was also known as Halima Narcisse Smith, Halima Narcisse, and was remarried before the trial began. The Court for the purposes of this opinion will hereinafter refer to this Defendant as "Ms. Narcisse."
[4] Case No. 19-31260, ECF Nos. 11 and 12.

services relating to preparation of documents to be filed in the United States Bankruptcy Court for the Western District of Louisiana. Counts I through VIII of the Complaint fully set forth the allegations of the UST which allegations this Court finds are clearly and convincingly supported by the evidence adduced at trial.

Beginning February 3, 2025, the Court conducted an eight-day trial admitting over 300 exhibits consisting of over 10,000 pages. The parties requested that the trial testimony be transcribed prior to closing arguments. Post trial briefs were submitted May 9, 2025 and closing arguments heard on May 13, 2025, after which the matter was taken under advisement.

Pursuant to Federal Rule of Bankruptcy Procedure 7052, the Court makes the following findings of fact and conclusions of law.[5]

## Jurisdiction

The Court has jurisdiction over the parties to and subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157. The Complaint alleges causes of action under 11 U.S.C. §110, §329, §526, and §528 of the Bankruptcy Code, and as such, it arises in the Bankruptcy Code and involves matters concerning causes of actions and substantive rights that are either provided by these Code provisions or could only arise in the context of a bankruptcy case. Therefore, this matter is a core proceeding in which this Court may enter judgment, final orders and decrees pursuant to 28 U.S.C. § 157. To the extent any non-core claims or counterclaims have been asserted in the above-captioned adversary proceedings, the parties have consented to this Court's jurisdiction to hear and determine all on a final basis. To the extent necessary, the parties have impliedly consented to the entry of a final judgment by this Court resolving all contested matters, claims, and counterclaims. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1947-48 (2015) (holding that a party impliedly consents to adjudication when the party "voluntarily appear[s] to try the case" with knowledge of the need for consent and without affirmatively refusing to provide it).[6]

---

[5] To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted and shall be construed and deemed as findings of fact.

[6] NVA and Nahas alleged in their Answer to the Third Amended Complaint that they do not consent to the bankruptcy court entering an order or judgment as to the specific requests for relief sought by the Plaintiff. (ECF No. 249, pp. 2-3.) To the extent this is an objection to the Court's authority to enter final orders/judgment in this case under *Stern v.*

**Venue**

Although defendants NVA and Nahas, and to a lesser extent, Kealey and Krueger, raised venue exceptions related to admission of evidence of Defendants' acts in cases not pending before this Court, venue properly rests before this Court pursuant to 28 U.S.C. §1408 and 1409(a), as the Complaint alleges a cause of action under Title 11 arising in Mr. Martin's Bankruptcy Case No. 19-31260 commenced in the Western District of Louisiana. Further, the Debtor's principal residence has at all times been in the Western District of Louisiana, including the 180 days immediately preceding the petition date.[7] Notwithstanding Counsel's admission at oral argument of Motions in Limine that this Court is a proper venue in which to adjudicate the cause of action arising in the Martin case, the Court will again address the argument raised by the Defendants regarding a lack of proper venue in their respective Post-Trial Briefs.[8]

In furtherance of the UST allegation that the Defendants engaged in a pattern of bankruptcy abuse that resulted in the filing of many deficient *pro se* Petitions throughout the United States, the UST alleged in the Complaint that "at least 50 Louisiana homeowners were directed/advised and in many instances pressured, to file bankruptcies, which resulted in at least 39 bankruptcy filings between 2017 and 2020, with some debtors filing multiple cases," and 27 of these being *pro se* cases from the Western, Middle and Eastern Districts of Louisiana.[9] Of those 27 Louisiana homeowner clients to file bankruptcy with preselected petition preparers, twelve cases were filed in this District. After extensive discovery, Defendants produced business records that revealed the

---

*Marshall*, 564 U.S. 462 (2011), that issue was raised in the Answer to Amended Complaint (ECF No. 111) and in a prior Motion for Summary Judgment by NVA at ECF No. 126  Despite the fact that the claims for relief alleged herein arise in and under the Bankruptcy Code and are therefore, not *Stern* claims, because the Motion for Summary Judgement was filed, the Court raised the issue at a preliminary pretrial conference on February 28, 2023, and pursuant to that conference, issued an Order permitting all parties to file and notice for a hearing on April 4, 2023 pleadings to Object to this Court's constitutional authority to enter final orders and/or judgments in this matter pursuant to *Wellness Intl Network, Ltd. v. Sharif*, 575 U.S. 665, 135 S.Ct. 1932 (2015), and Ordered that failure to timely raise the objection would be deemed consent to this Court's authority to enter final orders and judgments subject to the Federal Rules of Appellate Procedure and the Federal Rules of Bankruptcy Procedure. (ECF No. 130.)  No party filed a pleading to raise such an objection and Counsel for NVA and Nahas subsequently filed a Notice of Withdrawal of its Motion for Summary Judgment at ECF No. 136. Accordingly, despite the objection being repeated in the NVA and Nahas Answer to Third Amended Complaint, the Court finds NVA and Nahas have knowingly and voluntarily waived this issue by express (the Notice of Withdrawal) and implied consent to adjudication by the bankruptcy court under *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. at 679 (2015).

[7] Joint Ex. 1, ECF No. 465, ¶2; Case No. 19-31260.

[8] Transcript, ECF. No. 489, p.24, ll. 17-18, ECF Nos. 500, pp. 2-3 and 504, p.63.

[9] ECF No. 240, pp. 27-29, ¶¶86-95.

clients and number of *pro se* Petitions filed nationwide.[10]  The UST offered summary evidence regarding 186 clients who filed bankruptcy cases in other states.[11]

Counsel for Defendants raised what they defined as the "venue" issue as grounds for exclusion of the evidence in Motions in Limine, arguing the Court could not consider evidence of conduct that occurred outside the Western District of Louisiana.  The Court denied those Motions after oral argument finding the evidence admissible as relevant to the UST's cause of action under Section 526(c)(5), because the statute requires the Court to determine whether Defendants violated the Code in Mr. Martin's case *and* whether Defendants "engaged in a clear and consistent pattern or practice of violating this section." To determine whether there is "a clear and consistent pattern or practice," the Court must consider any evidence of a pattern of conduct regardless of where it is alleged to have occurred.[12]

Defense Counsel argued that a cause of action under Section 526 that "expands" to bankruptcy cases outside of the Western District doesn't comply with the venue rule. The Court rejects this mischaracterization of the statute.  Venue is proper when the proceeding arising under Title 11 is filed in the district where the related case under Title 11 is pending. (28 U.S.C. Section 1409(a)).  Evidence in support of an element of the cause of action stated in the Complaint is limited only by the exclusions and exceptions under the Code of Evidence, not by the venue provision of 28 U.S.C. § 1409. This Adversary Proceeding relates to the above captioned Bankruptcy Case of George Martin.  The UST has repeatedly stated that it does not seek recovery for "actual damages" suffered by homeowners residing outside this District.[13]  Actual damages belonging to those debtors may be property of the estates over which the district courts in those cases would have exclusive jurisdiction under 28 U.S.C. §1334(e).  However, the Defendants' conduct outside this District, nationwide, remains relevant in determining any appropriate sanctions and injunctive relief if warranted in this adversary proceeding upon proof of an act or a

---

[10] UST Impeachment Ex. 12, ECF No. 474, Business records of the Defendants admitted into evidence with no Objection. Trial Transcript, ECF No. 495, pp. 81-82. The Parties stipulated that all documents produced by all parties, pursuant to formal discovery conducted in this course of this adversary proceeding, are true and correct copies of the original documents. Joint Ex. 1, ECF No. 465, ¶29.

[11] UST Ex. 147, Doc. No. 443-1.

[12] The Court addresses the Motions in Limine later herein.

[13] *See eg.* ECF No. 318, p. 2.

6

continuing pattern of conduct violating § 526.  Accordingly, the Court finds, and has previously held, that venue for this Adversary Proceeding is proper before this Court.

### Pre Trial Proceedings and Preliminary Motions

**Dispositive Motions**

On July 1, 2024, Nahas filed a Motion for Summary Judgment and on August 31, 2024, Defendants Karen P. Kealy, Kealy Law Firm, PLLC, Kisch Law Firm, PLLC, Jay Krueger and US Auto Liquidators, LLC filed a Motion for Summary Judgment.[14]

Also on August 31, 2024 Nahas and NVA Financial filed a "Motion to Dismiss Adversary Proceeding on the Pleadings" and Defendants Kealy, Kealy Law, and Kisch Law filed a Motion for Judgment on the Pleadings. On the same date Krueger filed his Motion for Judgment on the Pleadings.[15]

After the filing of responses by the UST, hearings were held on August 28, 2024, with a final hearing on October 23, 2024.  The Court issued written reasons denying the Motions for Summary Judgment on October 31, 2024. Likewise the Court issued written Reasons denying the Motions for Judgment on the Pleadings on October 31, 2024. The Defendant Kealy, et al, and Krueger, lodged an interlocutory appeal of the Order denying the Motion for Judgment on the Pleadings on November 12, 2024. Nahas and NVA likewise filed a Notice of Appeal on November 14, 2024.[16]

All defendants filed Motions for Leave to Appeal.  However, the District Court denied the Motions for Leave to Appeal the Interlocutory Bankruptcy Orders by Memorandum Order dated December 11, 2024.[17]

**The Motions in Limine**

Defendants filed Motions in Limine to exclude evidence of their alleged contact with or involvement in multiple bankruptcy cases in Louisiana outside of the Western District of Louisiana and in other states.  While some of the defendants, Nahas and NVA, consistently argued the issue was also one of venue, the Court finds that the admissibility of the facts arising out of these cases

---

[14] ECF Nos. 304 and 337.
[15] ECF Nos. 327, 329 and 333.
[16] ECF Nos. 355, 356, 380, 382, 383, 391, 394 and 397.
[17] ECF Nos. 396, 398 and 401; ECF No. 413.

was an issue under the Federal Rules of Evidence and 11 U.S.C § 526 regarding the Court's determination of whether there was "a clear and consistent pattern or practice" on the part of the defendants either individually or as a group of one or more or all, acting in concert to abuse the bankruptcy process and violate § 526.

"Motions in limine allow a trial court to make a pretrial ruling on the admissibility and relevance of evidence." *Young Again Prods., Inc. v. Supplement Spot, LLC (In re Supplement Spot, LLC)*, No. 07-03019, 2009 WL 2006834, at *9 (Bankr. S.D. Tex. July 8, 2009) (citations omitted). "A motion in limine that seeks to exclude broad categories of evidence is rarely granted." *Id.* (citations omitted). Indeed, "[u]nless the evidence at issue is clearly inadmissible on all potential grounds, it should not be excluded in limine." *Id.* (citations omitted).

Fed. R. Evid. 403 provides, "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." While the Court maintains discretion to exclude relevant evidence if its probative value is substantially outweighed by its prejudicial value, that discretion is limited. The Firth Circuit cautions Courts to "sparingly" exercise that discretion. *Herrington v. Hiller*, 883 F. 2d 411, 414 (5th Cir. 1989). For the reasons stated on the record at the commencement of the trial, the Court denied the Defendants' *Motions in Limine to Exclude Evidence of cases* and their involvement therein in cases other than the George Martin case.[18]

### Motions for Judgment by Default

In the four-years leading to trial, the UST filed Motions for Clerk's Entry of Default as to three Defendants, which were entered into the record, but the Court deferred the Motions for Judgment by Default to the trial. Rule 55 of the Federal Rules of Civil Procedure, made applicable in adversary proceedings by Fed. R. Bankr. P. 7055, governs applications for default and default judgment. This involves sequential steps of default, entry of default, and default judgment. A default occurs "when a defendant has failed to plead or otherwise respond to the complaint within the time required by the Federal Rules." *New York Life Insurance Company v Brown*, 84 F3d 137, 141 (5th Cir 1996). Rule 55(a) provides:

---

[18] Trial Transcript, ECF No. 489, pp. 42-49.

(a) **Entering a Default.** When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default.

Once a default is entered, the Court may enter a default judgment in accordance with Rule 55(b)((2).

When the UST filed its initial Motions for Default, the Clerk entered its Defaults and sent Notices to the Defendants of the hearing for the Court to consider the evidence and enter its Judgment. However, the Court in this Adversary Proceeding struck the Clerk's Notices of the Evidentiary Hearings and left the Motions for Default to be considered at trial based on the ruling in *Escalante v. Lidge*, 34 F.4th 486, 495 (5th Cir. 2022)("When a case involves multiple defendants, courts may not grant default judgment against one defendant if doing so would conflict with the position taken by another defendant."). Thereafter, all Defendants were served the Order setting the trial of this matter as to all defendants. (ECF Nos. 266, 276.)

### Jeffrey Giordano

On March 5, 2024, the UST Requested a Clerk's Entry of Default against Jeffrey Giordano for failure to Answer the Third Amended Complaint and the Clerk's Entry of Default was entered.[19] Although Giordano did not Answer the Complaint or obtain Counsel, he made an appearance at a status conference on November 15, 2022, cooperated with discovery, was deposed, appeared at trial and testified. He never moved to set aside the Clerk's entries of Default. Nevertheless, his appearance and testimony at trial, including his sincere and contrite apology for his role in the foreclosure defense scheme, are of record in the case.[20]

The Court advised Mr. Giordano of his right to proceed *pro se* on February 5, 2025:

With that, you are also a *pro se* defendant in these proceedings. To my knowledge, you have not retained counsel, you have not filed responsive pleadings, and the Office of the U.S. Trustee has actually moved for default judgment against you, an entry of default. Is it your position you wish to continue *pro se*?

THE WITNESS: That's correct.[21]

---

[19] ECF Nos. 259, 260, 261.
[20] Trial transcript (Giordano), ECF Nos. 491, 492.
[21] Trial transcript (Giordano), ECF No. 491, p. 96, ll. 15-21.

Considering his appearance, his representations in his defense *pro se*, including the entirety of his trial testimony over two days, the Court will enter a Judgment as to Mr. Giordano based on the clear and convincing evidence adduced at trial, as discussed further herein.[22]

### Denise Rodriguez

On March 5, 2024, the UST Requested a Clerk's Entry of Default against Denise Rodriguez for failure to Answer the Third Amended Complaint. The Clerk's Entry of Default against Rodriguez is entered at ECF No. 258. Rodriguez served her *pro se* Answer on the UST on January 7, 2023 and later filed it into the record on May 8, 2023.[23] Rodriguez never made another appearance in the adversary proceeding. The Clerk's entry of Default at ECF No. 258 has never been set aside. On March 8, 2024, Rodriguez was served with the Order setting trial and did not appear. (ECF Nos. 266, 276.) Accordingly, the Court will enter Judgment by Default against Denise Rodriguez based on the evidence adduced at trial, discussed further herein.[24]

### All Provizions Inc.

On January 22, 2024, the UST's Third Amended Complaint named All Provizions Inc. a Defendant and executed service and summons as to All Provizions Inc. on January 26, 2024.[25] No Answer was ever filed by All Provizions Inc. On March 5, 2024 the UST Requested a Clerk 's Entry of Default against All Provizions Inc. for failure to file an Answer.[26] The Clerk's Entry of Default against All Provizions Inc was entered and no Answer was ever filed by All Provizions Inc; no appearance was made in the adversary proceeding, and no counsel appeared on its behalf. The Clerk's Entries of Default were never set aside.[27] On March 8, 2024, All Provizions Inc. was served the Order setting trial and no one appeared on its behalf.[28] However, based on the uncontroverted evidence adduced at trial and admitted by Joint Stipulation of the parties, including

---

[22] ECF Nos. 491-492.

[23] ECF No. 166.

[24] See : UST Exs. 9, 15-16, 20- Ms. Rodriguez's correspondence to Mr. Martin (ECF Nos. 432-9, 432-15-16, 20), UST Ex. 13, M4A File Voicemail message left by Ms. Rodriguez to Mr. Martin's Phone (ECF No. 432-13); UST Ex. 18, M4A File Ms. Rodriguez's voicemail recording indicating she was calling from Law Office about new Third Party Authorization (ECF No. 432-18); UST Ex. 19, M4A File Ms. Rodriguez's voicemail recording indicating she was calling from the Law Office of Halima Smith (ECF No. 432-19); UST Ex. 88, Referral of George Martin to Giordano showing it was copied to Denise (Neecy) Rodriguez <deniser.foreclosuredefense@gmail.com, ECF No. 436-59; Trial Testimony of Giordano at ECF No. 494, pp. 143-144, 147, 149; Trial Testimony of Kreuger at ECF No. 492, pp.219-225, ECF No. 493, pp. 24-25, 52; Trial Testimony of Nahas at ECF No. 494, pp. 163-168.

[25] ECF Nos. 240, 241, 245, 246.

[26] ECF No. 257.

[27] ECF Nos. 262 and 263.

[28] ECF Nos. 266 and 276.

the 1099 tax forms showing payments from NVA to All Provizions Inc., and testimony at trial, the Court finds sufficient evidence linking All Provizions Inc. to the actions of the other named Defendants and payments made from NVA to All Provizions, Inc. for Ms. Denise Rodriguez.[29] Based on the evidence adduced in support of the Complaint, the Court will enter Judgment as to All Provizions Inc.

### Summary of the Evidence Adduced at Trial

Evidence was adduced over the course of an eight-day trial from eight witnesses.[30] The parties introduced a multitude of exhibits by joint stipulation. Given the huge volume of exhibits, the Court is thankful for the parties' willingness to stipulate when possible. "Joint Fact Stipulations for Trial" were introduced as Joint Exhibit 1 and the parties stipulated "to the accuracy and authenticity of every document that was produced to the United States Trustee."[31] The UST filed his trial exhibit list, including docket entry numbers at ECF No. 467 consisting of 11 pages and listing some 287 exhibits. The parties stipulated to the admission of 156 exhibits, and defendants did not object to the admission of many of the other exhibits. The Court notes that the majority of the exhibits were business records and internal communications, financial records, client records and attorney contracts.

Defendants Narcisse and Narcisse Smith, LLC filed an Exhibit list at ECF No. 435. All exhibits 1-30 were admitted into evidence with the exception of number 22 which exhibit was already admitted as UST exhibit 35.

Defendants Nahas and NVA filed their exhibit list at ECF No. 430. Counsel for Nahas and NVA decided not to introduce any of the exhibits listed and numbered 1-15 on ECF No. 430.[32]

Defendants Kealy/Kisch, Kealy Law, Krueger, and US Auto Liquidators filed their exhibit list at ECF No. 428, however, none of the listed exhibits were offered for admission during trial.

---

[29] UST Ex. 205, ECF No.438-8; Trial Testimony (Nahas), ECF No. 494, p. 164 - 165.
[30] Testimony of George Martin (Transcript, ECF No. 489); Testimony of R. Joseph Moore (Transcript, ECF No. 489); Testimony of Halima Narcisse Smith (Transcript, ECF Nos. 490, 491); Testimony of Jeffrey Giordano (Transcript, ECF Nos. 491, 492); Testimony of Steven Nahas (Transcript, ECF Nos. 492, 494, 495); Testimony of Samantha Scott (ECF 492, 494, 495, 496); Testimony of Jay Krueger (Transcript, ECF Nos. 492, 493, 494, 496); Testimony of Karen Kealy Kisch (Transcript, ECF No. 495).
[31] Joint Ex. 1, ECF Nos. 465; Trial transcript, ECF No. 489, p. 49, ln 20 - p. 50, ln 25.
[32] Trial transcript, ECF No. 496, p. 65, l. 16.

The *pro se* defendant, Giordano, offered no exhibits. The *pro se* defendants, Rodriguez and All Provisions, Inc. failed to appear or offer a defense or any exhibits.

Finally, the UST offered impeachment exhibits during trial. UST Narcisse Impeachment Exhibits 1-12 were admitted; UST Nahas Impeachment Exhibit 1 was admitted; and UST Krueger Impeachment Exhibit 1 was admitted. Additionally, but not originally listed, UST Exhibits 288 and 148(A) were also admitted during trial.

### The Plaintiff, the Defendants and the Debtor

### United States Trustee, the Plaintiff

David W. Asbach is the duly appointed Acting United States Trustee for Region 5. He is an official of the United States Department of Justice, appointed by the Attorney General, to supervise the administration of bankruptcy cases and trustees. 28 U.S.C. §§ 581-589.

The UST has standing to raise, appear and be heard on any issue in any case or proceeding arising under Title 11 of the United States Code. 11 U.S.C. § 307.

### The Defendants

Steven Nahas lives in Clifton, Virginia and has been the sole member of NVA Financial Services, LLC since its inception. He testified that he had a high school education and is not an attorney. Nahas is the President of NVA Financial Services, LLC and testified he owned and managed several entities associated with what he termed as "this venture" and that he managed rental properties. He testified that he had personal knowledge in broad terms of the manner by which NVA conducted its business.[33] Mr. Nahas had been involved in almost all aspects of the business at one time or another, including manager, stating, "I've done it all at some - - one point or another I did it all." [34]

Mr. Nahas testified that he created his loan modification business, NVA, in 2012 based upon personal experience with mortgage loan companies. He testified, "I was a salesperson . . . In the beginning we didn't have our own network of attorneys, we were just a sales team and we -- well, we wrote files for other firms, we didn't have our own processors, our own attorneys, our own network."[35] NVA advertised on the internet and television commercials; as the business grew

---

[33] Trial transcript (Nahas), ECF No. 492, pp. 6-9.
[34] Trial transcript (Nahas), ECF No. 492, p. 9, ll. 17-19.
[35] Trial transcript (Nahas), ECF No. 492, p. 10, ll. 18-21.

he gradually recruited and developed a network of attorneys to assist clients that are in foreclosure or in danger of foreclosure.[36] When asked "who is actually doing the work," he replied "the whole team of NVA Financial, the sales people, processors, etc."[37] He testified that he recruits attorneys and that NVA conducts business in approximately 30 states.[38] The building of this "attorney network" was necessary in order for NVA to be compliant with the "MARS rule," to allow NVA to charge the homeowner clients upfront fees.[39] The Federal Trade Commission prohibits a company from collecting fees for providing mortgage assistance until it has successfully obtained mortgage relief on behalf of a client, but provides a narrow exception to the prohibition against advanced fee collection for attorneys and law firms in certain circumstances.[40]

Karen P. Kisch is an attorney who lives in Houston, Texas, and is/has been the owner of several law firms, including Kealy Law Firm PLLC, Kealy Law Center, and Kisch Consumer Law PLLC d/b/a Kisch Consumer Law.[41] Mr. Nahas has known Ms. Kisch approximately ten years. He testified that Ms. Kisch initially became local counsel for NVA in 2017, and he ultimately promoted her to "Managing Attorney" for NVA. [42] Ms. Kisch also acted as "payment processor"

---

[36] Trial transcript (Nahas), ECF No. 494, pp. 181-182; Trial transcript (Nahas), ECF No. 492, p. 10.

[37] Trial transcript (Nahas), ECF No. 494, p. 140, ll. 6-7.

[38] Trial transcript (Nahas), ECF No. 494, p. 140, ll. 9-15.

[39] Trial transcript (Nahas), ECF No. 494, pp. 140-141; Mr. Nahas is referring to the Mortgage Assistance Relief Services ("MARS") regulations, to which the Federal Trade Commission added a new rule in 2011. Under this MARS Rule, a firm may not collect fees for providing mortgage assistance until it has successfully obtained mortgage relief on behalf of a client. *See* 12 C.F.R. § 1015.5. There is a narrow exception to the prohibition against advanced fee collection. A law firm may collect advance fees under certain circumstances. 12 C.F.R. § 1015.7.

[40]*See In re Anderson*, No. 15-33603, 2017 WL 1066563, at *5 (Bankr. S.D. Tex. Mar. 17, 2017). The purpose of the rule is best explained as critical to deterring consumer fraud:

> The advance-fee ban was aimed at "discourag[ing] providers from making deceptive claims" and "provid[ing] additional protection against continued deception in th[e mortgage assistance relief services] industry." Indeed, the National Association of Attorneys General described the advance-fee ban as "critical" and "the linchpin of effective deterrence of fraudulent practices" by MARS providers because "[t]he collection of advance fees virtually ensures that consumers will have no recourse when consultants fail to perform services, as is generally the case." Consumer advocates, community organizations, and legal service providers also stated that a ban was "necessary to ensure that providers deliver the results they promise and to curb deception and abuse." *Id.* at 75, 114. *Fed. Trade Comm'n v. Lake*, 647 B.R. 213, 218 fn.2. (C.D. Cal. 2022)(citations omitted)(FTC brought non-dischargeability adversary complaint against debtor who knowingly participated in scheme to defraud consumers seeking mortgage relief.).

The Court will further address MARS later in these Reasons.

[41] Trial transcript (Kisch), ECF No. 495, pp. 85-86.

[42] Trial transcript (Nahas), ECF No. 494, p. 141, ll. 14-24; Although Ms. Kisch denied the description of her role, stating: "I was never a managing attorney. I've never received pay to be an attorney inside that firm or anything like that," she explained her nuanced view of her duties for NVA as being the "middle man" between NVA and local counsel, aiding "local counsel through things that they're not used to doing in foreclosure defense" if "there had been some sort of complaint filed." Trial transcript (Kisch), ECF No. 495, p. 88, ll. 23 – p. 89, l. 3, pp. 111-116.

for NVA and collected the fees paid by homeowner clients through her "Law Pay" account and remitted the payments collected to NVA, retaining her 10% of the fees paid by the NVA clients plus an additional $1,500 per week for payment processing.[43]

Jay Krueger lives in Fort Washington, Maryland and has worked as an "independent contractor" for NVA for ten years.[44] His current role is "attorney liaison," but Nahas testified that "Jay" [Mr. Krueger] has the most overarching knowledge, … of the "day-to-day nuts and bolts, clients, processing on files."[45] Krueger is also the sole member of U.S. Auto Liquidators, LLC, which the parties stipulated is Mr. Krueger's alter ego.[46] It was registered in Vero Beach Florida in 2005, and though administratively dissolved in 2010 with the Florida Department of State, it still maintains bank accounts, from which Mr. Krueger paid his personal expenses.[47] NVA paid the salary owed for Mr. Krueger's compensation in years 2019-2024 directly to U.S. Auto Liquidators, LLC.[48]

Defendants testified that Denise Rodriguez is a former NVA senior case processor who worked remotely in New York as an "independent contractor" as client processor and supervisor for homeowners applying for home mortgage modifications, but in 2019 and 2020, NVA paid compensation owed to Rodriguez directly to her corporate entity, All Provizions, LLC.[49]

Halima Narcisse an attorney who lives in New Orleans, Louisiana and is the sole owner of her law firm, the Law Office of Halima Narcisse Smith. She was hired by NVA in 2017 as local counsel for Louisiana.[50]

Defendant Jeffery Giordano, a bankruptcy petition preparer, became - NVA's "go to person" in May 2019, to prepare bankruptcy Petitions for homeowners, referred by the Defendants, needing to file a "bare bones bankruptcy petition."[51]

---

[43] UST Ex. 287, ECF No. 442-12, p. 4; Trial transcript (Nahas), ECF No. 494, pp. 146-148; Trial transcript (Kisch), ECF No. 495, p. 130.
[44] Trial transcript (Krueger), ECF No. 492, p. 171.
[45] Trial transcript (Nahas), ECF No. 492, pp. 10-11; Trial transcript (Krueger), ECF No. 492, p. 172.
[46] Trial transcript, ECF No. 494, pp. 6-7.
[47] UST Exs. 203, ECF No. 438-6 and 204, ECF No. 461; Trial transcript (Krueger), ECF No. 494, pp. 87-89.
[48] Trial transcript (Nahas), ECF No. 494, p. 171-172.
[49] UST Ex. 205, ECF No. 438-8; Trial transcript (Nahas), ECF No. 494, pp. 163-165; Trial transcript (Krueger), ECF No. 492, p. 219.
[50] Trial transcript (Nahas), ECF Nos. 492, p. 10, 494, p. 177; Trial transcript (Narcisse), ECF No. 490, pp. 11-13.
[51] Trial transcript (Giordano) ECF No. 491, pp. 102, 109.

As further discussed herein, the testimony and evidence clearly and convincingly demonstrated that the defendants, Nahas, NVA, Krueger, Kisch and the Kisch entities, Narcisse and the Narcisse entity, Giordano and Rodriguez, all collaborated in the "referrals" of homeowner clients to bankruptcy petition preparers to file putative *pro se* "bare-bones" bankruptcy cases as a part of a broader foreclosure defense scheme.

### **George Martin, the Debtor**

George Martin, at the time of the trial and currently, is a debtor in a voluntary Chapter 13 case filed August 6, 2019, which case, at all times relevant herein, has remained assigned to this Court.[52]

Mr. Martin testified that he had an eighth grade education stating "I think."[53]  He worked at WalMart unloading trucks at the time he filed the bankruptcy case but had since retired.  The Court notes that throughout his testimony, Mr. Martin had difficulty reading exhibits, understanding questions and responding to same.  However, Mr. Martin was able to recall the facts and circumstances by which he came to be a homeowner client of NVA Financial and its "attorney network."[54]  He remains the owner of his home located at 103 Hilltop Drive in West Monroe, Louisiana where he lives with his daughter.[55]

At some point Mr. Martin became delinquent on his home mortgage payments to the lender, Gateway Mortgage, and on May 20, 2019, he was served a notice of a pending foreclosure sale set for August 7, 2019.[56]  Martin contacted NVA for assistance with his home loan.  His initial NVA contact was Kelly Spann.[57]  While he did not recall where he found the number advertised, he contacted NVA and spoke with Kelly Spann, he testified:

---

[52] While multiple defendants alleged in multiple pleadings that the Chapter 13 bankruptcy case was dismissed September 17, 2019, they fail to acknowledge that the case was reopened November 15, 2019, closed again on January 10, 2020 and reopened, again, on June 15, 2020. Case No. 19-31260.
[53] ECF No. 489, p. 69, l. 3.
[54] Trial transcript (Nahas), ECF No. 492, p. 10, ll. 10-11.
[55] Trial Transcript (Martin), ECF No. 489, p.69, ll. 11-17; Joint Stipulation Ex. 1, ECF No. 465, provides: 2. At all times relevant to this litigation, Debtor George Martin's "principal residence" was 103 Hilltop Drive, West Monroe, Louisiana 71291.
[56] UST Ex. 10., ECF No. 432-10, Trial Transcript (Martin), ECF. No. 489, pg. 74.
[57] Trial Transcript (Krueger), ECF No. 492, p. 201.

> **"I don't know how I got that number, but I called Ms. Kelly and she said, 'Don't worry about it. I'm going to take care of everything,' then she -- that was -- and she -- she just take my information and that was it."[58]**

Spann sent Mr. Martin the retainer agreement for his execution via email.[59] Mr. Martin testified that he believed "Ms. Kelly" was connecting him to an attorney and that he was contracting with Ms. Narcisse to serve as his counsel.[60] The agreement attached to the email included a cover letter that congratulated him on his "first step toward saving [his] home" and the instruction to "call your legal assistant to help you in filling out this package," with the letterhead, "Law Offices of Halima Narcisse Smaith, LLC."[61]

Mr. Martin digitally executed the documents sent to him.[62] Mr. Martin paid an $1,100 retainer on May 22, 3019; the record reflects it was withdrawn from his bank account by Kealy Law Center on May 24, 2019.[63] Thereafter, Mr. Martin's account was debited $500 every month in withdrawals made by NVA from June 25, 2019-February 25, 2020.[64] When asked why these payments were withdrawn from his account, he stated, "Well, to be saving my house from bankruptcy," and further explained that he thought the payments were "supposed to be payment on my house."[65]

Mr. Martin received several emails and voice messages from various members of the NVA team, which were introduced into evidence, including calls from "Ms. Kelley," "Beth N." and Denise Rodriguez.[66] On June 28, 2019, Mr. Martin received a voice message on his phone from someone identifying herself as "Beth N.," stating, "I work for your attorney, the Law Office of Halima Narcisse and Smith and I just wanted to check with you, sir, referencing your case. We

---

[58] Trial Transcript (Martin), ECF No. 489, pp. 77-78.

[59] UST Ex. 1, EXF No. 432-1; Trial Transcript (Martin), ECF No. 489, pp. 79-80.

[60] UST Ex. 2, ECF No. 432-2; UST Ex. 1, ECF No. 432-1.; Trial Transcript (Martin), ECF No. 489, p. 83, ll. 2-4 and p. 85, ll. 4-12.

[61] UST Ex. 2, ECF No. 432-2; Trial Transcript (Martin), ECF No. 489, pp. 83-84.

[62] UST EX. 2, ECF No. 432-2; Joint Ex. 1, ECF No. 465; Trial Transcript, ECF No. 489, p. 50.

[63] UST Ex. 222, ECF No. 439-6, p. 13; UST Ex. 4, Trial Transcript (Martin), ECF No. 489, p. 89; Trial transcript (Krueger), ECF No. 492, p. 203, l. 13 – p. 204, l. 1.

[64] UST Ex. 8, 432-8, pp. 3,7,11,15,18,23,27,31 and 35; Trial Transcript (Martin), ECF No. 489, pp. 96, 98.

[65] Trial Transcript (Martin), ECF No. 489, p. 98, l. 20-25.

[66] UST Ex. 1,3,5,6,7,9; ECF No. 432-1,432-3,432-5,432-6,432-7,432-9; UST Ex. 13, ECF No. 432-13; UST 18, ECF No. 432-18; UST 19, ECF No. 432-19; UST 222, ECF No 439-6.

were hoping to get some documentation from you in house so that we could move forward expeditiously and I sent you an email May 30th outlining what we needed."[67]

With the foreclosure sale date looming, on August 2, 2019, Mr. Krueger, on behalf of NVA, "referred" Mr. Martin's name, address, social security number, mortgage lender information, contact information for counsel for the mortgage lender and the date of the scheduled sheriff's sale to Mr. Giordano to prepare a bankruptcy petition.[68] Thereafter, Mr. Martin received a call from Jeffrey Giordano, who prepared and emailed to Mr. Martin a "minimal, bare-bones . . . skeleton petition" and walked him through how to file it on his own.[69]

On August 5, 2019, Mr. Martin received an email with forms attached from Jeffrey Giordano, stating, "Enclosed are all the needed forms. Print out all. Please call me with any questions."[70] When Mr. Martin was asked who he thought sent the forms, he stated. "I would thinking it was coming from Ms. Kelly," but also acknowledged that Denise Rodriguez told him to file bankruptcy and that he thought his 2019 bankruptcy case was being handled by an attorney.[71] Following Mr. Giordano's directions, Mr. Martin printed the forms and drove with his daughter to the Office of the Bankruptcy Clerk in Shreveport and filed the Petition on August 6, 2019.[72] Mr. Martin's bank account statement reflects $200 paid to Jeffrey Giordano on August 7, 2019 and another $195 payment to Jeffery Giordano on August 12, 2019.[73] Notes in NVA's file for Mr. Martin on August 6, 2019 show Denise Rodriguez "Faxed BK documents" and "called the lender and FC attorney for the status of the sale date . . ."[74]

Mr. Martin's *pro se* Petition for Relief was dismissed on September 19, 2019, because he did not file the credit counseling certificate required under 11 U.S.C §109(h); the Clerk of the Bankruptcy Court also noting in the dismissal Order that Mr. Martin failed to pay the full amount of the filing fee.[75] Meanwhile, NVA continued to debit Mr. Martin's bank account for the next six

---

[67] UST Exs. 5 and 6, ECF Nos. 432-5 and 432-6; Trial Transcript (Martin) ECF No. 489, p. 112, ll. 6-21.
[68] Joint Ex. 1, ECF No. 465, ¶14; UST Ex. 88, ECF No. 436-59; Trial Transcript (Giordano), ECF No. 491, p. 100, ll. 2-3, p. 111, p. 122, ll. 6-9.
[69] Trial transcript (Giordano), ECF No. 491, p. 118, ll. 1-14, p. 119, ll. 1-14; Joint Ex. 1, ECF No. 465, ¶25.
[70] UST Ex 11-12, ECF Nos. 432-11,432-12.
[71] Trial Transcript (Martin), ECF No. 489, p. 128 ll. 15-21, p. 135, ll. 1-9, p. 151, ll. 7-9.
[72] Trial Transcript (Martin), ECF No. 489, p. 128, p. 174, ll. 6-10; UST Ex. 14, ECF No. 432-14; Case No. 19-31260, ECF No. 1.
[73] UST Ex. 8, ECF No. 432-8, pp. 7,10.
[74] UST Ex. 222, ECF No. 439-6, p.10; *See also* UST Ex. 272, ECF No. 441-38.
[75] UST Ex.14, ECF No. 432-14; Case No.19-31260, ECF Nos. 11,13.

months, and the mortgage lender proceeded with its foreclosure efforts.[76] Mr. Martin continued receiving calls and emails from Denise Rodriguez, indicating she was calling on behalf of the Law Office of Halima Narcisse Smith, and from Jay Krueger.[77] A new Sheriff's sale date was scheduled for March 11, 2020.[78]

Mr. Krueger directed Ms. Rodriguez and Mr. Giordano to pressure Mr. Martin to file a second bankruptcy case.[79] Mr. Giordano called and left a voice message on Mr. Martin's phone on February 25, 2020, stating "I assisted you back in August with a foreclosure date. Apparently you have another one. Denise mentioned it to me or at least emailed me that your foreclosure, you have a new one for March 11th. So you need to get ahold of me. I need to update the forms. We need to file again."[80]

When Mr. Martin was served again with a notice of the pending sheriff's sale, he sought new help from a bankruptcy attorney in Monroe, Mr. Joe Moore of the E. Orum Young Law Office.[81] Mr. Martin testified that when he told Denise Rodriguez that he hired Mr. Moore, she "got kind of mad" and wanted him to fire Mr. Moore.[82]

On March 10, 2020, Mr. Giordano left another urgent message for Mr. Martin:

I left you a message last week. You have a foreclosure date scheduled for tomorrow. We can stop it. I need to update the forms. My fee would not be at much as last time, but I don't know if something you want to do. Please call me. You can call me at this number or my work number because I'm working out of the office today. But my work number is . . . That will ring to my cell number and I'll pick up. Call me, let me know if you're just going to let it go or you have other plans or you need my assistance. Just give me a call and let me know one way or the other.[83]

However, on March 10, 2020, Mr. Moore filed a new bankruptcy Petition for Mr. Martin (Case No. 20- 30325), but in an effort to also remediate the filing fee deficiency in the dismissed case, he moved to enroll and reopen his 2019 *pro se* bankruptcy case on June 11, 2020.[84] The 2020 case

---

[76] UST Ex. 8, 432-8, pp. 15,18,23,27,31 and 35.

[77] UST Exs. 15-23, ECF Nos. 432-15-432-23; Trial Transcript (Martin), ECF No. 489, pp. 137-146.

[78] UST Ex. 222, ECF No. 439-6, p. 3.

[79] Joint Ex. 1, ECF No. 465, ¶16.; UST Ex. 123, ECF No. 436-94.

[80] UST Ex. 21, ECF No. 432-21; Trial Transcript (Martin), ECF No. 489, p. 146; Trial transcript (Giordano), ECF No. 491, p. 149.

[81] Trial Transcript (Martin), ECF No. 489, pp. 151-152.

[82] Trial Transcript (Martin), ECF No. 489, p. 152, l. 17 – p. 153, l. 10.

[83] UST Ex. 22, ECF No. 432-22; Trial Transcript (Martin), ECF No. 489, p.148.

[84] Case No. 19-31260, ECF Nos. 24, 25; Joint Ex. 1, ECF No. 465, ¶17.

was ultimately dismissed, but litigation between Mr. Martin's mortgage lender and Mr. Moore continued in the reopened 2019 bankruptcy case.

After repeated calls and voicemail messages from Denise Rodriguez and Jay Krueger in late March of 2020, wherein they urged him to continue to allow them to "work his file," Mr. Martin requested to cancel the services of NVA.[85] Mr. Martin paid a total amount of $5,995 to the Defendants from May 24, 2019 to February 25, 2020.[86]

Clearly Mr. Martin was a distressed homeowner, in default on his payments and facing foreclosure, when attempting to save his home, he contacted NVA, and believing he had legal representation, paid them for assistance with a loan modification that they never provided. However, defendants did gather Mr. Martin's personal information and instructed him to file a *pro se* bankruptcy petition that he did not want. By Joint Stipulation of Fact, it is agreed by all parties that Mr. Martin believed Ms. Narcisse was his attorney based on representations made to him by employees of NVA Financial Services LLC, but that she never personally communicated with him and never drafted or filed any pleading for him.[87]

After six years, Mr. Martin finally obtained mortgage modification relief only through Mr. Moore's efforts in negotiation with counsel for his mortgage lender, for which Mr. Moore incurred legal expenses on Mr. Martin's behalf in the amount of $11,000, with an Agreed Order granting that relief in his bankruptcy case entered on May 1, 2025.[88]

Further, the Court notes that at no time during Mr. Martin's pending Chapter 13 bankruptcy case did the defendants make an appearance or participate. Neither NVA, Narcisse, Kisch, Kreuger nor the other defendants acting for NVA disclosed their employment by Mr. Martin, sought approval – acceptance or rejection – of the purported contract or sought approval of any counsel – Narcisse, Kisch or otherwise – to be employed on behalf of the bankruptcy estate. Further they failed to disclose the prepetition payments they received from Mr. Martin. All of course to

---

[85] Trial Transcript (Martin), ECF No. 489, pp. 152-154; UST 222, p. 1.

[86] UST Ex. 8, 432-8, pp. 3,7,11,15,18,23,27,31 and 35.

[87] Joint Ex. 1, ECF No. 465, p. ¶18-24; Trial Transcript, ECF No. 489, p. 50.; Trial transcript (Narcisse), ECF No. 490, p. 212, ll. 13-25, p. 213, ll. 1-7.

[88] Case No. 19-31260, ECF No. 63; Trial transcript (Moore), ECF No. 489, p. 214.

perpetuate their continuing concealment of the bare bones bankruptcy filing and, all the while knowing that the filing would be quickly dismissed in accordance with their scheme.

The findings of the Court above as to the actions of the defendants in deceiving and manipulating Mr. Martin are supported and not disputed by the Joint Stipulations of Fact.[89]

**Legal Analysis and Conclusions of Law**

### Burden of Proof

The claims for sanctions and disgorgement in Counts I through VIII of the complaint are normally subject to a preponderance of the evidence standard. However, a clear and convincing standard in a civil case is appropriate where "particularly important individual interests or rights are at stake." *Grogan v. Garner*, 498 US 279, 286 (1991) (quoting *Herman & Macclean v. Huddleston*, 459 US 375, 389, 90 (1983)). "While a preponderance of the evidence standard applies in routine cases where a court reduces--or even orders disgorgement of--fees under 11 U.S.C. §§ 329-330, this is not a routine case." *Hobbs v. Chesson*, No. MC 16-00201, 2018 WL 4172667, at *6 (Bankr. W.D. La. Aug. 29, 2018). Considering the extent of the sanctions requested in this case and the request for injunctive relief against the Defendants as well as the imposition of civil penalties under § 526, the relief requested by the UST is "punitive in nature and implicates particularly important individual interests or rights." *Id.* The Court finds the UST must establish all of its claims for relief by clear and convincing evidence. *Id*.

### The Defense that the UST Claims are Time Barred

The Defendants raised a defense that the claims of the UST are time barred under 28 U.S.C. § 1628(a). A review of the post trial briefs of the defendants reveals that the arguments are almost identical.[90] The crux of the defense is that the bankruptcy cases referenced by the UST to support the allegation of a "clear and consistent pattern or practice of violating" Section 526 by the defendants cannot be used in this case as they are time barred. The Court finds no argument that the Complaint of the UST is time barred as to George Martin, the debtor herein. As stated by this

---

[89] Joint Exhibit1, ECF No. 465, pp. 3-8, 10-27, 29.
[90] ECF Nos. 500, p. 24 and 504, p. 56.

Court in connection with the venue argument and the Motions in Limine, neither this Court nor the UST are considering these cases for adjudication of damages.[91]

However, 11 U.S.C. 526(c)(5) provides that:

> Notwithstanding any other provision of federal law and in addition to any other remedy provided under federal or state law, if the Court, on its own motion or on the motion of the United States Trustee or the debtor, finds that a person intentionally violated this section, or engaged in a clear and consistent pattern or practice of violating this section, the Court may – (A) enjoin the violation of such section; or (B) impose any appropriate civil penalty against such person.

Section 526 does not impose any statute of limitation; however, neither the Court nor the UST or any other party could pursue a cause of action under § 526 unless and until the Court or the moving party had knowledge of the alleged abuse, acts or pattern of practice.

Title 28 U.S.C. 1628(a) applies a four year limitation commencing when "the cause of action accrues." There is no definition of "accrues;" however, the Fifth Circuit has stated that the cause of action accrues under federal law at a time when the moving party or plaintiff knows or has reason to know of the basis of cause of action. *Adepegba v. State of Louisiana*, 41 F.3d. 663 (5th Cir. 1994). "The general approach under the discovery rule [is] that a limitations period begins to run when a claimant discovers the facts that give rise to a claim and not when a claimant discovers that those facts constitute a legal violation." *Mack v. Equable Ascent Fin., LLC*, 748 F.3d. 663, 665-66 (5th Cir. 2014).

Clearly, 11 U.S.C. §§ 110, 526, 527 and 528 are consumer protection statutes, and it defies logic and thwarts the intent of Congress that defendants simply need to lay low and conceal their actions for 4 years or more and then escape all liability under Bankruptcy Code. The defense and the argument further make no sense in light of the fact that Section 526(c)(5) allows the Court, on its own motion, to raise the issue of potential abuse or fraud once discovered by the Court. Had Congress intended to place time barring restrictions on the relief afforded under these code sections, Congress would have specifically done so. George Martin and each and every debtor subjected to schemes of bankruptcy abuse, fraud and violations of the Code would remain largely unprotected should Defendants' argument prevail.

---

[91] See ECF No. 489.

The relevant fact herein, however, is that no statute of limitation has expired regarding George Martin's Chapter 13 bankruptcy proceeding. Further, as argued by the UST, the adversary proceeding herein was commenced on December 23, 2021, less than one year from the knowledge of the causes of action giving rise to the Complaint. The defense offered is without merit.

### The Defense of Absence of a Joint Venture or Enterprise

Defendants argue that the UST's Complaint fails as the defendants operated no formal legal entity §§in the form of a joint enterprise, partnership or other entity in which they were all members or partners under any state law.[92] Citing the Third Amended Complaint, Defendants quote paragraph 35:

> "Along with 'local counsel' and bankruptcy petition preparers, the Defendants have since 2017 operated a joint enterprise and partnership promising foreclosure assistance and mortgage modification services to individuals nationwide. Defendants' joint enterprise and partnership has acted as that term is defined under §101(12A) and have provided bankruptcy petition preparation services under § 110." [93]

The Defendants all argued that unless the parties defendant operated jointly within some legal entity, they could not be held liable under 11 U.S.C. §§ 110, 526, 527 or 528. Throughout the course of dispositive motions and trial, this Court addressed this issue, explaining to defendants that the Court perceived the allegations of "joint enterprise" and "partnership" to be generic terms referencing defendants acting in concert, in a collaborative fashion, to achieve the goals of NVA and perpetuate the loss mitigation/loan modification business. The evidence at trial certainly, clearly and convincingly, supports the Court's interpretation of the allegation. Mr. Nahas testified about the policies and procedures he implemented for NVA and "team" at NVA. Mr. Krueger was employed by NVA and Ms. Narcisse and Ms. Kisch were legal counsel working on behalf of NVA. Mr. Giordano received repeated referrals from NVA to prepare bankruptcy petitions and Ms. Rodriguez was employed by NVA.

Once again, it defies logic that Congress would have enacted a consumer protection statute that was enforceable only if the alleged transgressors were organized under or operated within some legal entity. However, in this case, defendant NVA Financial is a legal entity and was in control of and orchestrated the acts of each and every defendant. Defendants consistently – if not

---

[92] ECF Nos. 500, p. 32; 504, p. 36.
[93] ECF No. 240, p. 15, ¶ 35.

blindly – ignored this fact. Further, Defendants US Auto Liquidators, All Provizions, Kealy Law, Kisch Law, and the Law Office of Halima Narcisse are legal entities.

The Court addresses the legal argument that the UST failed to prove the facts central to the elements of a joint enterprise or partnership although the Court finds no formal legal entity to be required or necessary, either procedurally as pled by the UST, or under the Bankruptcy Code. Under Louisiana law, a "joint venture" arises when parties have an implied or express contract marked by the elements of consent, sharing profits/losses and where each party exercises control over the common proprietary interest. *Baba Lodging, LLC v. Wyndham Worldwide Operations, Inc*., 2011 WL 1598910, at *3 (W.D. La. Apr. 26, 2011)(Joint venture was not found between two companies where one only had a one-time payment for the license to use the other's software program.).   A joint venture requires that "each party ... have equal right to direct and govern the conduct of the other involved, as well as some voice in the control and management of the business undertaking which is the subject of the parties relationship." *Id*. "The existence or nonexistence of a joint venture is a question of fact, although what constitutes a joint [ ]venture is a question of law." *Id*, quoting *Grand Isle Campsites, Inc. v. Cheek*, 262 So.2d 350, 357 (La.1972).

Under Louisiana law, the essential elements of a joint venture and a partnership are the same, joint ventures are generally governed by partnership law. *Latiolais v. BFI of Louisiana, Inc*., 567 So.2d 1159 (La.App. 3 Cir.1990). Joint ventures arise only where the parties intended the relationship to exist, and they are ultimately predicated upon contract either express or implied. *Broadmoor, L.L.C. v. Ernest N. Morial New Orleans Exhibition Hall Auth*., 2004-0211 (La. 3/18/04), 867 So. 2d 651, 663.

The Defendants limited much of their defense to eliciting evidence that they did not (1) share in "profits and losses" with each other, (2) consent to the formation of an agreement with each other or (3) exercise a right to control or proprietary interest in the alleged "joint enterprise" or partnership, which are all elements necessary to establish a "joint enterprise" or partnership. Citing an unreported opinion, *Bertram v. Progressive SE. Ins. Co*, 2021 WL 865317, at *6-7 (W.D. La. Mar. 8, 2021), the Defendants argue that the UST's failure to prove facts as to these elements is fatal to their claims. In *Bertram*, the Plaintiff in a removed personal injury action arising out of a vehicle accident alleged a joint venture existed between a freight line driver and an out-of-state

transportation broker, who arranged some details of the transportation process that included the use of its warehouse in Texas. The Court found:

> While Plaintiffs allege that the Defendants enjoyed a financial benefit, that does not equate to sharing in profits and losses. Indeed, every entity and/or person in every transaction to transport goods in commerce is motivated by receiving a financial benefit. This Court cannot make that giant leap and accept the conclusory allegation that Defendants' were involved in a joint venture.

*Bertram v. Progressive Se. Ins. Co.*, 2021 WL 865317, at *3 (W.D. La. Mar. 8, 2021).

In *Bertram*, the broker was merely a warehouse in an interstate transportation chain that had no agreement or exercise/control over a driver of products that made a stop there. The Court finds that the *Bertram* case is not only irrelevant to the Bankruptcy Code violations alleged in the Complaint, but factually distinguishable from this case where the UST alleged in the Complaint and has proven at trial much more than joint liability based on a single point of contact between otherwise unrelated parties in commercial shipping. The evidence adduced at trial established a much more intricate plan or scheme orchestrated by and between the Defendants to violate the Bankruptcy Code's requirements for Petition Preparers and Debt Relief Agencies. The facts here also go beyond the mere one-time payment for use of a licensed product as were the facts in *Baba Lodging,* 2011 WL 1598910, at *3. The Defendants worked together with Nahas, NVA and Kealy to advertise, solicit distressed homeowners, share log notes, withdraw funds from solicited homeowners' bank accounts, act in concert to share homeowners' information among the Defendants, coordinate referrals to local counsel, Halima Narcisse Smith and other attorneys nationwide, and permit employees (or the appearance that they were employees of local counsel) to contact homeowners. The defendants each consented to share profits from the scheme and exercised some control in their respective roles in the foreclosure defense and bare bones bankruptcy filing scheme. Accordingly, the Court is unpersuaded by the Defendants' reliance on any perceived failure of the UST to prove the elements of a joint venture under Louisiana law.

The Court finds the joint venture defense to be a red herring and not responsive to the Bankruptcy Code's requirements of Petition Preparers and Debt Relief Agencies. The existence of a partnership or joint enterprise it is not an element under the definition of "Petition Preparer" under 11 U.S.C. § 110(a) or "Debt Relief Agency" under 11 U.S.C. § 101(12A) and is not an element to be proved under 11 U.S.C. §§ 110, 329, 526, or 528. Even if the Court found the UST failed to meet its burden of proof that a legal entity – joint enterprise – under law existed under or

24

through which all Defendants worked, that would not require a finding for the Defendants on the claims herein because the UST has alleged that *each* Defendant violated §§ 110, 526, and 528 of the Bankruptcy Code. Although a finding of the existence of a "joint enterprise" is not required for the UST to prove that each Defendant engaged in a scheme that violated the Bankruptcy Code, the evidence adduced showed that the Defendants coordinated their efforts, acted in concert, and each were aware of their role in the successful execution of the foreclosure defense scheme for the common purpose of continuing to bill the homeowner clients. Whether that coordination of effort fits within the "joint enterprise" concept of state contract law is not a required element under § 110 or § 526 and is not relevant here. What is relevant is that all the defendants worked together in a coordinated and collaborative effort in pursuit of one common goal – earning as much money as possible, while often abusing the bankruptcy process as a means to continue billing homeowner clients who could ill afford paying –sadly for mortgage relief they often did not receive.

### 11 USC § 110 – Penalty for persons who negligently or fraudulently prepare bankruptcy petitions

Section 110(a)(1) provides:

> (a) In this section –
>
>> (1) "bankruptcy petition preparer" means a person, other than an attorney for the debtor or an employee of such attorney under the direct supervision of such attorney, who prepares for compensation a document for filing;

The Bankruptcy Code defines "person" as also including corporations. 11 U.S.C. 101(41). The remainder of §110, parts (b) – (l) were enacted to protect consumers from abuses by non-lawyer petition preparers.

Section 110 was added to the Bankruptcy Code as part of Bankruptcy Reform Act of 1994 and was later amended as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. *In re Jolly*, 313 B.R. 295, 300 (Bankr.S.D.Iowa 2004)(citing *Consumer Seven Corp. v. U.S. Trustee (In re Fraga)*, 2190 B.R. 812, 816-17 (B.A.P. 9th Cir.1997).

The House of Representatives report reasoned:

> This section adds a new section to chapter 1 of title 11 United States Code to create standards and penalties pertaining to bankruptcy petition preparers. Bankruptcy petition preparers not employed or supervised by any attorney have proliferated across the country. While it is permissible for a petition

preparer to provide services solely limited to typing, far too many of them also attempt to provide legal advice and legal services to debtors. These preparers often lack the necessary legal training and ethics regulation to provide such services in an adequate and appropriate manner. These services may take unfair advantage of persons who are ignorant of their rights both inside and outside the bankruptcy system.

*4 H.R. Rep. 103-834, 103rd Cong., 2nd Sess. At 40-42 (Octob 4, 1994). See also *In re Farris*, 598 BR 411 (W.D.La. 2019) and *In re Brackens* 598 BR 420 (W.D.La. 2019).

Since its enactment and revision, the scope of Section 110 has been expanded jurisprudentially. Citing *In re Guttieriz*, 248 B.R. 287 (W.D.Tx 2000), Judge Rodriguez states:

Section 110 'proscribes virtually all conduct falling into the category of guidance or advice effectively restricting 'petition preparers' to rendering only scrivening/typing services.' Anything more, 'be it suggesting bankruptcy as an available remedy for a debtor's financial problems, merely explaining how to fill out the schedules, or answering questions about exemptions or whether a claim is or is not secured will invariably contravene either state laws proscribing the unauthorized practice of law or other more specific provisions of §110.

*The United States Trustee*, 652 BR 731, 739 (S.D.Tx 2023), citing *In re Martinez*, 72 Fed. Appx. 138, 2003 WL 21849832, at 3 (5th Cir. 2003).

The Courts interpreting § 110 have consistently found that the interpretation of "preparer" is not construed narrowly. "Preparer" includes referring a debtor to a typist, providing the information to the typist, determining what information of the debtor is needed by the typist, limiting the information provided to the typis,; suggesting to the debtor that the debtor should file bankruptcy and rendering any other assistance calculated to achieve the filing of a bankruptcy petition by a debtor. See for example:

The definition of a BPP is not limited to persons who actually prepare and file bankruptcy petitions. See *In re Jolly*, 313 B.R. 295, 300 (Bankr. N.D. Ohio 2004) ("The fact that the person does not place the data and the numbers on the form does not excuse that person from advising the court of their participation in the process of preparing the documents for filing with the bankruptcy court. Neither does the fact that the person provided these services by computerized services excuse the person from revealing that person's role in the preparation of the documents"). Moreover, a person need not receive direct payment from the debtor to be considered a BPP. *Gaftick,* 333 B.R. at 186 (national franchisor, to which its franchisee remitted a portion of fee collected for preparation of debtor's Chapter 7 petition, schedules, and statement of financial affairs, qualified as BPP, even though it did not receive payment directly from debtor). Lack of knowledge of the

Bankruptcy Code is irrelevant as well. *In re Ali*, 230 B.R. 477, 483 (Bankr. E.D. N.Y. 1999) (foreclosure consultant's alleged lack of knowledge of §110 was not reasonable cause for his numerous violations of its provisions in preparing skeletal bankruptcy petitions on his client's behalf for the purpose of delaying foreclosure, and did not affect the property of monetary sanctions to deter future illegal conduct on his part). *In re Nina*, 562 B.R. 585 (E.D.N.Y. 2016).

See also Judge Rodriguez's holding:

> While Auto Recovery Partners, LLC did not physically fill out the chapter 13 petition, numerous courts across the country have found that this omission is not controlling. For example, in *In re Jolly*, the Bankruptcy Court for Southern District of Iowa held that "[t]he fact that the person does not place the data and numbers on the form does not excuse that person from advising the court of their participation in the process of preparing the documents for filing with the bankruptcy court." Instead the Court reasoned that " 'preparation' of a document includes both the physical preparation and the dictation or the determination of the information to be placed on the document by the 'preparer.'"

> The interpretation of "preparer" to include the dictation or determination of the information to be placed on the document is supported by the House of Representatives report discussing the implementation of §110. There the House of Representatives explained "While it is permissible for a petition preparer to provide services solely limited to typing, far too many of them also attempt to provide legal advice and legal services to debtors… These services may take unfair advantage of persons who are ignorant of their rights both inside and outside the bankruptcy system." From this text it is clear that the purpose of §110 is to protect innocent debtors from unqualified legal advice. To interpret "preparer" so narrowly as to include only those who physically fill out the documents, would provide a glaring workaround for bad actors and undermine the very purpose of the statute. Thus, this Court will interpret "preparation" of a document under §110(a)(1) to include both the physical preparation and the dictation or the determination of the information to be placed on the document. *In re Flores*, 652 B.R. 276, 281-282 (S.D.Tx 2023).

Many prior persons have attempted to evade the requirements and restrictions of §110, all in the name of assisting debtors, while operating under debt relief schemes similar to the defendants herein. In review, Collier on Bankruptcy reports:

> Courts have rejected attempts to evade the language of the statute by persons who claimed they were not compensated for preparing documents but merely were collecting money for other services. If a franchisor of a petition preparation service prepares documents that are ultimately filed in a bankruptcy case, the franchisor and the franchisee are both petition preparers under the statutory definition. Similarly, the operators of an Internet site that prepared bankruptcy documents for filing were petition preparers. Individuals who, working as employees of another individual or entity, prepare documents for filing are bankruptcy petition preparers. An entity whose solicitation letter mentioned bankruptcy, and that for a substantial

fee assembled information and documents that could easily be transferred to the bankruptcy forms by the attorney to whom it referred cases, was a debt relief agency even though the attorney sighed the papers filed with the court. Even when a non-attorney did not prepare the actual bankruptcy documents for filing, he was a bankruptcy petition preparer when he (1) used the trade name "Affordable Legal Servies," (2) advertised directly to persons needing bankruptcy services in ads under the category of "Bankruptcy," (3) was the direct point of contact between the debtors and selected typists, (4) handed out documents on behalf of the typists, including, in some cases, the typists' questionnaire, (5) entered into service contracts for "Bankruptcy processing (start to finish)" and (6) provided a list of federal and state exemptions to the debtors, directing them to select one.

Because the definition of "person" includes a corporation, "bankruptcy petition preparer" encompasses a corporation that prepares bankruptcy petitions for *pro se* debtors, even though the corporation was owned by a licensed attorney. A "document for filing" is in turn defined as a petition or any other document prepared for filing by a debtor in a United States bankruptcy court or a United States district court in connection with a case under title 11.

A bankruptcy petition preparer is also specifically included in the definition of "debt relief agency" in section 101 of the Code and is therefore subject to the requirements of sections 526, 527 and 528.

*Collier on Bankruptcy*, Vol. 2, §110.01, 16th Ed.

## Debt Relief Agencies

The Bankruptcy Code defines a "Debt Relief Agency" in §101(12)(A):

The term "debt relief agency" means any person who provides any bankruptcy assistance to an assisted person in return for the payment of money or other valuable consideration, or who is a bankruptcy petition preparer under section 110, but does not include—

(A) any person who is an officer, director, employee, or agent of a person who provides such assistance or of the bankruptcy petition preparer;
(B) a nonprofit organization that is exempt from taxation under section 501(c)(3) of the Internal Revenue Code of 1986;
(C) a creditor of such assisted person, to the extent that the creditor is assisting such assisted person to restructure any debt owed by such assisted person to the creditor;
(D) a depository institution (as defined in section 3 of the Federal Deposit Insurance Act) or any Federal credit union or State credit union (as those terms are defined in section 101 of the Federal Credit Union Act), or any affiliate or subsidiary of such depository institution or credit union, or
(E) an author, publisher, distributor, or seller of works subject to copyright protection under title 17, when acting in such capacity.

The term "debt relief agency" was added to the Code in 2005. The definition is central to any application of the Code sections that purport to regulate debt relief

28

agencies. No similar definition existed under the Bankruptcy Act or the Bankruptcy Code before 2005. "Debt relief agency" means "any person who provides any bankruptcy assistance to an assisted person in return for the payment of money or other valuable consideration, or who is a bankruptcy petition preparer under section 110." Collier on Bankruptcy, Vo. 2, §101.12A, 16th Ed.

Addressing the term "debt relief agency," Judge Neil P. Olack explained:

> Section 526 "Restrictions on **Debt Relief Agencies**," was enacted in 2005 as part of BAPCPA "to correct perceived abuses of the bankruptcy system." *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 231-32, 130 S.Ct. 1324, 176 L.Ed.2d 79 (2010); *Hersh*, 553 F.3d at 746 ("BAPCPA is a 'comprehensive package of reform measures' designed to improve bankruptcy law and practice by restoring personal responsibility and integrity in the bankruptcy stem and ensure that the system is fair for both debtors and creditors"). As relevant here, §526 and §527 regulate the conduct of a "**debt relief agency**," and §526(c) and §528 provide sanctions and remedies when a **debt relief agency** "intentionally or negligently" fails to comply with those regulations or engages in a clear and consistent pattern or practice of violating those regulations. Legal Helpers disputes that it is a **debt relief agency** subject to §526 and §527.
>
> In interpreting a statute, the Court begins with the plain language of its text. The Code defines a **debt relief agency** as "any person who provides any *bankruptcy assistance* to an assisted person in return for the payment of money or other valuable consideration." 11 U.S.C. §101(12A) (emphasis added). Bankruptcy assistance means "any goods or services sold or otherwise provided to an *assisted person* with the express or implied purpose of providing information, advise, counsel, document preparation, or filing, or attendance at a creditors' meeting or appearing in a case or proceeding on behalf of another or providing legal representation with respect to a case or proceeding" in bankruptcy. 11 U.S.C. §101(4A) (emphasis added). An assisted person is defined as "any person whose debts consist primarily of consumer debts and the value of whose nonexempt property is less than $186,825." 11 U.S.C. §101(3) (footnote omitted). These three (3) definitions determining whether an entity is a **debt relief agency** are imprecise and have led to problems in their application. *See* 4 Collier on Bankruptcy ¶ 526.01[3] (16th ed. 2013). For example, until 2010, the U.S. Courts of Appeals disagreed about whether §526 covered attorneys. *Compare Milavetz, Gallop & Milavetz, P.A. v. United States*, 541 F.3d 785, 794 (8th Cir. 2008) with *Hersh*, 553 F.3d at 746. The U.S. Supreme Court resolved that issue by holding that "attorneys who provide bankruptcy assistance to assisted persons are **debt relief agencies**." *Milavetz*, 559 U.S. at 239, 130 S.Ct. 1324. *In re Huffman*, 505 BR 726, 758-759 (S.D. Ms 2014).

Most relevant to the issues raised by the UST in this Adversary Proceeding is Judge Olack's analysis that the Court must look to the actions of the defendants and not to the name the defendants might use to describe their relationship with their homeowner clients.

29

A finding of a "**debt relief agency**" for purposes of §526, however focuses upon the provision of bankruptcy assistance to an assisted person or a prospective assisted person, and not on the name an entity calls itself. Otherwise, the entities that §526 was intended to cover could determine for themselves whether the statute applies by selecting a name that would either opt them in or out." *In re Huffman*, *supra* at 761.

In order to fall within the definition of "debt relief agency", a person must render "bankruptcy assistance" to an "assisted person" *OR* be a bankruptcy petition preparer under §110. Certainly a party may fall into both categories if the party both provides bankruptcy assistance to an assisted person and is determined to be a bankruptcy petition preparer.

Section 101(4)(A) provides:

The term "bankruptcy assistance" means any goods or services sold or otherwise provided to an assisted person with the express or implied purpose of providing information, advise, counsel, document preparation, or filing, or attendance at a creditors' meeting or appearing in a case or proceeding on behalf of another or providing legal representation with respect to a case or proceeding under this title.

Collier on Bankruptcy states:

The term "bankruptcy assistance" was added to the Code in 2005. No similar definition existed under the Bankruptcy Act or the Bankruptcy Code prior to 2005. "Bankruptcy assistance" means "any goods or services sold or otherwise provided to an assisted person with the express or implied purpose of providing information, advise, counsel, document preparation or filing, or attendance at a creditors' meeting or appearing in a case or proceeding on behalf of another or providing legal representation with respect to a case or proceeding under this title.

The term "bankruptcy assistance" is critical to any application of the sections of the Code that purport to regulate the activities of debt relief agencies; sections 526, 527 and 528. Collier on Bankruptcy, Vol. 2, ¶ 101.04(a), 16th Ed.


**Debtor, George Martin, is an "assisted person" under 11 USC 101(3)**

Section 101(3) defines "assisted person":

The term "assisted person" means any person whose debts consist primarily of consumer debts and the value of whose nonexempt property is less than $226,850.[94]

---

[94] 11 U.S.C. § 101(3). This amount applies in cases commenced on or after April 1, 2022. For cases commenced in the three-year period beginning April 1, 2019, the dollar amount is $204,425. The George Martin Chapter 13 case was filed August 6, 2019 and the applicable dollar amount herein is $204,425.

As reviewed above, the Bankruptcy Code contains a number of provisions regulating the conduct of the broad class of bankruptcy professionals termed "debt relief agenc[ies]." That category includes, with limited exceptions, "any person who provides any bankruptcy assistance to an assisted person in return for ... payment ...," or who is a bankruptcy petition preparer." 11 U.S.C. § 101(12A). "Bankruptcy assistance" refers to goods or services "provided to an assisted person with the express or implied purpose of providing information, advice, counsel, document preparation, or filing, or attendance at a creditors' meeting or appearing in a case or proceeding on behalf of another or providing legal representation with respect to a case or proceeding" in bankruptcy. 11 U.S.C. § 101(4A). An "assisted person" is someone with limited nonexempt property whose debts consist primarily of consumer debts. 11 U.S.C. § 101(3). *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 232–33, 130 S. Ct. 1324, 1330, 176 L. Ed. 2d 79 (2010).

Defendants argue that the UST has not proved that defendants are a "debt relief agency" because the UST failed to establish that Mr. Martin is an "assisted person," as defined by the Code. In determining whether a debtor is an "assisted person," bankruptcy courts refer to the description of the debts (of consumer or business origin) and the stated value of nonexempt assets on Debtor's sworn Petition, Schedules and Statements.  *See In re Irons*, 379 B.R. 680, 685 (Bankr. S.D. Tex. 2007)([The Debtor] is an Assisted Person. The schedules filed in this case reflect that [he] has no non-exempt property. The petition filed . . . states that his debts are primarily consumer debts.).

Mr. Martin has filed three bankruptcy cases in the Western District of Louisiana in 2003, 2019 and 2020.  "Under Fifth Circuit law, a court may take judicial notice of (a) prior court proceedings as a matter of public record; (b) its own records; (c) related proceedings and records in cases before that court; and (d) all documents filed with the court in the bankruptcy case." *In re Santos*, 616 B.R. 332, 341 (Bankr. N.D. Tex. 2020), citing *In re Deepwater Horizon*, 934 F.3d 434, 440 (5th Cir. 2019); *State of Fla. Bd. of Trustees of Internal Imp. Tr. Fund v. Charley Toppino & Sons, Inc.*, 514 F.2d 700, 704 (5th Cir. 1975); *Sherman v. Greenstone Farm Credit Services, ACA*, Case No. 3:11-CV-0710-N, 2011 WL 2038573, at *3 n. 6 (N.D. Tex. May 24, 2011); *In re Texas Rangers Baseball Partners*, 521 B.R. 134, 142 n. 13 (Bankr. N.D. Tex. 2014).   In making its findings of fact, this Court also takes judicial notice of the evidentiary record made at trial, the hearings in the related bankruptcy case and of all documents filed therein. *Id.*, 616 B.R. at 341.

Evidence adduced at trial included the record of the related bankruptcy case, wherein Martin obtained legal counsel, Mr. Joseph Moore, to reopen his case after his deficient *pro se* Petition was dismissed.[95]  Mr. Moore testified that he has practiced Bankruptcy Law for 13 years in the Western, Middle and Eastern Districts of Louisiana.[96] Mr. Moore moved to reopen Mr. Martin's dismissed *pro se* case and represented Mr. Martin in the related case during the pendency of this Adversary Proceeding, pursuing a restructuring of Mr. Martin's home mortgage. His efforts resulted in in the filing of an Application to Incur Secured Debt to Approve Supplemental Partial Claim.[97]

All pleadings in Mr. Martin's current bankruptcy case, filed *pro se* at the direction of NVA and its team, show no nonexempt property valued over $204,425.  But as the Court noted above, Mr. Giordano prepared the Petition as a "bare bones" filing, without regard to the veracity of the information contained therein and designed to be quickly dismissed.  As such, no Schedules of Assets and Liabilities or Statement of Financial Affairs were prepared for filing as NVA and its team did not want the documents to be filed. The parties stipulated that, "On March 10, 2020, George Martin filed another Chapter 13 petition through his current bankruptcy attorney Joseph Richard Moore of E. Orum Young Law LLC, which became *In re Martin*, Case No. 20-30325 (Bankr. W.D. La. 2020)."[98]  In Case No. 20-30325, Mr. Martin, through Mr. Moore, filed the Petition as a "consumer debtor" and listed only $101,120 in total real and personal assets.  Mr. Martin checked "yes" at Question 16a: "Are your debts primarily consumer debts? Consumer debts are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."[99]  The total claims filed in case number 19-31260 amounted to $101,134.96, $99,591.95 of which was for the home mortgage debt. The home mortgage creditor stated the value of the property to be $99,591.65.[100]

Mr. Martin testified that he is a retiree and had only an 8th grade education.[101]  According to his pleadings in the related cases, Mr. Martin's debts were incurred in purchasing his home and

---

[95] UST Ex. 14, ECF No. 432-14, Case No. 19-31260, ECF Nos. 24, 25; Joint Ex. 1, ECF No. 465, ¶17.
[96] Trial transcript (Moore), ECF No. 489, p. 194.
[97] UST Ex. 14, ECF No. 432-14, Case No. 19-31260, ECF No. 61.
[98] Joint Stipulation of Fact, ECF No. 465, ¶17.
[99] Case No. 20-30325, ECF Nos. 1, 8.
[100] Case No. 19-31260, Proof of Claim No. 2-1.  The Court notes that under Louisiana law, Mr. Martin is entitled to a homestead exemption in the amount of $35,000.00 (Const. Art. XII § 9; La. Rev. St. § 20:1(A).)
[101] Trial transcript (Moore), ECF No. 489, pp. 68-69.

a vehicle, i.e., consumer debts only.[102]  Therefore, the Court finds Martin was and is an "assisted person," as he is a person with limited nonexempt property whose debts consist primarily of consumer debts.  Even further, the Court finds Mr. Martin to be an unsophisticated lay person. Mr. Martin is the epitome of the consumer debtor Congress intended to protect under Sections 526-528 and 110. "The prohibition against making untrue or misleading statements in bankruptcy cases is expressly designed to protect unsophisticated individuals in financial distress who rely on debt relief agencies for proper guidance." *In re Cook*, 610 B.R. 852, 865 (Bankr. N.D. Ill. 2019), citing e.g., *Milavetz v. United States*, 559 U.S. 229 (2010).

The filing of the Petition in Case No. 19-31260 was orchestrated and prepared by NVA and its team.  It was by design "bare bones," to be quickly dismissed.  NVA and its team prepared no Schedules of Assets or Statement of Financial Affairs and did not want the documents filed. There was no disclosure by NVA or its attorneys of any fees collected or contracts signed.

Mr. Martin is an "assisted person" under 11 U.S.C. § 101(3) and Defendants are each a "debt relief agency" subject to the provisions of 11 U.S.C § 526 and § 528.

**The Broader Scale of the Foreclosure Defense Scheme**

The evidence and testimony at trial clearly and convincingly showed that Mr. Martin's case was not an isolated incident. The defendants created a scheme to recruit homeowner clients who would pay a retainer and monthly fees to Defendants in return for alleged loss mitigation or loan modification services to assist homeowner clients with their home mortgages. The UST adduced evidence of thousands of pages of NVA's business records, called "Loan Post Notes," which are records of NVA clients printed from its database used for generating and storing documents, maintaining client information and billing, and comprehensive notes documenting contact with the client and communications between various NVA staff and the Defendants.[103]  The complete "universe of Loan Post Notes" that were turned over by the Defendants in discovery, show the case records for 229 clients and was admitted into evidence without objection and without contradiction by defendants through testimony or other evidence.[104]

---

[102] UST Ex. 17, ECF No. 432-17. The loan modification application prepared by NVA and its team on behalf of Mr. Martin lists no significant assets owned by Mr. Martin other than his home.
[103] Trial transcript (Krueger), ECF No. 492, pp. 171- 179.
[104] UST Narcisse Impeachment Ex. 12, ECF No. 474. Trial transcript (Scott), ECF No. 495, p. 82).

Mr. Krueger explained NVA's procedures and how Loan Post Notes were used. When a new client called NVA, all work was memorialized in the Loan Post Notes: a local attorney in the network was assigned, an Agreement and Third Party Authorization ("TPA") were generated automatically and sent to the client by the staff processor, but the local attorney was sent a notice if "tagged" in the notes entry or was sent a separate email regarding the new client.[105] Nahas testified that the Agreements were just templates.[106] "[T]ypically, Mr. Nahas has said the moment somebody has signed, within the next day or two, he wants that file assigned to a processor to start working it regardless of whether somebody has paid or not. But that note that you're referring to -- so that's when I then go in -- I assign it just like the attorney was assigned typically, and I put that over to a preliminary processor . . . or a processor assistant, that's to start work on the initial collection of documents from a homeowner."[107]

The NVA staff would begin "working the file," requesting the homeowner's documents regarding their mortgage, starting a loan modification, calling the lender and requesting payments from the clients.[108] Nahas explained that NVA employees told clients they were communicating "from" or on behalf of" the local attorney's office to avoid confusion.[109] Mr. Krueger would then assign the file to a "senior case manager" to "review the package."[110]

Mr. Krueger trains local attorneys on how to access and use the Loan Post Notes system. Once local attorneys were given access, they could see all of the clients "assigned" to them, their contracts, uploaded documents and a running history of notes made by NVA employees documenting calls, emails and payments.[111]

Clients' initial retainers were collected using Ms. Kisch's Law Pay program, and once the payment clears, the funds are automatically deposited to the Kisch Consumer Law bank account.[112] The withdrawals on the clients' accounts appeared in their records as being made by "Kealy Law Center."[113] When asked how Ms. Kisch processes payments, Nahas stated the NVA employees

---

[105] Trial transcript (Krueger), ECF No. 492, pp. 172-182, p. 201, l. 19-202, l. 5.; p. 202.
[106] Trial transcript (Nahas), ECF NO. 494, p. 202, l. 2.
[107] Trial transcript (Krueger), ECF No. 492, p. 207, ll. 11-22.
[108] Trial transcript (Krueger), ECF No. 492, pp. 179-180, 202, 216, 218.
[109] Trial transcript (Nahas), ECF No. 494, p. 167-168.
[110] Trial transcript (Krueger), ECF No. 492, p. 218, ll. 18-25 – p. 219.
[111] Trial transcript (Krueger), ECF No. 492, pp. 172-179.
[112] Trial transcript (Nahas), ECF NO. 495, p. 8, ll. 15-25.
[113] *See* UST Ex. 222, ECF No. 439-6; Trial transcript (Kisch), ECF No. 495, p. 126, ll. 6-11.

have limited access to Kisch's Law Pay account, "She doesn't physically do it. Our payment processors or the billing department, those are the people that do it. And they run the payments for the clients and her Law Pay portal."[114]  After the initial retainer is processed by Ms. Kisch's Law Pay, client monthly payments were made to NVA through either RAM, LLC, Law Pay or EPPS, LLC.[115]  Each month, NVA would call or send the client an SMS text that said "foreclosure defense reminder," which was documented in the Loan Post Notes file for the client.[116]

Although the timing varied by lender, Mr. Krueger explained that when "we submit a complete loss mitigation package to the lender, more  than -- and -- and a sale date hasn't been scheduled or it's more than 37 days away, the lender has to review that package or -- I'm sorry -- they have to suspend the foreclosure proceeding until a completed review of that package is made."[117] When NVA submitted a loss mitigation package to the lender but not in time to stop a foreclosure sale date, Mr. Krueger would refer the client to Mr. Giordano to prepare a bankruptcy Petition and give the case number to the counsel for the lender, because only an automatic stay imposed by the filing of the Petition would stop the foreclosure.[118]   Krueger also acknowledged the case numbers and "BK filing document" would be uploaded to the NVA Loan Post Notes system, because it is "something that we can share with the lender or foreclosure attorney."[119]  In case clients had questions, training material for NVA employees included what Nahas described as general knowledge and understanding of bankruptcy law for Chapters 7 and 13.[120]  Mr. Krueger testified that whenever the Loan Post Note entry says "referred," it indicates that a homeowner's contact information was sent to an NVA approved Petition preparer.[121]

As arranged between Mr. Krueger and Mr. Giordano, between 2017-2022, these "referrals" were usually made by email.[122]  The referrals were typically made within the week of the scheduled

---

114 Trial transcript (Nahas), ECF NO. 495, p. 8, ll. 4-11.
115 Trial transcript (Kisch), ECF No 495, pp. 90-91.
116 Trial transcript (Krueger), ECF No. 492, p. 211.
117 Trial transcript (Krueger), ECF No. 492, p. 230, ll. 8-13.
118 *See* UST Ex. 90, ECF No. 436-61; Trial transcript (Giordano), ECF No. 492, pp. 37-38.
119 Trial transcript (Krueger), ECF No. 493, p. 27, ll. 22-23.
120 Trial transcript (Nahas), ECF No. 495 p. 7; UST Ex. 228, ECF No. 439-12.
121 Trial transcript (Krueger), ECF No. 493, p. 9, ll. 7-11; p. 13, ll. 10-16; Trial transcript (Krueger), ECF No. 494, p. 17, ll. 11-16.
122 UST Ex. 62, ECF No. 436-33; Trial Transcript (Giordano), ECF No. 491, p. 104, ll. 16-19, p. 175, l. 21- p. 176, l. 13; See UST Exs. 77-142, ECF Nos. 436-48 – 436-113; See UST Summary Ex. 143, 436-114, reflecting 72 Email referrals to Bankruptcy petition preparers.

foreclosure sale.[123] Giordano testified with respect to their routine practice, the emails to Giordano from NVA staff would have only a sale date, the name of a prospective debtor, the address, social security number, phone number, lender information and foreclosure attorney information, but he testified that it was "crystal clear" what he was expected to do when he received this information.[124] Giordano termed the relationship between himself and Krueger as a "team effort" and "an "unspoken arrangement understood by both parties, clearly understood:"[125]

> **Q So is it fair to say that this referral that you received was consistent with a pattern and practice of the referrals you were receiving?**
> **A Yes.**
> **Q So now, without looking at exhibits, those are the referrals sent by Mr. Krueger, would you be able to tell me what was the subject of each referral email?**
> **A Yes.**
> **Q What would that be?**
> **A It would be the only thing I did for them, which was stop these sale dates.**[126]

Mr. Giordano was refreshingly forthcoming in his testimony when asked, "what is your understanding, based upon your dealings with Mr. Krueger, what were these bankruptcies supposed to accomplish?" He answered, **"Prolong, lengthen, elongate the sale of the house to give them more time to bill the client or to save the home."**[127] Giordano would respond to the email referral, "received," to let Mr. Krueger know he got the assignment.[128] Next, he would call the client.[129] If his attempts to contact the homeowner were unsuccessful, he would email or call NVA staff to let them know. When asked, **"Did Mr. Krueger and people associated with Mr. Krueger ever tell you that they would reach out to a client or the homeowner and ask them to contact you," he answered, "yes" and "often."**[130]

With respect to the information input in the Petition, Giordano did not solicit information from the client, and on cross examination, Mr. Giordano testified that he made selections on the schedules on many questions seeking legal information about debts, marital status, property value,

---

[123] Trial transcript (Giordano), ECF no 491, p. 162, ll. 14-23.
[124] Trial transcript (Giordano), ECF No. 491, p.123, l. 13 – p.124, l. 4, p. 168, l. 20 – p. 169, l. 20.
[125] Trial transcript (Giordano), ECF No. 491, p.127, ll. 6-14.
[126] Trial transcript (Giordano), ECF No. 491, p. 175, l. 21 -p g. 176, l. 6; See UST Exs. 77-142, ECF No. 436-48-ECF No. 436-113 (66 Referrals from Defendants to Giordano).
[127] Trial Transcript (Giordano), ECF No. 491, p. 127, ll. 15-21.
[128] Trial transcript (Giordano), ECF No. 491, p.69, ll. 6-18.
[129] Trial transcript (Giordano), ECF No. 491, p.118, ll. 1-14.
[130] Trial transcript (Giordano), ECF No. 491 p. 166, l. 16 – 167, l. 1.

etc. without regard to veracity.[131]  He routinely only identified the mortgage lender on the matrix or schedule D, because "that's the only creditor of note, so that they can be notified that there was a bankruptcy filing."[132]  He was not concerned by the deficiencies in the schedules for Petitions he prepared, Mr. Giordano explained, "the only reason why I would prepare the documents is to stop the sale date."[133] He specifically did not disclose his involvement in the preparation of the Petition "to avoid detection."[134]  He further explained on cross-examination, **"I didn't want to reveal my name, I just thought that because it was a skeleton petition and it wasn't going to go off the ground that far that I don't -- my name didn't have to be included for the job to get done."**[135] He instructed, "they [the clients] have to print it out, they have to sign it, they have to date it, and then they have to file it. I look up where they need to go to file it, I instruct them to contact me with the case number. . . As a service, I contact the law firm handling the foreclosure and pass it on to them."[136]

Regarding the purpose of the Petition filing, Giordano testified:

Q. Whenever a homeowner is referred to you by Mr. Krueger, did you ever have to convince any homeowner to file a bankruptcy?
A No.
Q Did Mr. Krueger or anybody else associated with Mr. Krueger ever tell you why you needed to prepare forms for bankruptcy filings?
 A I needed to prepare them to stop the sale date.
Q Did they ever tell that to you?
A No, I don't think so.
Q What did Mr. Krueger say about the purpose of these bankruptcies when he reached out to you?
. . .
A Jay Krueger and I had an understanding, I was to do -- and I'm only able to do one job and that was to prepare those documents for the debtor, for the homeowner. So I was a one-trick pony, you know, that's all I did. I didn't do anything else, I didn't do anything less or more, and it was understood by both parties that's what I would do.[137]

---

[131] Trial transcript (Giordano), ECF No. 492, pp. 83-89.
[132] Trial transcript (Giordano), ECF No. 491, p.132, l. 24- p. 133, l. 4.
[133] Trial transcript (Giordano), ECF No. 492, p. 61, ll. 2-3.
[134] Trial transcript (Giordano), ECF No. 491, p.131, ll. 9-15.
[135] Trial transcript (Giordano), ECF No. 492, p. 69, ll. 5-8.
[136] Trial transcript (Giordano), ECF No. 491, p.119, l. 19 – p.120, l. 2.
[137] Trial transcript (Giordano), ECF No. 491, p. 155, l. 8 – p. 156, l. 18.

When asked, "Is it fair to say that all these filings were supposed to be dismissed," Mr. Giordano answered, "Yes."[138]

For his compensation, Giordano took credit card payments from homeowners over the phone and the transactions were made through NMI Network Merchants.[139] Usually the client/debtors paid Mr. Giordano directly but on one occasion, NVA paid him the $200 fee in a Massachusetts case where a Debtor "stiffed" him and he complained to NVA about it.[140] Giordano estimated that prior to 2020, he would generate $2,000-$3,000/month in income from the NVA referrals, though during the Covid pandemic the referral income dropped, it resumed after 2020.[141] Exhibit 146 is the UST's 11-page Summary of homeowners who paid both NVA and Mr. Giordano in the relevant time period. It was admitted into evidence by stipulation of the parties.[142]

Mr. Nahas testified that NVA started the practice of referring homeowners to bankruptcy petition preparers in 2014 or 2015, on suggestion of another attorney, Eric Helbing, but when asked about NVA training procedures for making referrals, Nahas shrugged, "It's not rocket science."[143] In his affidavit, Mr. Nahas stated that from 2017 to present, 231 Louisiana residents, including George Martin, signed up for assistance in applying for mortgage modification. "During that time period time [sic], 20 of those Louisiana residents (including George Martin), filed for bankruptcy protection. Of those 20 persons who filed for bankruptcy protection sixteen (16) selected an attorney or bankruptcy preparer referred by an employee of NVA, and four did not.[144] Nahas confirmed that all 231 Louisiana clients were assigned to Ms. Narcisse as NVA local attorney.[145] But at trial, Nahas explained there were never any referrals of clients to outside bankruptcy attorneys:

> "So I would say we referred all the bankruptcy preparers, petition preparers, PP, whatever. . . .
> Q So there were no referrals to the attorneys? Do I understand that correctly?
> A That's probably right.[146]

---

[138] Trial transcript (Giordano), ECF No. 492, p. 61, ll. 8-10.
[139] Trial transcript (Giordano), UST Ex. 75, ECF No. 436-46; ECF No. 491, p.137, l. 18 – 140, l. 5.
[140] Trial transcript (Giordano), ECF No. 492, p.79, l. 20 – p. 80, l. 6.
[141] Trial transcript (Giordano), ECF No. 492, p. 33.
[142] UST Ex. 146, ECF No. 436-117; Trial transcript, ECF No. 496 p.8.
[143] Trial transcript (Nahas), ECF No. 494, pp. 209, l. 6 and 212, l. 19.
[144] Affidavit of Nahas, UST Ex. 224, ECF No 439-8 (admitted by joint stipulation).
[145] Trial transcript (Nahas), ECF No. 494, p. 208, l. 7-25 – p. 209, l. 2.
[146] Trial transcript (Nahas), ECF No. 494, p. 208, ll. 7-16.

Mr. Krueger even explained this tactic to Ms. Narcisse in emails dated December 7, 2017: **"This client needs to file a bankruptcy, if nothing else to stop the sale and to force the lender's review of the submission package." . . . "We can refer her [client] to a petition prep service who can type her documents for an emergency *pro se* filing if she'd like. I believe they charge approximately $200 to prepare the docs. This is only a temporary fix, though, that cancels the sale forcing the lender to review of her submission package, but it is not a complete bankruptcy filing."**[147] However, Ms. Narcisse is not a bankruptcy attorney, and as discussed further herein, rarely responded to email notifications regarding NVA clients.[148] He also testified that clients were also referred to petition preparers by NVA staff other than Mr. Krueger and Ms. Rodriguez with no input from the "local attorneys."[149]

The UST questioned Defendants regarding many of these cases which contained similar, if not identical, bankruptcy referrals for homeowner clients.[150] From the email referrals, the Loan Post Notes and financial records of the Defendants, the UST discovered bankruptcy cases filed pursuant to NVA referrals between 2017 and 2023. The UST Exhibit 147 is a summary of those cases that distills to a list of 186 *pro se* bankruptcy Petitions filed pursuant to the referrals by Defendants to bankruptcy petition preparers nationwide.[151] In the majority of cases, there is no disclosure of a bankruptcy petition preparer. The Summary is compiled from information in UST Ex. 148, the certified copies of those bankruptcy cases' records consisting of thousands of pages spread across twelve docket entries.[152] Exhibit 147 was admitted into evidence pursuant to Fed. R. Evid. 1006, based on the admission of the underlying evidence, the complete certified case records in Exhibit 148, from which the summary was derived.[153] The Court also notes that the

---

[147] UST Ex. 37, p. 1, ECF NO. 436-8 (Emphasis supplied); UST Ex. 38, p.1, ECF No. 436-9; Trial transcript (Narcisse), ECF No. 490, p. 175, ll. 1-9.

[148] UST Impeachment Ex. 8, ECF NO. 482, pp. 9-38.

[149] Trial Transcript (Krueger), ECF No. 493, p. 75; *See* Referral of Jeremy Wyatt), UST Ex. 208, ECF No. 438-11, p. 209.

[150] UST Exs. 77-142, ECF No. 436-48 - ECF No. 436-113 (66 Email Referrals from Defendants to Giordano); Trial transcript (Giordano), ECF No. 491, pp. 170-176. ECF No. 492, pp. 18-29; pp. 37-56; UST Ex. 143, ECF No. 436-114, UST Summary of 72 Referrals made between November 30, 2017 to November 14, 2022; 66 made to Giordano, 5 to Total Petitions and 1 to Dallas Evans); Trial transcript (Krueger) Discussing Loan Post Notes entries showing referrals made to petition preparers, ECF No. 493, pp. 13-77.

[151] UST Ex. 147, ECF No. 443-1.

[152] UST Ex. 148, ECF Nos. 444, 445, 446, 447, 448, 449, 450, 451, 452, 453, 454 and 455; Supplemented with Ex. 148A, ECF No. 477, which are the certified copies of nine of those bankruptcy cases in Ex. 148, about which Mr. Giordano testified regarding the details and the circumstances of the referrals, revealing similar course of action for each client referral.

[153] Trial transcript, ECF No. 492 at p. 157- 167; ECF No. 471.

information corresponding to Exhibits 147 and 148 is found throughout the 2,157 pages of Loan Post Notes admitted into evidence with no objection and to which the parties stipulated that the Loan Post Notes are the true and correct business records of the Defendants.[154]

Together, these exhibits reflect that between April 4, 2017 and January 23, 2023, 186 *pro se* Petitions were filed as "bare-bones" Chapter 13 cases filed after NVA referrals, all dismissed shortly after filing due to deficiencies in the pleadings, which afforded no meaningful relief to the Debtors. Twelve of the cases were filed in the Western District of Louisiana, seven in the Middle District of Louisiana and eight in the Eastern District of Louisiana.

Krueger testified that NVA continues withdrawing fees from homeowner clients' bank accounts even after the client files a Petition for Bankruptcy relief when "we're continuing the loss mitigation efforts on the file."[155] As noted above, client payments are withdrawn from their accounts using Ms. Kisch's Law Pay program, for which Nahas testified that when Kealy/Kisch became "the managing attorney," Nahas agreed to pay her $1500/week.[156] Once the clients' payments clear, the funds are automatically deposited to the Kealy Law Center or Kisch Consumer Law bank account.[157] Kisch then withdraws her compensation (10% plus her weekly $1,500 for managing attorneys) and transfers the balance to NVA.[158]

The parties jointly stipulated to the admission of the financial evidence adduced, and that they were true and correct copies.[159] The UST offered the IRS 1099 Forms issued for years 2019-2022 by Kealy Law Center to NVA, to which Nahas testified, "these are all the payments that were processed through her Law Pay account."[160] The 1099s show that the following amounts were transferred to NVA after Ms. Kisch's "cut:" $2,048,581.49 in 2019; $1,758,099.11 in 2020; $1,343,998.00 in 2021; and $1,703,366.35 in 2022.[161]

---

[154] Trial transcript, ECF No. 492, p. 170, lines 14-16 (Parties stipulated that Loan Post Notes are business records); Joint Ex. 1, ECF No. 465, ¶29; UST Impeachment Ex. 12, ECF No. 474.
[155] Trial transcript (Krueger), ECF No. 494, p. 127, l. 24 – p. 128, l. 4.
[156] Trial transcript (Nahas), ECF No. 494, p.157, ll. 18-24.
[157] Trial transcript (Nahas), ECF No. 495, p. 8, ll. 15-25.
[158] Trial transcript (Nahas), ECF No. 495, p. 9, ll. 5-17.
[159] Joint Ex. 1, ECF No. 465, ¶29.
[160] Trial transcript (Nahas), ECF No. 494, p. 146, l. 20 – p. 147, l. 10.
[161] UST Ex. 199, ECF No. 438-2; UST Ex. 200, ECF No. 438-3; UST Ex. 201, ECF No. 438-4; UST Ex. 202, ECF No. 438-5.

Nahas testified both that all of the payments from NVA clients were processed through this Kealy/Kisch Law Pay system; but also testified that in addition to Kealy being a payment processor, they used RAM, LLC to collect payments from homeowners and at some point started using EPPS, LLC.[162] This is significant because, other financial records of the actual deposits to the NVA Capital One account from RAM, LLC, EPPS, LLC and Kealy Law Center reflect much larger yearly deposits from NVA clientele:

$1,196,119.55$ in 2017;

$1,716,524.50 in 2018;

$3,194,453.03 in 2019;

$2,841,037.95 in 2020;

$2,325,319.70 in 2021; and

$1,350,917.15 in 2022 (up to August 25, 2022).[163]

The total amount deposited to the NVA account for the relevant time period (2017 to 2022) is $12,624,371.88.[164] This amount is less than the total amounts charged to homeowner clients, since it does not include the amount withheld for Ms. Kisch's compensation.

The only written agreement between NVA and Ms. Kisch was the initial Third Party Agreement used when hiring local attorneys, signed by Ms. Kisch on January 11, 2017, but Mr. Nahas did not sign it.[165] Despite the amount of client funds being collected and transferred, Mr. Nahas did not see a need to sign any written agreement, stating, "I trusted her. Everything was working smoothly and didn't feel the need to redo the agreement. Maybe never even thought about it, really."[166] Even after Ms. Kealy married, became Ms. Kisch and changed the name of her firm from Kealy Law Center to Kisch Consumer Law, they did not need to update their existing agreement because "everything was working smoothly."[167] To the Court's surprise, the tone of this testimony by all parties was so smoothly flippant that it appeared the Defendants acted completely without regard for corporate and contractual formalities. Nahas adduced no contradictory evidence

---

[162] Trial transcript (Nahas), ECF No. 494, p. 148, ll. 19-20; Trial transcript (Nahas), ECF No. 494, p. 160, ll. 17-19.
[163] UST Ex. 292, ECF No. 442-7, Summary of All Homeowner Revenue Deposited to NVA (Admitted by Joint Stipulation of the Parties).
[164] UST Ex. 292, ECF No. 442-7, Summary of All Homeowner Revenue Deposited to NVA (Admitted by Joint Stipulation of the Parties).
[165] UST Ex. 287, ECF No. 442-12; Trial transcript (Nahas), ECF No. 494, p. 144, ll. 11-22; p. 152, l. 23.
[166] Trial transcript (Nahas), ECF No. 494, p.150, ll. 18-20.
[167] Trial transcript (Nahas), ECF No. 494, p. 150.

of NVA business expenses, and Nahas further testified that he used the NVA funds to also pay for his personal expenses, for instance, mortgage payments, landscaping, condo association fees and remodeling expenses for homes in Hawaii and St. Marten, and gifts for his children.[168]

After Kisch withdraws her compensation and transfers the balance to NVA,[169] Mr. Nahas stated he then pays local attorneys their percentage of the fee.[170] These local attorneys were recruited with the line in an advertisement that said, "Additional income stream with very little time expenditure on your part," which prompted the UST to ask Mr. Nahas:

> Q And so what is very little time expenditure on the part of the attorneys? Would you tell us, how much time would an attorney have to spend on a particular homeowner on average?
>
> A I have no idea in terms of time, but the business model is set up that we do the bulk of the work. We do all the grunt work, the chasing the clients, collecting the docs, putting the package together.
>
> Q And so what do the attorneys do?
>
> A Their job is supervisory. Log in every couple of days, look at your client, see what's new, that type of thing.[171]

Defendants created a network of local counsel that thrived on no accountability, like Ms. Narcisse, who never met with or counseled Mr. Martin. All the while, Mr. Martin believed Ms. Narcisse to be his attorney based upon an agreement he signed. No meaningful legal counseling was intended or provided to the NVA clients.

Thus, the overwhelming evidence adduced from the Defendants themselves showed that hundreds of clients who paid NVA for help with their mortgage arrearages were shunted into frivolous *pro se* bankruptcy cases without meaningful legal counseling and with a total disregard for the bankruptcy process, the legal consequences and the rights of the debtors and creditors involved. The evidence establishing the amount of financial gain betrays the underlying motivation of the Defendants - money. If a home went to foreclosure sale, defendants made no more money. If Defendants achieved a successful loan modification, Defendants made no more money. If a homeowner filed a legitimate bankruptcy case, Defendants made no more money. However, if

---

[168] Trial transcript (Nahas), ECF No. 495, p. 20.
[169] Trial transcript (Nahas), ECF No. 495, p. 9, ll. 5-17.
[170] Trial transcript (Nahas), ECF No. 495, p. 9, l. 25- p. 10, l. 10.
[171] Trial transcript (Nahas), ECF No. 494, p. 197, ll. 8-19.

Defendants filed a "barebones" or "skeleton" bankruptcy proceeding under Chapter 13, which filing was designed to meet with dismissal by the unsuspecting Bankruptcy Court within 30 to 45 days, defendants could resume "the loan modification process" – i.e. **resume billing the homeowner client**.  As Mr. Giordano testified clearly, the purpose of pushing the clients to file bankruptcy Petitions was to give Defendants more time to bill.[172]

The thousands of pages of Loan Post Notes expose the extent of the harassment for payments and lack of results achieved for the NVA clients.  In one referral to Mr. Giordano, for a couple, Jerry and Kewanna Morgan, Mr. Krueger notes, "Mrs. Morgan mentioned to me that she filed last time and was dismissed on 6/14/2019 for nonpayment of her filing fees. She said they are interested in filing again under just her husband's name this time."[173] And Mrs. Morgan may have summed up the clients' experience with NVA best when after being "prepped and referred" to a Petition preparer for a *second* bankruptcy case and continuing to be harassed by the Defendants for payments for their services from May to December of 2019, she wrote to NVA:

> **"We have sent u guys thousands of dollars to end up still in the same situation. Then on top of that u keep calling like a bill collector. We r debating whether to keep trying to save our home thru this long grueling & expensive process with u guys or just file bankruptcy. I was debating but if I was going thru u guys if I'm not mistaken I had 10 days after a letter I received from u guys to respond & I was gonna send in our payment & paperwork today so everything will b up to date & accurate but u keep calling & calling & texting make it seem like a scam just for money."**[174]

Loan Post Notes for NVA clients show the Morgans were not alone in their frustration with NVA.  The Court can deduce that the client frustration was the natural result of the vacuum of accountability that is inevitable when using a profit generating "processing" plant to provide help to those needing professional legal assistance.  Several times, Nahas referred to his employees as "processors" who provide "intake" and "processing services."  When asked to explain what "processing" means, Nahas stated what they do for the local attorneys:

> We signed up a client. We sent them the file, the information we had. I don't remember if we sent it or they were just logged into our platform. I really don't remember. But we'd certainly notify them. And they would pick up where our processing team does today. They

---

[172] Trial Transcript (Giordano), ECF No. 491, p. 127, ll. 15-21.
[173] UST Ex. 90, ECF No. 436-61.
[174] UST Ex. 208, ECF No. 438-11, p. 96, Loan Post Notes for the Morgans, pp. 96-116.

reach out to the client. They start the document collection, work it all the way through the end.[175]

But instead of "picking up," as we see in Ms. Narcisse's pleadings and testimony, the business structure led to finger pointing. Ms. Kisch perfectly described the problem when she wrote in an email to her Co-Defendants, "**we really need to get the attorneys to speak to their clients and stop, if you haven't already using the petition preparation services.**"[176] Ms. Kisch also claimed she did not know that NVA was referring clients to bankruptcy petition preparers in her discovery deposition, but that since reading some of the Loan Post Notes, she has become aware of it.[177] The Court finds that given her level of involvement in the scheme which will be detailed further herein, Ms. Kisch's statement regarding petition preparers is not credible.

However, what these Defendants ignore is the fact that practicing law is a profession, it is not farmed out for processing, but scores of entries in Loan Post Notes, admitted into evidence by joint stipulation or with no objection, demonstrate that it was the "processor" attempting to handle the clients' legal issues, sadly and ineffectively, and in violation of every state law restricting the unauthorized practice of law.

The Loan Post Notes show one client, Mr. Andrew Barnes, also received calls and messages from NVA staff who said they were calling "on behalf of 'the firm.'"[178] These notes, NVA's own internal communications, document the urgency of the client's desire to save his home, his frustration with the inability to speak with legal counsel at the same time he is being harassed for payments to NVA. His home was scheduled for foreclosure sale on August 22, 2018. On August 15, 2018, an entry made by "Jannet D" of NVA states, "**I spoke to Mr Barnes, he said all we do is call and ask for a payment but we are not doing anything, he said he has asked to speak to his attorney several times and that we are also losing all of the docs that he sends us . . . Can someone please follow up with Mr. Barnes? He has a payment scheduled for 8/20..**"[179] When Mr. Andrew Barnes repeatedly sought the advice of his attorney, expressed his frustration with not being able to reach her and demanded to speak with her, he was transferred to various NVA employees.[180] Although Ms. Narcisse was sent an email by NVA staff member

---

[175] Trial Transcript (Nahas), ECF No. 494, p. 180, ll. 4-10.
[176] UST Ex. 256, ECF No. 441-22.
[177] Trial transcript (Kisch), ECF No. 495, pp. 152-153.
[178] UST Ex. 64, ECF No. 436-35, p. 3,4.
[179] UST Ex. 64, ECF No. 436-35, p. 3; Trial transcript (Krueger), ECF No. 494, pp. 20-27.
[180] UST Ex. 64, ECF No. 436-35, p.1.

Kelsey Brown with his contact information on August 16th, the Loan Post Notes indicate Ms. Narcisse did not attempt to return his repeated attempts to contact her until late on August 22nd.[181] Ms. Narcisse made a Loan Post Notes entry at 4:24 PM on August 22, 2018, which stated**, "I've been out of the office alot with trials the last 2 weeks. Just called Mr. Barnes—tried to leave a voicemail but was unable to do so. I will call again this evening."**[182] Unfortunately, the Loan Post Notes also indicate that Mr. Barnes lost his home when it was sold to the mortgage lender on August 22, 2018, and the NVA team closed his file the next week.[183] The Loan Post Notes show payments received from Mr. Barnes to Kealy Law Center PLLC from April 18-July 19, 2018 total $2,650.[184] Had bankruptcy counsel been recommended and a legitimate bankruptcy petition filed, the home likely would have been saved.

For NVA clients Ricky and Penny Champagne, the mortgage lender denied a loan modification request, and Denise Rodriguez sent an email to Ms. Narcisse to this effect but, only one minute later, referred the Champagnes to a petition preparer to file a *pro se* bankruptcy case and without any consultation between the Champagnes and Ms. Narcisse. Denise Rodriguez sent the bankruptcy documents to the mortgage lender.[185] This misuse of a purposefully incomplete Petition filing just to obtain a "case number" to continue the Defendants' foreclosure defense scheme is just another example of the flagrant disregard Rodriguez and other NVA staff had for the bankruptcy system and the legal consequences of filing a bankruptcy case.

Whether or not the Defendants ever had any legitimate concern about the bankruptcy process and the abuse thereof, they lost sight of helping the homeowner clients through the legitimate bankruptcy process. The end goal of the Defendants was to continue billing, resulting in the $12,624,371.88 NVA generated from homeowner clients' payments between January 2017 and August of 2022.[186] This staggering figure is only the amount of homeowner payments sent to NVA after Ms. Kisch's entities collected them, which does not include the funds kept by Ms. Kisch pursuant to her agreement with Mr. Nahas, the amounts paid to the "local attorneys such as Ms. Narcisse," or the funds paid by the homeowners directly to Mr. Giordano and the other bankruptcy

---

[181] Email to Ms. Narcisse, UST Ex. 61, ECF No. 436-32.; UST Ex. 64, 436-35, p. 1.
[182] Loan Post Notes for Andrew Barnes, UST Ex. 64, ECF No. 436-35, p. 1.
[183] UST Ex. 64, 436-35, p. 1; Trial transcript (Krueger), ECF No. 494, pp. 26-27.
[184] UST Ex 64, 436-35.
[185] Trial transcript (Krueger), ECF No. 494, p. 39; UST Ex. 70, ECF No. 436-41.
[186] UST Ex. 282, ECF No. 442-7.

form preparers. The creation of an attorney network using attorneys who often never met with, represented or spoke with clients – but received compensation – and the failure to disclose the bankruptcy petition preparers on the bankruptcy filings and to render the sham bankruptcy filings as *pro se* all persisted in concealing the true motive of the defendants and escaping detection by the Court, the Trustee and all other players in the bankruptcy process.

**Evidence of Efforts to Conceal the Foreclosure Defense Scheme**

Although the Court was presented with an overabundance of evidence in this case, after years of discovery, it is also evident that the full scale of the foreclosure defense scheme may not be fully known. Not only did Mr. Giordano testify that his role in the scheme was to "avoid detection," but as early as 2019, there are NVA emails showing intent to distance or disguise Defendants from the Petition Preparer part of the foreclosure defense scheme.[187] One such example, admitted by Joint Stipulation of the parties, is a string of emails that began with a referral of a client by NVA staff member Tanya Rivera to a petition preparer, Quiana Ramirez, at Total Petitions, LLC.[188] The referral begins, "I have another referral for you to stay the sale. I went over your fees with her last week and again a few minutes ago for good measure," and ends with the client's name, address, contact information, social security number and the mortgage lender information.[189] The string shows that Qiana Ramirez forwarded the message to the client and to NVA staff, Mr. Krueger and Tonya Rivera, with her instructions to the client, which included, **"We can prepare the chapter 13 bankruptcy bare bones petition for you if you get the documents to us ASAP."**[190] From that message, Mr. Krueger forwarded the string to Mr. Nahas, and copying Tanya Rivera, asking, **"Am I being overly cautious here? I don't think Qiana should be sharing Tanya's referral email back to the client in her introductory petition prep email."**[191] Mr. Nahas indicated he agreed, and Mr. Krueger instructed Qiana "to refrain from doing that."[192] Again, the Court finds it unbelievable that a primary defense offered was that Defendants did not work together and there was no organized effort to file bare bones, abusive bankruptcy petitions. Clearly, that defense fails.

---

[187] ECF No. 491, p. 131, ll. 9-15.
[188] UST Ex. 170, ECF No. 437-22.
[189] UST Ex. 170, ECF No. 437-22, p. 2.
[190] UST Ex. 170, ECF No. 437-22, p. 1.
[191] UST Ex. 170, ECF No. 437-22, p. 1.
[192] UST Ex. 170, ECF No. 437-22, p. 1; Trial transcript (Krueger), ECF No. 494, p. 70-72.

Of particular importance to the Court in addressing the concealment and pattern of conduct of the defendants to abuse the Bankruptcy Code is that even after the filing of this Adversary Proceeding and the commencement of pretrial discovery by the UST, the defendants continued the practice and simply stopped using emails and loan post notes to make referrals to the form preparers and instead made the referrals by telephone. **Mr. Krueger testified that after the Adversary Proceeding was filed, Mr. Nahas told Mr. Krueger and Ms. Rivera to cease the practice of sending homeowners to bankruptcy petition preparers, however, he also acknowledged that the referrals were still being made, but by phone and not by email.**[193] Giordano testified that after this Adversary Proceeding was filed, he no longer heard from Mr. Krueger, and that he started receiving referrals by phone calls from another NVA employee, Mr. Katz, instead of Mr. Krueger, but that at some point **Mr. Krueger mentioned that "this case was only about George Martin and he stressed to [him], meaning that anything outside of that doesn't have to be discussed."**[194]

Further, it bears noting that over the course of some three years in this adversary proceeding, defendants failed to be forthcoming in producing discovery records. The UST was required to repeatedly and diligently seek copies of records which defendants failed to produce.[195]

---

[193] Trial transcript (Krueger), ECF No. 493, p.77, l. 17 – p. 78, l. 21.

[194] Trial transcript (Giordano), ECF No. 492, p. 57, l. 24 – p. 58, l. 8.

[195] *See:* Impeachment Exhibit 1, ECF No. 483, Email chain between UST and Narcisse shows Narcisse sent an email regarding documents, but failed to attach them, delayed responding to discovery and when asked for "all" communications, she sought a dismissal from the suit based on her cooperation in producing "all that I have." Ms. Narcisse later explained that her attempt to exchange cooperation with informal discovery requests for her dismissal from this adversary proceeding was "her at her worst . . and sent "out of fear" rather than "nefarious purposes." Trial transcript 491, p. 13, ll. 6-10. She maintained that her responses to formal discovery were "as cooperative as possible," and any emails not sent were simply "human error." Trial transcript (Narcisse), ECF No. 491, pp. 13, l. 22 -14, l. 3.

Trial transcript (Narcisse), 490, pp. 51-57 (Compare Ex. 29 page 2, to Ex. 180, 437-32 and Ex. 67), Email forwarded to UST by Narcisse was incomplete.

Trial transcript (Narcisse), ECF No. 490, p. 108- HNS failed to give the UST the Ram Agreement (UST Ex. 26) in April 2022, because "she forgot it existed."

Trial transcript (Narcisse), ECF No 490, pp. 127-128, ln 1-10, Narcisse failed to give the UST copies of "welcome" emails sent to clients like the one to which Ex. 66 referenced in the Loan Post Notes for Dennie Dumas.

Trial transcript (Narcisse), ECF No. 490, p. 168 ll. 17-20, Narcisse failed to turn over her copy of email related to UST Ex. 43.

Trial transcript (Narcisse), ECF No. 490, p. 175, ll. 19-22, Narcisse failed to turn over the email at UST Ex. 38, where Mr. Krueger explained that filing the *pro se* Petition for a client was a "temporary fix, though, that cancels the sale forcing the lender to review of her submission package, but it is not a complete bankruptcy filing."

Trial transcript (Narcisse), ECF No. 490, p. 186, ll. 19-24, Narcisse failed to turn over email regarding UST Ex. 46, where she responded to Mr. Krueger that the petition prep service filing bankruptcy for the client would be a great

The UST did not receive through discovery any of the email referrals made by NVA staff other than those made by Mr. Krueger, which excluded the email referrals sent by Tanya Rivera. The "Summary of Loan Post Notes showing Making Referrals to BPPs," admitted without objection, reflects there were 31 Referrals for which the corresponding Email was not provided to the UST by the Defendant during discovery.[196]

Defendants expressed no respect or regard for the Bankruptcy Code, the rules of discovery or Mr. Martin and the other homeowner clients.

## Defendants' Liability under Section 329(b)

The Court first turns to the practice of professionals and unauthorized professionals in this Court and the Plaintiff's count under 11 U.S.C. § 329 seeking disgorgement of fees paid in exchange for services not rendered and/or that were excessive and unreasonable given the lack of value to Mr. Martin and which ultimately harmed him, his estate and likely that of all similarly situated "*pro se*" debtors who hired the Defendants to help them in their mortgage remediation efforts. The UST alleged that Defendants falsely promised legal services and arranged for abusive *pro se* bankruptcies as part of the foreclosure defense scheme and in doing so, the attorneys

---

option for him because "the client has to pay at least $2500 up front so any savings would be appreciated by him, I'm sure."

Trial transcript (Narcisse), ECF No. 491, pp. 61-66, Ms. Narcisse's responses to Request for Interrogatories 6 and 8 denying knowledge of fraud are compared to her allegations in her cross-claim that her co-defendants acted fraudulently.

The UST did not receive an email referral that was made by Tanya Rivera for client Ronald Leatherman, which was referenced in the Loan Post Notes in UST Ex. 208, ECF No. 438-11, p. 95. Trial transcript (Krueger), ECF No 493, p. 32, l. 24- p. 34, l.3.

The UST did not receive an email referral that was made by Tanya Rivera for client Veronica Camp, which was referenced in the Loan Post Notes in UST Ex. 208, ECF No.438-11, p. 13. Trial transcript (Krueger), ECF No 493, p. 34, ll. 13-15.

The UST did not receive an email referral that was made by Tanya Rivera for client Denine Dumas, which was referenced in the Loan Post Notes in UST Ex. 66, ECF No. 436-37, p. 9. Trial transcript (Krueger), ECF No 494, p. 28, ll. 10-18.

*See also* "Summary of Loan Post Notes showing Making Referrals to BPPs," UST Ex. 206, ECF No. 438-9, Admitted without Objection. Summary shows there were 31 Referrals for which the corresponding Email was not provided to the UST by the Defendant during discovery.

A copy of the RAM, LLC agreement with NVA was not turned over to the UST in discovery. Trial transcript (Nahas), ECF No. 494, p. 156, ll. 15-19.

[196] UST Ex. 206, ECF No. 438-9.

involved, Ms. Narcisse and Ms. Kisch, repeatedly and intentionally violated § 329 as a part of a clear and consistent pattern and practice. Section 329 of the Bankruptcy Code provides:

> Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

The Bankruptcy Court's duty to determine the reasonableness and necessity of fees paid to attorneys "is critical to the integrity of the bankruptcy process as 'the debtor is in a vulnerable position and is highly dependent on its attorney and therefore will be reluctant to object to the fees of the attorney.' The bankruptcy process starts with and depends on disclosure." *In re Learson*, 638 B.R. 341, 352 (Bankr. E.D. La. 2022) quoting *Jensen v. U.S. Trustee (In re Smitty's Truck Stop, Inc.)*, 210 B.R. 844, 848 (10th Cir. B.A.P. 1997). To this end, the Fed. R. Bankr. P. 2016 requires:

> Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 14 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to the United States trustee within 14 days after any payment or agreement not previously disclosed.

Fed. R. Bankr. P. 2016(b). "The legislative history for § 329 notes that '[p]ayments to a debtor's attorney provide serious potential for evasion of creditor protection provisions of the bankruptcy laws, and serious potential for overreaching by the debtor's attorney and should be subject to careful scrutiny.'" *In re Learson*, 638 B.R. 341, 352 (Bankr. E.D. La. 2022) quoting H.R. REP. NO. 95-595, at 329 (1977), reprinted in 1978 U.S.C.C.A.N. 5787.

Here, however, the UST has shown by clear and convincing evidence that the Defendants' foreclosure defense scheme thrived on *non-disclosure* by the petition preparers and attorneys hired and paid by Mr. Martin to help him save his home. Neither Ms. Narcisse nor Ms. Kisch filed a Rule 2016 disclosure in Mr. Martin's case or in any of the cases of similarly situated NVA clients who filed Petitions in Louisiana. Clearly they shared – as attorneys – in the fees paid by Mr.

Martin to NVA. Ms. Kisch accepting ten percent of $1,100 and Ms. Narcisse being paid $439.90.[197]

In most cases, bankruptcy courts are faced with bankruptcy counsel who openly appear in the case filed before it, precluding the need to examine the temporal and circumstantial components of § 329. Here, because of the lengths to which Defendants attempted to hide the conduct of the legal professionals involved, the Court must examine if the attorneys herein were hired and paid for "services rendered or to be rendered in contemplation of or in connection with the filing of a bankruptcy petition."

> [M]ost courts have interpreted the operative phrase— "'in contemplation of or in connection with'—as incorporating two different concepts and have applied different standards under each sub-phrase." *In re Mayeaux*, 269 B.R. at 622 (citations omitted). "A fee payment is made 'in contemplation of' a bankruptcy case if the underlying professional services were rendered at a time when the debtor was contemplating bankruptcy." *Id*. "The services should have more than a casual relationship to the bankruptcy proceedings." *In re Zepecki*, 258 B.R. at 724. **Applying § 329's provisions broadly, "[c]ourts apply a subjective test, looking to whether the debtor was influenced by the possibility or imminence of a bankruptcy proceeding in making the transfer, to determine whether attorneys' fees payments were made 'in contemplation' of bankruptcy."** *Id*. (citing In re Dixon, 143 B.R. 671, 676 n.3).

*In re Learson*, 638 B.R. 341, 355 (Bankr. E.D. La. 2022). (Emphasis added)

It is stipulated by the parties that Mr. Martin signed the Agreement showing Ms. Narcisse was his attorney and that he believed Ms. Narcisse was his attorney.[198] Further, Ms. Narcisse's contract with NVA was with Ms. Kisch as managing attorney for NVA.[199] His testimony shows that he thought his *pro se* bankruptcy case was a part of the services for which he hired the Defendants and with whom he communicated for months. He responded to the instructions of "Beth N.," "Ms. Kelly," and Denise Rodriguez who called him "on behalf of the Law Office of Halima Narcisse Smith."[200] In applying this subjective test, the Court looks to Mr. Martin's understanding from the beginning of his interactions with the Defendants, revealed by the totality of his testimony, particularly the statement that to save his home, Mr. Martin "just gave it to Ms.

---

[197] UST Ex. 151, ECF No. 437-3, p. 3.
[198] Joint Ex. 1, ECF No. 465, ¶¶7,8,9,21.
[199] UST Ex. 25, ECF No. 432-5.
[200] UST Exs. 1, 3, 5, 6, 7, 9; ECF Nos. 432-1, 432-3, 432-5, 432-6, 432-7, 432-9; UST Ex. 13, ECF 432-13, 432-18, 432-19; UST Ex. 222, ECF No. 439-6.

Kelly," whom he thought worked for Ms. Narcisse, and that he thought "she was handling it."[201] He even drove to Shreveport to file the bankruptcy Petition prepared by Giordano on their instructions in an effort to save his home.[202]

Mr. Martin's testimony is further supported by the testimony of Mr. Krueger and Mr. Giordano, who repeatedly confirmed that the filing of a bare-bones petition was the common method by which the Defendants perpetuated the foreclosure defense scheme when faced with a looming "sale date" on the home.[203] The temporal component of § 329, "in contemplation of or in connection with a bankruptcy case" is satisfied as Mr. Martin was paying the Defendants for services to save his home when the Defendants knew they were contemplating filing a bankruptcy case on his behalf "just to stop the foreclosure." Mr. Martin continued to pay them for mortgage relief, which payments continued to be made even after the Petition was filed.[204]

The Court finds the fees paid by Mr. Martin under the Agreement with Ms. Narcisse and to the Defendants were made "in contemplation of a bankruptcy case." Mr. Martin paid a total of $5,995 in fees to the Defendants. The Loan Post Notes for Mr. Martin show $1,100 was paid to Ms. Kisch's entity, Kealy Law Center, when it withdrew a $1,100 initial retainer from Mr. Martin's Ouachita Valley Federal Credit Union account.[205] Thereafter, EPPS, LLC, a payment processor for NVA Financial and Ms. Narcisse, withdrew nine $500 monthly payments from Mr. Martin's Regions Bank account.[206] After deducting its fee from each monthly payment, EPPS in turn divided Mr. Martin's funds and transmitted a total of $3,959.10 to NVA Financial and $439.90 to Ms. Narcisse.[207] Mr. Martin paid Mr. Giordano $200 on August 7, 2019, and $195 on August 12, 2019.[208]

The evidence admitted shows the compensation Defendants collected in connection with Mr. Martin's 2019 Bankruptcy Case, as well as in other cases involving similar victimized Western District of Louisiana residents and any compensation they received, no matter how small, exceeds the reasonable value of the services provided. To Mr. Martin, their services led to the dismissal

---

[201] Trial Transcript (Martin), ECF No. 489, pp. 77-78.
[202] Trial Transcript, ECF No. 489.
[203] Trial Transcript, ECF No. 493, p. 27, ll. 22-23; ECF No. 491, p. 127, ll. 15-21.
[204] UST Ex 8, 432-8, pp. 3, 7, 11, 15, 18, 23, 27, 31 and 35; Trial Transcript (Martin), ECF No. 489, pp. 96, 98.
[205] UST Ex 4, ECF No. 432-4, p. 3; UST Ex. 229, ECF No. 439-13, p. 71.
[206] UST Ex. 150, ECF No. 437-2, p. 3; UST Ex. 8, ECF No. 432-8, pp. 4, 8, 12, 16, 19, 24, 28, 32, 36.
[207] UST Ex. 151, ECF No. 437-3, p. 3.
[208] UST Ex. 8, ECF No. 432-8 pp. 8, 11.

of his case with a § 109(g) finding, another bankruptcy case added to his filing history and an excessive delay in achieving, through no effort of defendants, the home mortgage relief for which he originally sought their services.

Bankruptcy courts are "empowered, pursuant to 11 U.S.C. § 329 and Bankruptcy Rule 2017(a), to order the return of any unreasonable or excessive portion of an attorney's fee paid before commencement of a bankruptcy case for services rendered or to be rendered in contemplation of the filing of a bankruptcy petition." *Matter of Lee*, 884 F.2d 897, 899 (5th Cir. 1989) (citation omitted)( The bankruptcy court did not err in disallowing compensation for services not performed.) The bankruptcy court has broad authority to discipline attorneys and to award or disgorge fees paid in connection with bankruptcy proceedings. *Matter of Prudhomme*, 43 F.3d 1000, 1003-04 (5th Cir.1995); *In re Anderson*, 936 F.2d 199, 204 (5th Cir.1991). It is common for a bankruptcy court to order disgorgement of fees in order to obtain compliance with a court order or punish misconduct of attorneys. *In re Avante Real Est., Inc.*, 69 F.3d 536 (5th Cir. 1995), citing *Woods v. City Nat'l Bank & Trust Co.* 312 U.S. 262, 268 (1941); *Anderson*, 936 F.2d at 204. The Court examines each of the attorneys involved separately.

**Karen P. Kisch**

Ms. Kisch was a part of the NVA network of attorneys and was "local counsel" for Texas clients as well as the nationwide payment processor for NVA through her legal entities and managing attorney for NVA and its local counsel network. To make a distinction between her role as NVA "local counsel" as opposed to her role as bankruptcy attorney, she testified that she filed 139 bankruptcy cases in 2024 for "her personal clients," and that about 60% of those are in Chapter 13.[209] Interestingly, she testified when asked about her claim in an email wherein she claimed she had not been served, she stated:

> **So like I've said, I don't litigate in Bankruptcy Court. So when I consider a law suit, most of my clients are served you know, served by processor. I forgot completely that you just have to put it in the mail in Bankruptcy Court.**[210]

---

[209] Trial transcript (Kisch), ECF No. 495, p. 150-151.
[210] Trial transcript (Kisch), ECF No. 495, p 167, ll. 11-14; UST 256, ECF No. 441-22; UST Ex. 256, ECF No. 441-22.

The Court finds it odd that Ms. Kisch would testify that she does not litigate in bankruptcy court while filing about 139 cases a year in bankruptcy court. This was however the least of her frequent inconsistencies in her pleadings and testimony. Ms. Kisch was not a credible witness.

In her deposition testimony, Ms. Kisch denied knowing that NVA referred its clients to petition preparers and suggested at trial that she only became aware of it after reading the Loan Post Notes in this Adversary Proceeding.[211] The Court begins by noting this is not the first time Ms. Kisch has been the subject of the investigation of misuse of the Bankruptcy Code and subject to disgorgement of fees under § 329. The UST introduced exhibits, which were admitted by Joint Stipulation of the parties, of several instances where Bankruptcy Courts have stumbled upon her involvement in *pro se* filings, showing a consistent pattern of abuse of the Bankruptcy Code dating back to 2016.

In January of 2016, a *pro se* case was filed in the Southern District of Mississippi by Loretta Alsworth. Although Ms. Kisch (then Kealy) was a licensed attorney, she acted as a petition preparer under a 2015 Colorado registered entity, Petition Prep, LLC.[212] The UST filed a §329 Motion to Examine the Transactions with Ms. Alsworth, alleging Kisch failed to disclose she was attorney, failed to move to appear *pro hac vice* and acted as a "ghostwriter" contrary Fed. R. Bankr. P. 9011. *See In re Futch*, No. 09-01841-NPO, 2011 WL 1884187, at *2 (Bankr. S.D. Miss. May 18, 2011), citing *In re Cash Media Sys., Inc.,* 326 B.R. 655, 673 (Bankr.S.D.Tex.2005). The UST Motion was granted, and Ms. Kisch agreed to disgorge $200.[213]

Kisch admitted that Petition Prep, LLC was her entity, through which she hired a bankruptcy paralegal named Qiana Ramirez to draft Petitions, but who no longer works for Petition Prep, LLC. She also hired Anthony Torres and Joe Camarada to work at Kisch Consumer Law, however, all three of these people appear to work or have worked for Total Petitions, another source to whom NVA made client referrals. Ms. Kisch was asked:

> Did Total Petitions have a relationship with NVA?
> A Other than seeing the referrals, I have no idea other than that.
> Q That's what I'm referring to. Is Total Petitions, are these people, Kiana Romerez,
> Anthony Torres, were they [B]PPs that NVA referred homeowners to?

[211] Trial transcript (Kisch), ECF No. 495, pp. 152-153.
[212] UST Ex. 185, ECF No. 437-37 (Case No. 16-0002); Ms. Kisch testified that Petition Prep, LLC was her entity. Trial transcript (Kisch), ECF No. 495, p. 137-139.
[213] UST Ex. 185, ECF No. 437-37; Trial transcript (Kisch), ECF No. 495, pp. 91-94.

A I've come to that conclusion now from this case, yes.
Q Okay. And Anthony Torres works for Kisch Law Firm, is that what you said?
A He's one of my bankruptcy paralegals today.
Q Understood. Joe Camarado, what is his role?
 A He used to work for me. He was my legal assistant intake person, but he has moved on to another firm.[214]

The Court finds Ms. Kisch's feigned recently-acquired knowledge of the link between NVA and the petition prep companies and their shared employees disingenuous considering the appearance of "Petition Prep, LLC" along with the name Karen Kealy in the *pro se* disclosures of Ms. Alsworth's case in 2016.

Also in January of 2016, a *pro se* case was filed by Darlene Cheers in the Northern District of Georgia, where "Karen Kealy" is listed as the petition preparer on the Petition for Chapter 7 relief.[215]  Based on her prior filing history, Ms. Cheers was not eligible for a discharge.[216]  When asked during her testimony in this trial why she was listed as petition preparer in Ms. Cheers case, Ms. Kisch denied that she was the petition preparer, and offered in explanation:

> I can't think that there's a reason. Because my name, my firm's name appears on her bank statements as the payment processor for her loan modification work. So she may have misunderstood that I'm not her attorney, I'm the petition prep, I mean not the, sorry, the payment processor and thought that I was the one she paid to help her.[217]

When further questioned about the timing, the UST noting Ms. Cheers filed in 2016, which was a year before Ms. Kisch was hired by NVA in 2017, she simply denied giving legal advice to Ms. Cheers and stated that she does not remember the case at all.[218]  The Court notes that on Ms. Cheers' §521 Statement of Intention, it states with respect to her home "Retain the property and Debtor intends to negotiate a loan modification with her lender."[219]  In reviewing the pleadings in the Cheers case, the Court finds that this §521 Statement suggests the pattern of using the *pro se* bankruptcy filing to gain time to negotiate a loan modification without regard for the legitimate purpose and rights of debtors and creditors in bankruptcy cases began earlier than 2017 and perhaps with Ms. Kisch herself.

---

[214] Trial transcript (Kisch), ECF No. 495, p. 139, ll. 1-14.
[215] UST Ex. 186, ECF No. 437-38 (Case No. 16-50126).
[216] UST Ex. 186, ECF No. 437-38.
[217] Trial transcript (Kisch), ECF No. 495, pp. 95, lines 15-20.
[218] UST Ex. 186, ECF No. 437-38; Trial transcript (Kisch), ECF No. 495, pp. 94-96.
[219] UST EX. 186, ECF No. 437-38, p. 37.

Once Ms. Kisch was hired by Mr. Nahas in 2017, her role as "payment processor" seems to have exposed her involvement in cases in other districts. On July 24, 2017, Mr. Donald Danko filed a *pro se* Petition in the Northen District of Ohio, where again, the matrix and schedules list only the mortgage creditor. With that Petition, Mr. Dallas Evans filed the § 110 Disclosure as the petition preparer who was paid $199, but a separate form filed by *pro se* debtors in that district and signed by Mr. Danko reflects he paid $255. Noting this discrepancy, the UST filed a Motion to have Mr. Evans provide a full accounting, wherein it is also alleged that Mr. Danko disclosed paying $1,350 to Kealy Law Center. The services exceeding the amount allowed by local rule and Mr. Evans failing to appear at the hearings on the Court's Order to Appear and Show Cause and the UST's Motion, the Court Ordered Mr. Evans to disgorge $250 and permanently enjoined him from acting as a bankruptcy petition preparer on September 15, 2017. The Court issued a separate Order to Appear and Show Cause to the Kealy Law Center, ordering the production of all contracts, payment information, description of services for Mr. Danko to the UST. The Order was served on Kealy Law Center at 9300 West Courthouse Road, Suite 301, Manassas, Virginia 20110, which is an address also used for Mr. Nahas's American Mortgage Assistance Center and NVA.[220] Ms. Kisch sent a Response to the UST but did not file it into the record, wherein she states "Mr. Evans is a referral source we send clients to." Ms. Kisch explained at trial that her use of the word "we" was a simple mistake, and that she should have stated that [NVA "local counsel" in Ohio] Mr. Faroniya "through NVA" may have sent referrals to Mr. Evans.[221] In the Response she also stated:

> The Kealy Law Center in no way acts as a bankruptcy petition preparer. The Kealy Law Center, at the direction of the debtor's local attorney, refers clients to petition preparation companies if there's a need for these services. The client contracts with the petition preparation service directly if they choose to use this service.[222]

But when asked at trial, **"Was this statement true and correct at the time you made it?" she stated:**

> **No, it's not. I probably just thought it was the best way to handle it. But I don't do that for him or any other lawyer. . . . I don't send clients to petition companies at the direction of local counsel. As a matter of fact, most local counsel don't refer to bankruptcy preparers.**

---

[220] UST Ex. 184, ECF No. 437-6, p. 82. See eg. UST Exs. 273 and 287; Trial transcript (Krueger), ECF No. 492, pp. 186-187; Trial transcript (Nahas), ECF No. 494, pp. 178-179.
[221] Trial transcript (Kisch), ECF No. 495, p. 103, ll. 2-10.
[222] UST Ex. 184, ECF No. 437-36, p. 86.

**Q. If it was incorrect at the time, why did you make the state, the incorrect statement in the first place?**

**A. I don't know. I'm sorry.**

**Q. You don't have an explanation?**

**A. No, just the fact that I tried to help the attorneys and that was what NVA asked me to do so, but I've never referred a client for anyone to a bankruptcy petition preparer, any other attorney's clients.**[223]

After Ms. Kisch and NVA's local counsel, Yousef Faroniya, disclosed to the UST information about Mr. Danko and two other NVA clients who filed cases in the Northern District of Ohio, an agreement was reached between the UST, Mr. Faroniya and Kealy Law Center to refund fees to the three *pro se* filers.[224]  Following the Notice of the UST regarding the additional information received from Kealy Law Center and the settlement, the Court entered minute entry, "Hearing set for 11/1/2017 not necessary, reported as resolved and no further action against Kealy Law Center necessary."[225]

This is also not the first time a Nahas entity and Kealy Law Center have been Co-Defendants in an Adversary Proceeding.   In 2018, the UST filed a Complaint against ND Processing, Friedman Law Associates, P.C., David C. Graham, Esq. and Kealy Law Center in the District of Kansas seeking relief under §§ 526-528, alleging facts very similar to the facts alleged against the Defendants herein as shown in the excerpted pleadings attached as Appendix 1.

The similarities between Mr. Martin's and the Fuller case are unmistakable.  The Stipulated Judgment that resolved the Adversary Proceeding stated that NVA Financial Services, LLC shares the same address as Kealy Law Center, NVA received the *pro se* debtor's payments, and that Mr.

---

[223] Trial transcript (Kisch), ECF No. 495, p. 104, l. 21 – p. 105, l. 12.

[224] *See* Richard Lee Jones, Case No. 17-51866 (NDOH) filed on Augst 7, 2017, pursuant to the Danko Stipulation, Ms. Kisch also agreed to return of $1,100 in fees to Mr. Jones; (UST Ex. 184, ECF No. 437-36, pp. 155-157); and Curtis Norman Dorsey, Case No. 17-14799 (NDOH) filed on August 15, 2017, the Court ordered Kealy Law Center and Yousef Faroniya to refund $2,600 to Mr. Dorsey, but no certification of the payment made as ordered, the court ordered a representative of the Kealy Law Center and Mr. Faroniya to appear at a hearing on January 23, 2018, but the certified docket sheet reflects hearing was canceled after a Notice of Certification of Disgorgement was entered. (UST 184, ECF No. 437-36, pp. 97-123.).

[225] UST Ex. 184, ECF No. 437-36, p. 28.   UST EX. 184, ECF No. 437-36; Trial transcript (Kisch), ECF No. 495, pp. 22-96. See also Another "bare-bones" *pro se* Chapter 13 case was filed on January 10, 2020 in the Northern District of Ohio by Paula Colston (Case No. 20-10172), in which only the mortgage lender was listed as a creditor on the matrix.  Again, in the separate form required of pro se debtors in the Northen District of Ohio, Ms. Colston's form shows she paid $345 to "Jefery" to have her Petition prepared. UST Ex. 184, ECF No. 437-36, p. 19.  Her case was dismissed for deficiencies in the pleadings on February 28, 2020. UST Ex. 184, ECF No. 437-36; Trial transcript (Kisch), ECF No. 495, pp. 2-21.

Nahas exercised his authority to execute the Stipulated Judgment.[226] It further provided that NVA Financial Services and its employees would not act as a debt relief agency or provide debt relief services to any individual who could file a bankruptcy case in the District of Kansas, but other relief against Kealy Law Center was waived.[227] The Kansas Complaint filed and served on Kealy Law Center in 2018, with the detailed recitation of what this Court now finds has been the standard operating procedure for the Defendants since at least 2017, completely discredits her testimony that she did not know NVA was referring clients to bankruptcy petition preparers until she read some of the Loan Post Notes in the course of this Adversary Proceeding.[228] Ms. Kisch is an officer of the Court and a member of the State Bar of Texas. Her lack of candor and inability to speak the truth deeply disturbs this Court.[229]

The UST asked Ms. Kisch about the unusual lack of any written agreement with NVA, as the keeper and controller of the money in the Law Pay account from the inception of their business relationship in 2017:

> I'm trying to understand, Mr. Nahas, not what I would call a small time businessman. You're an attorney. It seems like there is a lot of money, we're talking millions of dollars per year. And we have this arrangement and understanding. And you all are two time zones away from each other, and there's no written agreement governing how this is going to operate and work. Why was it never reduced to a writing when this was an agreement involving millions of dollars every year? Our calculations show upwards of 12 million in revenue, although I don't think all of that went through LawPay. Why, given that you're an attorney and he is not a new businessman or he's not small time running, you know, a box on a corner, why was this never reduced to a writing?
>
> A I believe he trusted me. He didn't think I was going to abscond with his money. He trusted me.[230]

The Court finds their casually simplistic, mutual trust so unconvincing that it lends more weight to the finding that this was a purposeful detail in their conspiracy to disguise the business practice from the eyes of prying bankruptcy courts.

---

[226] UST Ex. 187, ECF No. 437-39, pp. 54-55.
[227] UST Ex. 187, ECF No. 437-39, p. 55.
[228] Trial transcript (Kisch), ECF No. 495, p. 152, l. 15 – p. 153, l. 18.
[229] While the Court does not need additional evidence against Ms. Kisch for the UST to meet the clear and convincing burden imposed by the Court, the UST at ECF No. 240, pp. 11-12, related the prosecution of Ms. Kealy in the state of Colorado, which forced her to file a personal bankruptcy in an attempt to discharge the imposed judgment for acts similar to those cases described above.
[230] Trial transcript (Kisch), ECF No. 495, p. 129, ll. 1-16.

The Court finds Ms. Kisch's lack of candor before it is appallingly unethical. Ms. Kisch has exhibited a repeated nationwide pattern of hiding her involvement in *pro se* cases starting in 2016, skirting ethical obligations to clients, being discovered, and after disgorgement of de minimis sums imposed by courts in individual cases, reappearing in new venues to perpetuate the foreclosure defense scheme. The Court finds her repeated disregard for the ethical and professional obligation to homeowner clients in need of meaningful legal counseling in their most stressful moments has been motivated by sheer greed.[231] The Court finds more than sufficient cause exists under § 329(b) to bar her to the extent it can from enjoying the fruits of egregious and unethical conduct. *In re Soulisak*, 227 B.R. 77, 82 (Bankr. E.D. Va. 1998). Ms. Kisch is ordered to disgorge the $110.00 – ten percent fee she received from Mr. Martin and pay same to his Chapter 13 Trustee in Case No. 19-31260 within 30 days. Further this Court will make a disciplinary referral to the State Bar of Texas and the Chief Judge of the Southern District of Texas.

The Court refers Karen Kisch to the U.S. District Court for the Western District of Louisiana for disciplinary actions and recommends she be suspended from practice in the District for a period of 1 year under Local Rule 83.2.10. Pursuant to the same rule this Court will order she be suspended from practice in the U.S. Bankruptcy Court for the Western District of Louisiana for a period of 90 days. The Bankruptcy Clerk's Office will be ordered to immediately suspend Ms. Kisch's CM/ECF privileges and password. Any reinstatement following the suspension is to be contingent upon payment of all fees, disgorgement and sanctions against Ms. Kisch herein.

### Halima Narcisse Smith

Ms. Narcisse is an attorney and has been admitted to the Louisiana bar since 2002, practicing family law, successions, estate planning and some civil litigation as the sole member of The Law Office of Halima Narcisse Smith.[232] She does not practice foreclosure defense or bankruptcy law.[233] In 2017, she was looking for supplemental work: "At that time my business was in a lull, as happens a lot in solo practitioner businesses, and I needed supplemental income. I had a son who was going to LSU in a couple of months. I just bought a new house with my

---

[231] Ms. Kisch's role in the scheme was repeated emphasized throughout the testimony and evidence admitted at trial; Kisch's legal agreement with Narcisse, UST Ex. 25, ECF No. 432-5; ECF No. 494, pp. 203-204; ECF No. 495, p. 112; ECF No. 494, pp. 143-144; ECF No. 495, p. 88.
[232] Trial transcript ECF No. 490, p. 11-13, ECF No. 491, p. 10.
[233] Trial transcript, ECF No. 490, page 12, l. 12-20.

former husband, so there were a lot of strains."[234] She responded to a Zip Recruiter advertisement that NVA posted, promising the following benefits: **"Additional income stream with very little time expenditure on your part.. . .Depending on your state, we may be able to generate tens of scores of client for you over a several-month period with each one paying you an average $250 to $450, although this amount could be higher depending on the complexity of this case."**[235]

When her response to the ad was sent, NVA sent a message through Zip Recruiter that said in pertinent parts:

> "We have assembled a network of approximately 100 attorneys nationwide in order to assist clients in their state with loan modification/foreclosure defense. Our intake and processing centers in Virginia and New York handle the majority of the work including:
>
> National television marketing campaign with several ad agencies generating hundreds of calls per week.
>
> Pre-screening to determine good candidates for loan modification programs; MARS compliant intake professionals to retain the client on your behalf.
>
> All customer service including document collection, weekly updates for the clients, billing and collections."
> . . .
> Attorney responsibilities are as follows:
>
> Oversight of the file, including veto power, if it is deemed that the client is not a good candidate.
>
> Provide any legal advice that may be required. This usually only occurs when we are unable to obtain a modification for the client, and further options such as bankruptcy may need to be considered.
>
> Represent client at hearings, although this is extremely unlikely. The need for this is usually precluded by our loss mitigation efforts directly with the lender. Among our entire network of attorneys, the need to appear at a hearing may only happen once every several months.

---

[234] Trial transcript 490, p. 196, ll. 18-22.
[235] UST Ex. 24, ECF No. 432-24, pp. 2-3; See also Trial transcript (Narcisse), ECF No. 490, p. 82.

In addition, if the location of the hearing is geographically impractical or impossible, we have the ability to hire someone to make an appearance on your behalf.

. . .

Additional income stream with very little time expenditure on your part.[236]

This was signed by Steve J. Nahas as Owner of American Mortgage Assistance Center.[237] Ms. Narcisse responded that she was "interested in becoming a part of your team."[238] She had only one meeting by telephone with Mr. Nahas, during which she took sparse notes outlining her duties, after which she signed a Third Party Services Agreement with Kealy Law Center.[239] The extent of her notes was that she would be paid 10% of the homeowner fees for which she would "do welcome email, respond to answer, appear in court if necessary (happens very rarely)."[240] But the Agreement required Narcisse to pay Kealy Law Center 90% of fees collected and "properly supervise non-attorney tasks and services."[241] When confronted with the terms of the Third Party Services Agreement with Kealy Law Center, she denied either party "performed" under this agreement, stating: "Yes, this contract, as I said before, none of the duties and responsibilities of either party were fulfilled. They were not met. This contract is hollow. It has no legal merit."[242] She went further, **"Just because it says it doesn't mean that it happened in reality. Again, as I testified ad nauseam about this document, none of the duties and responsibilities were fulfilled by either party. It's a completely hollow contract. Completely hollow. Nothing that's contained in this was actually done by either party."**[243]

> Q So you mentioned earlier that this was a hollow, if you will, hollow contract. So in your mind did it have any effect?
>
> A In my mind, no, because none of the terms were followed by anyone and it wasn't what I agreed to do or what was explained to me that I would be doing when I spoke with Mr. Nahas when he outlined what my attorney responsibilities would be."[244]

---

[236] UST Ex. 24, ECF No. 432-24, p. 2
[237] UST Ex. 24, ECF No. 432-24, p. 3.
[238] UST 24, ECF No. 432-24.
[239] Trial transcript (Narcisse), ECF No. 490, p. 203, ll. 5-8; Narcisse Exs. 2-3, ECF Nos. 435-2, 435-3; UST Ex. 25, ECF No. 432-25.
[240] Narcisse Ex. 2, ECF No. 435-2.
[241] Narcisse Exs. 2-3, ECF Nos. 435-2, 435-3; UST Ex. 25, ECF No. 432-25.
[242] UST Ex 25, ECF No. 432-25; Trial transcript (Narcisse), ECF No. 490, p. 85-88.
[243] Trial transcript (Narcisse), ECF No. 490, p. 98, ll. 19-24.
[244] Trial transcript (Narcisse), ECF No. 490, p. 206, ll. 4-9.

Narcisse maintained, "What I understood my duties were, were to appear in court if necessary, draft responsive pleadings if necessary, be available to advise clients, specifically to advise clients should the loan modification fail what their options would be."[245]  On June 15, 2017, Narcisse executed the RAM Agreement authorizing Nahas/NVA to access client funds. [246]

Ms. Narcisse testified over the course of two days, with her initial responses to the UST's questions being less than forthcoming, often failing to recall or being evasive.   For example, when asked how NVA notified her of a new client, she responded, "My understanding is that it was *the company's client* because I did not enter into any attorney/client contract with any homeowner."[247] Ms. Narcisse denied that she received funds from Mr. Martin, because she "did not receive any money that came from Mr. Martin's bank account *directly*."[248] When asked if she used the Loan Post Notes system, she admitted making some entries, but did not recall anything specific.[249] When asked if she received emails with client information updates sent by NVA, she responded:  When someone felt the need to send them to me, they sent them to me.[250] The Court did not find her testimony reliable in the least, particularly after a day of not being able to recall receiving notifications of new clients, sending client emails and making Loan Post Notes entries were refuted by stipulated Exhibits and Impeachment Exhibits entered into evidence.[251]  What was very clear to the Court was that she took no action as an attorney to represent Mr. Martin other than accepting the retainer fee to represent Mr. Martin.

When asked, "Did you represent Mr. Martin in the mortgage distress and foreclosure?" she responded: "His file was assigned to me, yes. However, I did not receive any notice of his bankruptcy, so there was nothing that I could do at that point."[252] However, emails and Loan Post Notes for Mr. Martin show she did receive an email notification of Mr. Martin's "New Client File" and was sent a message on August 7, 2019, by Denise Rodriguez, noting she spoke with the foreclosure attorney after his *pro se* case had been filed.[253]

---

[245] Trial transcript (Narcisse), ECF No. 490, p. 205, ll. 14-17.
[246] UST Ex. 36, ECF No. 432-36.
[247] Trial transcript (Narcisse), ECF No. 490, p. 41, ll. 2-4 (emphasis supplied).
[248] Trial transcript (Narcisse), ECF No. 490, p. 34, ll. 5-12 (emphasis supplied).
[249] Trial transcript (Narcisse), ECF No. 490, p. 43.
[250] Trial transcript (Narcisse), ECF No. 490, p. 44-45 ll. 4-5.
[251] See UST Exs. 29, ECF No. 432-29; UST 30, ECF No. 432-30; UST Impeachment Exhibits 1,3,4-6, ECF No. 483.
[252] Trial Transcript (Narcisse), ECF No. 490, p. 91, ll. 20-22.
[253] UST Ex. 29, ECF No. 432-29; UST Ex. 222, ECF No. 439-6, p. 11.

When asked if she represented other clients, specifically Barbara Freeman or Elbert White, she responded, "That is a tricky question. . . .Yes and No," and explained, "No in the sense that I did not physically enter into an attorney/client relationship with her. But did I provide legal services for her, yes."[254]

The UST adduced evidence of several instances where, despite her statement that she did not practice bankruptcy, she was specifically asked by Jay Krueger in an email to give legal advice regarding bankruptcy to NVA client, identified as Deno Shelmire.[255] Ms. Narcisse responded in the Loan Post Notes for the Shelmire client, **"I spoke with Ms. St. Andrew about becoming the executor of the estate- she didn't understand, so I talked her through it. She is unable to file for bankruptcy since she filed on 2 prior occasions. Her sister, who inherited ½ of the property, will be looking into filing for bankruptcy to save the house."**[256] Her testimony also reflected that she understood the gravity of filing a Petition for Bankruptcy relief, the legal consequences and cost to the debtor, such that she referred one client to a bankruptcy attorney. In response to an email from Mr. Krueger regarding the Patin clients, which stated,

> "Halima, the Patins' request for modification has been denied by Wells Fargo. They'll have an FHA loan and received a mod in September of 2018. They are not eligible for consideration of another mod until June of 2020. Bonnie has reviewed the denial with the clients, they are aware of the sale date on 10/2. Please contact them to discuss retention options and exit strategies. It's our understanding that they intend to file bankruptcy. Per their request, **we have provided them with a referral to a petition prep service, but suspect they will need full representation for BK.** They had an $800 payment scheduled to be run now, but the billing was suspended with the denial and having exhausted loss mitigation options. Sale date 10/2/2019."[257]

> Q So what did you do after you received this email?
> A I called the Patins and, even though they were referred to a bankruptcy petition preparer, I still gave them the option to talk to a bankruptcy attorney.
> Q Did you refer them to a bankruptcy preparer?
> A No.
> Q Did you say that they need to seek a bankruptcy preparer?
> A No.[258]

---

[254] Trial transcript (Narcisse), ECF No. 490, p. 151, lines 14-24; UST Ex. 36, p 1, ECF No. 436-7.
[255] UST Ex. 40, ECF No. 436-11.
[256] UST Impeachment Ex. 6, ECF No. 483, p. 105.
[257] Trial Transcript (Krueger), ECF No. 494, p. 42, ll. 10-23; Narcisse Ex. 27, ECF No. 435-28.
[258] Trial transcript (Narcisse), ECF No. 491, p. 24 l. 8- p. 25, l. 6.

Nevertheless, the Loan Post Notes for the Patins reflect that they had already paid the Defendants $1,400, and had requested a refund of $600. The Patins filed a *pro se* Petition for relief (Case no. 19-51172) after being referred to Mr. Giordano to prepare the Petition.[259] Although she knew referrals to petition preparers were being made, she insisted that was not something she did.[260]

In response to her evasiveness regarding whether or not she received notifications when a client was assigned to her, the UST introduced Impeachment Exhibit 8, which is a summary based on all of the Loan Post Notes admitted into evidence by Joint Stipulation at ECF No. 474. The Summary identifies 207 email notifications sent to Ms. Narcisse at her email address.[261] These are "New Client Notifications," updates, notes regarding specific questions, documentation of problems in the clients' files and requests by clients to speak with their attorney. Out of the 207 emails to Ms. Narcisse, dated between July 5, 2017 and December 22, 2021, Ms. Narcisse responded in the Loan Post Notes file only 30 times, which is only 14%, with most of those responses occurring between July and September of 2017 when she had first been hired by Ms. Kisch/NVA.[262]

Ms. Narcisse testified that she made approximately $16,000 from "this venture" between 2017 and 2022. Regarding that income, she testified:

> A. The money came from NVA Financials. I don't know for which person discreetly it came from because it was not segregated that way.
> Q. If NVA was paying you money did you ask NVA to provide any tax forms to reflect that you were receiving income from NVA?
> A. No, they did not send me any 1099s.
> Q. Did you ask for one?
> A. No.
> Q. Why not?
> A. I don't know. I just --
> Q. Did you report this income to the IRS?
> A. I report -- I give my bank statements to my accountant and he prepares them based on my statements, so —[263]

---

[259] UST Ex. 163, ECF No. 437-15, pp. 80-95; UST 148A, pp. 54-70, Trial Transcript (Narcisse), ECF No. 491, p. 24; Trial Transcript (Krueger), ECF No. 494, p. 42.
[260] Trial transcript 491, p. 44, ll. 21-25.
[261] UST Impeachment Exhibit 8, ECF No. 482, pp. 9-38.
[262] UST Impeachment Exhibit 8, ECF No. 482, pp. 9-38.
[263] Trial transcript (Narcisse), ECF No. 490, p. 116, ll. 5-17; p. 115, l. 6.

Ms. Narcisse testified that she "never thought about EPPS or who was withdrawing anything from anyone's account."

With respect to use of her name and law firm name, Ms. Narcisse filed a cross claim in this Adversary Proceeding (which was dismissed on procedural grounds), in which she alleged her co-defendants acted fraudulently. When asked

> "They called third parties saying that they were from or with or employed in some way by the Law Office of Halima Narcisse Smith, and I have never employed anyone other than my mother and she's an independent contractor. I did not agree to them engaging clients on my behalf using my name. . . . I did not agree to any of that." [264]

The evidence overwhelmingly shows that Ms. Narcisse allowed her codefendants to use her name and law firm as a false façade to induce Mr. Martin into believing she was his attorney. She provided no legal counsel to Mr. Martin and the evidence clearly shows a pattern that she rarely acknowledged, met with or counseled her NVA referred clients; but – she always accepted their money.

And even this false façade was hidden from bankruptcy courts, because Defendants knew what they were doing was in violation of §§ 110, 526, 527 and 528 and for Ms. Narcisse, in violation of § 329 and the Disciplinary Rules applicable to attorneys in Louisiana.

Halima Narcisse Smith and the Law Firm of Halima Narcisse Smith does not deny that she collected compensation from Mr. Martin and other Louisiana clients "assigned" to her through their payments to NVA, and for which, in connection with the Mr. Martin's and other bankruptcy cases filed, performed no meaningful service in exchange for the amounts paid. Narcisse testified she collected $16,413.89 in connection with her NVA cases involving victimized Western District of Louisiana residents. Certainly, that amount exceeds the reasonable value of services provided by her as a licensed attorney.

The value of these services were not only $0 but were actually detrimental to Mr. Martin and to others in achieving the relief for which consumer bankruptcy protection exists and even

---

[264] Trial transcript (Narcisse), ECF No. 490, p. 2, l. 192-193; ECF No. 491, pp. 62-66, ll. 8-14.

further in the filing of "sham cases" that add prior case history to debtors with real consequences under § 362(c) and/or 109(g).[265]

The Court will order disgorgement of the fee paid by Mr. Martin in the amount of $439.90 to be paid to his Chapter 13 Trustee in Case No. 19-31260 within 30 days.

Unlike Ms. Kisch, Ms. Narcisse is licensed to practice law in the State of Louisiana and therefore subject to the review and discipline of this Court as well as the Office of Disciplinary Counsel, the Supreme Court of the State of Louisiana, and the U.S. District Court.

Lawyers are officers of the Court and are held to higher standards. Lawyers must serve their clients best interests within the bounds of the law. Courts and clients alike rely on lawyers to be present, dedicated to the law and to honor the agreements and contracts they make with their clients.

> "An attorney is required to perform reasonable inquiry to include interviewing the client, requiring the client to produce relevant information, reviewing the client's financial documents and other information, and resolving any inconsistencies prior to filing the case." *In re Burnett*, No. 21-020187-dd, 2022 WL 802586, AT *6, 2022 Bankr. LEXIS 684, at 14 (Bankr. D.S.C. Mar. 16, 2022) (citing *In re Kincaid*, Case No. 19-70433, 2021 WL 5858895, at *7-8, 2021 Bankr. LEXIS 3357 *24, (Bankr. C.D. Ill. 12/9/2021)).

Certainly this Court has the authority under 11 U.S.C. 105(a) to enforce court rules and orders to carry out the processes of the Bankruptcy Code and to sanction counsel and discipline unprofessional conduct.

Ms. Narcisse – despite her contract with Mr. Martin – never made an appearance before this Court, never counseled Mr. Martin, never assisted him in any way – but she accepted her fee to represent him. She testified she was paid over $16,000 to serve as local counsel in Louisiana for NVA's homeowner clients. Much of the evidence at trial shows she failed to take any action to represent the clients – she simply accepted the fee, knowing all the while that she was a part of the abusive scheme.

---

[265] UST Exs. 31-32, ECF Nos. 436-2 and 436-3).

The Court finds that Ms. Narcisse violated at least 10 of the Louisiana Rules of Professional Conduct.[266] This Court will make a referral to the Office of Disciplinary Counsel. Further the Court will send a copy of these Reasons to the Chief Bankruptcy Judges of the Eastern District of Louisiana District and Bankruptcy Courts.

Attorneys practicing in the Western District of Louisiana are subject to Local Rules 83.2.4 and 83.2.10, which are made applicable to the Bankruptcy Courts.

The Court refers Halima Narcisse to the U.S. District Court for the Western District of Louisiana for disciplinary actions and recommends she be suspended from practice in the District for a period of 1 year under Local Rule 83.2.10. Pursuant to the same rule this Court will order she be suspended from practice in the U.S. Bankruptcy Court for the Western District of Louisiana for a period of 90 days. The Bankruptcy Clerk's Office will be ordered to immediately suspend Ms. Narcisse's CM/ECF privileges and password. Any reinstatement following the suspension is to be contingent upon payment of all fees, disgorgement and sanctions against Ms. Narcisse herein.

### Mr. Krueger and Ms. Rodriguez

Although non-lawyers, the evidence at trial clearly shows that they both provided legal advice to Mr. Martin and other homeowner clients. They both encouraged bankruptcy filings, they gathered and provided client information necessary for the filing of the abusive bankruptcy filings and they accepted compensation for their services. Bankruptcy Courts look to state law to determine what actions constitute the unauthorized practice of law.

LSA-R.S. 37:213(1) makes it unlawful for an unlicensed person to practice law. LSA-R.S. 37:212(A) defines the "practice of law" as appearing in a representative capacity as an advocate in any court in the state, or advising, helping or acting for another in legal matters for compensation. LSA-R.S. 37:212 does not prevent persons from acting on behalf of themselves in legal matters. *Poirier v. Alco Collections, Inc.*, 107 F.3d 347, 350 (5th Cir. 1997).

The unauthorized practice of law by a non-licensed person is an affront to our exclusive and plenary power to define and regulate all facets of the practice of law, including the admission of attorneys to the bar. *See Bester v. Louisiana Supreme Court Comm. on Bar Admissions*, 00-

---

[266] Rules 1.1(a); 1.3, 1.4, 1.5(a), (b), and (e); 1.15(c); 3.3; 3.4; 5.4 and 7.1.

1360 (La.2/21/01), 779 So.2d 715. Additionally, it is a violation of state law under LSA-R.S. 37:213.

[V]iolation of the rules of this court and the laws of this state has the potential to undermine the public's confidence in the integrity of the judiciary. As we explained in In re: *Wimbish*, 98-2882, p. 5 (La.4/13/99), 733 So.2d 1183, 1187:

> The canons [of the Code of Judicial Conduct] were designed to promote a standard for judicial conduct that continuously reaffirms the integrity of the judiciary. Judges hold a unique position of administering justice. They symbolize the law, and, accordingly, their actions reflect favorable or unfavorably on the judicial system. For this reason, it is important that judges comply with the laws and rules governing their conduct in a manner which promotes public confidence.

*In re Broussard*, 2005-0475 (La. 4/22/05), 900 So. 2d 814, 817; Louisiana Revised Statute 37:213.

The "practice of law" is defined in LSA R.S. 37:212 which states:

> (1) In a representative capacity, the appearance as an advocate, or the drawing of papers, pleadings or documents, or the performance of any act in connection with pending or prospective proceedings before any court of record in this state; or

> (2) For a consideration, reward, or pecuniary benefit, present or anticipated, direct or indirect;

> (a) The advising or counseling of another as to secular law;

> (b) In behalf of another, the drawing or procuring, or the assisting in the drawing or procuring of a paper, document, or instrument affecting or relating to secular rights;

> (c) The doing of any act, in behalf of another, tending to obtain or secure for the other the prevention or the redress of a wrong or the enforcement or establishment of a right; or

> (d) Certifying or giving opinions, or rendering a title opinion as a basis of any title insurance report or title insurance policy as provided in R.S. 22:512(17), as it relates to title to immovable property or any interest therein or as to the rank or priority or validity of a lien, privilege or mortgage as well as the preparation of acts of sale, mortgages, credit sales or any acts or other documents passing titles to or encumbering immovable property.

Mr. Krueger and Ms. Rodriguez, individually and directing NVA staff to do so, represented to Mr. Martin that they were "with" Ms. Narcisse's office. Given their active involvement in advising Mr. Martin and countless others to file bankruptcy proceedings, and gathering – sometimes harassing Mr. Martin and others – for the information necessary for filing the abusive

bankruptcy cases, the Court will make a referral to the State Office of Disciplinary Counsel for investigation of Mr. Krueger and Ms. Rodriguez for their unauthorized practice of law in the State of Louisiana.

**The Defendants are all found to be Bankruptcy Petition Preparers and Debt Relief Agencies, Individually and Collectively**

Ruling on Motions by the Defendants for leave to appeal interlocutory rulings made by this Court, the U.S. District Court stated:

> **This case concerns the alleged abuse of the bankruptcy process by Defendants. Defendants comprise several entities and persons, each allegedly participating in a fraudulent scheme purporting to provide debt relief services to financially distressed homeowners—while instead providing nothing of value and taking what crumbs remained of their desperate victims' dwindled resources. Indeed, if the allegations are true, Defendants' "services" provided and methods employed amounted to an exploitative scam—one smidge above those of the "Nigerian Prince" ilk."[267]**

This Court finds by clear and convincing evidence that the allegations of the Complaint are true and that the Defendants acted in concert, in bad faith, to abuse the bankruptcy process and specifically Mr. Martin – acting at all times as bankruptcy petition preparers and debt relief agencies.

**Bankruptcy Petition Preparers**

At trial, counsel for defendants were reluctant to utilize the terms enterprise or business enterprise or any other reference that would have lead one to believe that they acted as a group. The testimony and evidence adduced at trial clearly showed that the defendants acted as a "team" as characterized by Mr. Nahas.

---

[267] ECF No. 413, pp. 1-2.

Mr. Nahas and Mr. Krueger knew each other for over two decades and were partners in a prior business venture. Mr. Krueger joined NVA Financial in 2014. Although an independent contractor for NVA, Mr. Krueger testified that he receives payment for his services through his entity US Auto Liquidators, LLC. The point being, Mr. Krueger and Mr. Nahas enjoyed a long running business relationship and Mr. Krueger progressed from being a "sale agent" at NVA to supervising processors and sales reps and basically becoming Mr. Nahas's right hand man.[268]

Mr. Krueger and other members of the NVA team communicated and interacted with document drafters to prepare "skeleton" or "barebones" bankruptcy forms. Specifically, Mr. Krueger recruited Mr. Giordano to assist NVA with NVA's need to file bankruptcies for homeowners. At the time Mr. Krueger struck the deal with Mr. Giordano on May 7, 2019, Mr. Krueger emailed "I've copied Tonya Rivera on this email so that the two of you have each other's contact info. I will start sending you some sale date referrals momentarily."[269]

Mr. Krueger would decide when a bankruptcy filing was necessary in a particular case and according to Mr. Giordano would instruct him to stop any bankruptcy prep when a bankruptcy filing was no longer necessary.[270] Regarding Mr. Martin, Mr. Krueger was the one who transmitted Mr. Martin's information to Mr. Giordano, which information resulted in the Chapter 13 bankruptcy case being filed.[271]

Mr. Nahas developed the policies and procedures by which NVA Financial operated and provided services to homeowners. These policies and procedures included the gathering and dissimilation of homeowner client information and the referral of same to persons/typists such as Mr. Giordano for the filing of bankruptcy proceedings, solely at the determination of NVA, for homeowner clients such as Mr. Martin.

Ms. Kisch maintained and controlled the Law Pay system which collected all monies from homeowner clients on behalf of NVA. As stated earlier, Ms. Kisch received 10% of the collections for her services. Ms. Kisch also was the managing attorney for local counsel and entered into the contract with Ms. Narcisse and handled the Texas filed for NVA.

---

[268] Trial transcript (Nahas), ECF No. 494, pp. 169-174; Trial transcript (Krueger), ECF No. 493, p. 77; ECF No. 492, pp. 172, 226.
[269] UST Ex. 62, ECF No. 436-33.
[270] Trial transcript, ECF No. 492, p. 53; See also ECF No. 436 – p. 102, l. 3.
[271] Joint Exhibit 1, ECF No. 465, ¶14 at p. 3; See also ECF No. 436-59, l. 2.

Ms. Narcisse was the contracting attorney with Mr. Martin, the Debtor herein and was to provide a list of services on behalf of Mr. Martin. Ms. Narcisse made entries into the loan post system regarding Mr. Martin, but states she never met or communicated with Mr. Martin.

On July 30, 2019, Mr. Krueger assigned Mr. Martin's file to Denise Rodriguez who was a contractor with NVA Financial. Ms. Rodriguez working by email with Mr. Krueger and Ms. Tonya Rivera communicated with Mr. Martin by email and ultimately Mr. Krueger spoke with Mr. Martin regarding needed documentation to address the upcoming foreclosure sale. Ultimately, Mr. Krueger, on behalf of NVA, "referred" Mr. Martin's information for typing by Mr. Giordano.[272]

Defendants repeatedly argued in pleadings and at trial that they had no ongoing business or enterprise related in anyway to the filing of bankruptcy proceedings. At times they indicated that they worked separately in an uncoordinated fashion. The evidence is clear and convincing that nothing is further from the truth. The loan post notes, the collection of monies from homeowners, the payments to each of them received from NVA for the services they performed, the emails and the fact that referrals were made to typists such as Mr. Giordano for filing bankruptcy proceedings all convincingly show that the parties worked in concert, collaboratively, for monetary gain. All of this was accomplished under the guise of "loan modification services," without regard to or compliance with the Bankruptcy Code.

Without the advertising for and solicitation of homeowner clients by NVA, Mr. Martin would not have become a loss mitigation customer. Without payment by Mr. Martin to NVA and the collection and processing of same by Ms. Kisch, NVA would not have performed services on behalf of Mr. Martin. Without the contract between Ms. Narcisse and Mr. Martin, Mr. Martin would not have known he had legal counsel representing his interests in the loan mitigation process.[273] Absent the gathering by NVA and its team of personal information of Mr. Martin, no bankruptcy referral could have been made by NVA and its team for typing by Mr. Giordano. Without the referral by Mr. Krueger and the repeated calls and emails from Ms. Rodriguez to Mr. Martin no bankruptcy case would have been filed. The Court is convinced that the Defendants, Nahas, NVA, Krueger, Giordano, Kisch, Narcisse and Rodriguez acted in concert for financial

---

[272] UST Ex. 222, ECF No. 439-6, pp. 11-12.

[273] Although Mr. Martin signed the contract, Ms. Narcisse states she did not sign the contract; however, she entered loan post notes regarding Mr. Martin. The false or sham representation by Ms. Narcisse, at the behest of Ms. Kisch, the managing attorney, only further facilitated the collaborative scheme of the defendants. See UST Ex. 222, ECF No. 439-6.

gain to profit from the foreclosure defense/mortgage modification scheme and the preparation of documents necessary to file barebones bankruptcy petitions to stop foreclosure sales. Mr. Nahas and Mr. Krueger testified that it was necessary to stop foreclosure sales in order to allow an opportunity to continue the loss mitigation process and obtain a new timeline from the mortgage lender for loss mitigation once the bankruptcy case was filed and then ultimately dismissed. Mr. Giordano testified that the cases were all to be filed as "bare bones" cases and purposefully, only the basic petition and documents were filed as NVA did not want the bankruptcy case to survive more than 30-45 days on the average. Further no bankruptcy petition preparer disclosure was made as required by the Bankruptcy Code.

As stated earlier, Courts do not narrowly limit "petition preparer" to only the typist or scrivener. The Courts have held parties liable as petition preparers when those parties profit from schemes that suggest or refer a bankruptcy filing or gather and steer the homeowner client into an unwanted bankruptcy. As in this case, the gathering of information sufficient to complete the filing process is enough to subject defendants to §110.[274] The fact that they all worked together to profit from the scheme reinforces this Court's finding that they are all subject to §110 as petition preparers.

Citing multiple courts finding parties liable as petition preparers as stated above in, *In re Spence*, 411 B.R. 230 (D. Maryland, 2009) the Court stated:

> "However, courts applied the definition of §110(a) broadly in rendering a person a bankruptcy petition preparer. *See In re McGill,* 2007 WL 1119939 (Bankr.E.D.Tenn. Apr. 13, 2007); *In re Reynoso,* 477 F.3d 1117, 1123 (C.A.9 2007); *In re Springs,* 358 B.R. 236, 241 n. 4 (Bankr.M.D.N.C.2006); *In re Hennerman,* 351 B.R. 143, 148–49 (Bankr.D.Colo.2006); *In re Thomas,* 315 B.R. 697, 703–04 (Bankr.N.D.Ohio 2004); *In re Jolly,* 313 B.R. at 301 (Bankr.S.D.Iowa 2004); *In re Pillot,* 286 B.R. 157 (Bankr.C.D.Cal.2002); *In re Willman,* 1997 WL 781878 (Bankr.E.D.Pa. Dec. 18, 1997); *Ferm v. United States (In re Crowe),* 243 B.R. 43 (9th Cir. BAP 2000); *In re Landry,* 250 B.R. 441 (Bankr.M.D.Fla.2000); *In re Gaftick,* 333 B.R. 177 (Bankr.E.D.N.Y.2005); *In re Moore,* 290 B.R. 287, 293 (Bankr.E.D.N.C.2003); *In re Moffett,* 263 B.R. 805 (Bankr.W.D.Ky.2001); *In re Farness,* 244 B.R. 464 (Bankr.D.Idaho 2000).
>
> As demonstrated by the attached Appendix, the papers prepared by TADFA tracked the papers required for a bankruptcy filing and were easily transferred to the Schedules and Statement of Financial Affairs by the Sirody Firm. TADFA opened the door to the bankruptcy process and then led these debtors inside that process by

---

[274] See *In re United States Trustee*, supra at 739.

71

assembling the material necessary, including ordering credit reports, to enable the Sirody Firm to actually file the cases. The court finds no competent evidence of any other function. ("We assemble the information that they return to us together with the credit reports and any other pertinent financial information and forward it to the attorneys who are going to be handling that particular individual's case." (Tr. 171, l. 20–24)).

It is abundantly clear to the court that TADFA's "bankruptcy option" was developed by Uhre in an attempt to escape the requirements of §110. TADFA solicited those in financial peril, advised and steered most of them who could afford its fees toward bankruptcy, dangled "benefits" before them and then sold, for a hefty price, a Workbook that was the functional equivalent to bankruptcy Schedules and Statements of Financial Affairs.

Therefore, inductive reasoning (*i.e.,* "If it looks like a duck, swims like a duck and quacks like a duck, then it probably is a duck.") leads this court to find that TADFA is indeed a bankruptcy petition preparer under §110 and subject to that section's requirements and penalties. A contrary finding would undoubtedly frustrate the legislative purpose of §110."

*In re Spence*, 411 B.R. at 244-245.

Likewise, the Court in *In re Shadley*, 2013 Bankr. Lexis 1358 (U.S. Bankr.D.Minn., 2013) reviewed facts identical to acts of the defendants and the debtor, Mr. Martin. The defendants in *Shadley* collected the requisite filing information, transmitted the information to their self selected typist, all without the choice of the homeowner client, instructing the homeowner that a bankruptcy filing was needed.

Mr. Giordano, Mr. Nahas, NVA, Ms. Kisch, Mr. Krueger, Ms. Rodriguez and Ms. Narcisse, as well as all of their entities collaborated in their established scheme to profit from preparing the filing of the bankruptcy petition of Mr. Martin. Each one played a pivotal role funneling Mr. Martin and other clients into their scheme. They are each individually liable under § 110 and are each a bankruptcy petition preparer under § 110(a)(1).

**Defendants are a Debt Relief Agency**

As set forth above, a person becomes a "debt relief agency" under 11 USC 101(12A) by either providing "bankruptcy assistance to an assisted person in return for the payment of money or other valuable consideration, *OR* who is a bankruptcy petition preparer under Section 110…" (Emphasis added).

This Court finds that the Defendants satisfy both parts of the definition. Having found them to be bankruptcy petition preparers, they meet the definition of a debt relief agency – each of

them individually. However they – by their actions, processes, receipt of payments from Mr. Martin and sharing in the profits, and collecting Mr. Martin's data and guiding him into a bankruptcy filing –each clearly and convincingly fall within the definition of a debt relief agency.

Mr. Nahas and NVA asserted the defense that they fall within the exclusion of 101(12A) that excludes "(A) any person who is an officer, director, employee, or agency of a person who provides such assistance or of the bankruptcy petition preparer."

Likewise Ms. Kisch and her entities and Mr. Krueger and his entity raised the exclusion as a defense. However, they offered no evidence or testimony to rebut their involvement or participation in the collaborative scheme to abuse the bankruptcy process. Their post trial argument consists of nothing more than a recitation of the exclusion.[275]

To the extent Ms. Narcisse may have raised or inferred the defense, she is treated here as well, although the evidence shows she acted as local counsel for Mr. Martin and received payment from NVA from funds paid by Mr. Martin to NVA as a retainer for legal services.

The exclusion defense does not prevail. The evidence at trial and the testimony of the defendants clearly convinced the Court that each defendant was an independent member of the collaborative effort or enterprise of NVA. The testimony indicated that they controlled and operated the unincorporated loan modification business without any formal structure or one singular legal entity to which they all were members. They routinely and individually from time to time participated in emailing, making loan post notes, client calls, recruiting, legal review, managing local counsel and other tasks – all as coordinated through Mr. Nahas's and NVA's policies and procedures according to each of their assigned tasks. Moreover, they each profited from their efforts. They, each defendant, acted in concert and independently to perpetuate the bankruptcy filing of Mr. Martin and the continued billing of Mr. Martin for "loan modification services."

The Defendants offered no evidence of any debt relief agency by which they could have been employed and thereby be excluded as an officer, director or agent. In fact the defendants repeatedly urged neither NVA nor any defendant entity was a debt relief agency. Mr. Krueger testified that he and Ms. Rodriguez were independent contractors. Likewise Ms. Kisch and Ms.

---

[275] ECF No. 504 at p. 43, ¶ C.

Narcisse testified they were counsel, local counsel, or otherwise contract attorneys. Mr. Giordano testified he was an independent contractor. Mr. Nahas set up NVA, recruited clients, recruited attorneys, collected payments and made disbursements – all individual acts to perpetuate the scheme. The defendants cannot be excluded when by their own admission they are not part of any entity from which to be excluded.

As for Mr. Nahas as owner of NVA, when a corporate officer personally perpetuates wrongful conduct or personally violates a statute he may be held individually liable. *In re Anderson*, 2017 WL 1066563 (Bankr. S.D.Tx, 2017).

> When directors and officers authorize the commission of wrongful acts that are prohibited by statute, even if the acts are done on behalf of the corporation, they may be held personally liable. *Texas v. American Blastfax, Inc.*, 164 F. Supp. 2d 892, 898 (W.D. Tex. 2001); *Citronelle–Mobile*, 826 F.2d at 25 ("[P]ersonal responsibility for corporate liability may attach when the individual's wrongful conduct causes the violation of a statute [or] accompanying regulations ..."). In *American Blastfax*, the officers of a corporation which failed to disclose that its sale of unsolicited facsimile advertisements was unlawful, in violation of the Texas DTPA and the Telephone Consumer Protection Act, were personally liable for statutory damages because the officers actively oversaw and directed the conduct that violated the statute. *American Blastfax*, 164 F. Supp. 2d at 898. The court concluded that to hold otherwise would allow the individual defendants to simply dissolve the violating corporation, set up a new corporation, and repeat the unlawful conduct. *Id.*

*In re Anderson*, supra at p3.

> Some courts[1] have applied what has been termed the "guiding spirit" approach to determine whether a corporate officer may be held to be individually liable. This approach is designed to address the situation where a corporate officer directs a corporate agent to engage in wrongful conduct, but the officer does not personally engage in the wrongful conduct. *Ennis v. Loiseau*, 164 S.W.3d 698, 707–08 (Tex. App. 2005) (citing *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cir. 1985))("[a] corporate officer may not escape liability where he had direct, personal participation in the wrongdoing, as to be the 'guiding spirit' behind the wrongful conduct or the 'central figure' in the challenged corporate activity.").

*In re Anderson*, supra at pp.2-03.

Likewise U.S. District Judge Sarah S. Vance applied the "guiding spirit" rule stating:

Similarly, under a "well settled" rule of tort law, "when corporate officers directly participate in or authorize the commission of a wrongful act, even if the act is done on behalf of the corporation, they may be personally liable." *General Motors Acceptance Corp. v. Bates*, 954 F.2d 1081, 1085 (5th Cir. 1992). Under this rule, "the officer to be held personally liable must have some direct, personal participation in the tort, as where the defendant was the 'guiding spirit' behind the wrongful conduct ... or [was] the 'central figure' in the challenged corporate activity." *Mozingo v. Correct Mfg.*, 752 F.2d 168, 174 (5th Cir. 1985) (citing *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 907 (1st Cir. 1980)).

*SMH Enterprises, LLC v. Krispy Krunchy Foods, LLC* 2021WL 1226411 (E.D.La. 2021).

Not one of the corporate entities defendant herein acted as an entity that could have lead to an exclusion under § 101(12A)(A). Again, defendants never took such a position during trial as that would have required them to admit that there was a debt relief agency for which they worked. The UST clearly proved that no exclusion under §101(12A)(A) applies herein.

Should there remain any doubt, this Court adopts the "guiding spirit" rule. Mr. Nahas and NVA were without doubt the "guiding spirits" in the scheme. Mr. Krueger and U.S. Auto Liquidators, LLC certainly were "central figures" in orchestrating the NVA team involvement in Mr. Martin's loan file, with US Auto receiving funds on Mr. Krueger's behalf. Congress expressed no intent in the applicable Code language to allow these individual perpetrators to act and then hide behind some entity, all the while taking Mr. Martin's money and preparing his bare bones bankruptcy filing to further their enterprise of "loss mitigation" or "loan modification."

The defendants argued that the NVA and attorney homeowner contracts exclude bankruptcy services or assistance. Given the evidence at trial, this Court is clearly convinced that the contracts, the advertising, and any professed intent were all deceptions. There was no evidence offered by defendants at trial to show that they did anything other than act as a collective enterprise to provide bankruptcy assistance – debt relief services – to Mr. Martin by (1) suggesting, directing, instructing, advising him to file bankruptcy; (2) by sending his personal information necessary for filing a bare bones bankruptcy petition to Mr. Giordano; (3) by ensuring that the Chapter 13 bankruptcy case was filed timely to stop the foreclosure sale and that it could be quickly dismissed to allow monthly payments to continue to NVA and (4) ensuring that foreclosure counsel knew the bankruptcy was filed and the sale must be canceled, starting a new timeline under MARS for loss mitigation – and of course – the monthly billing of Mr. Martin.

The evidence was clear and convincing. The defendants acted – each of them – as debt relief agencies. The actions of the defendants were undisputed.

## Damages, Penalties, Sanctions and Injunctive Relief

The two goals of bankruptcy are oft-stated: "[t]he principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor,'" against which the Court must balance the additional goal of ensuring "the fair and equitable treatment of the creditors of a debtor in bankruptcy*." Marrama v. Citizens Bank of Mass*., 549 U.S. 365, 367, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007) (*quoting Grogan v. Garner*, 498 U.S. 279, 286, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)). "A central purpose of the Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt," *Grogan v. Garner*, 498 U.S. 279, 286, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (internal quotation marks omitted).

> "Both Chapter 7 and Chapter 13 of the Code permit an insolvent individual to discharge certain unpaid debts toward that end. Chapter 7 authorizes a discharge of prepetition debts following the liquidation of the debtor's assets by a bankruptcy trustee, who then distributes the proceeds to creditors. Chapter 13 authorizes an individual with regular income to obtain a discharge after the successful completion of a payment plan approved by the bankruptcy court."

*Marrama v. Citizens Bank of Massachusetts,* 549 U.S. 365, 367, 127 S. Ct. 1105, 1107, 166 L. Ed. 2d 956 (2007).

> To address "perceived abuses of the bankruptcy system," Congress enacted BAPCPA, or the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23. *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 231–32, 130 S.Ct. 1324, 176 L.Ed.2d 79 (2010); *see McCoy v. Miss. State Tax Comm'n (In re McCoy)*, 666 F.3d 924, 927 (5th Cir. 2012). "Among the reform measures the Act implemented are a number of provisions that regulate the conduct of 'debt relief agenc[ies]'—*i.e.,* professionals who provide bankruptcy assistance to consumer debtors"

*Id.* at 232.

The Defendants created a scheme to recruit homeowner clients who would pay a retainer and a monthly fee to Defendants in return for alleged loss mitigation or loan modification services to assist homeowner clients with their home mortgages. The operation developed in a fashion where homeowner clients such as Mr. Martin, would be forced into a bankruptcy filing to stop a foreclosure sale. However, the underlying reason was money for the Defendants. If a home went

to foreclosure sale, Defendants made no more money. If Defendants achieved a successful loan modification, Defendants made no more money. If a homeowner filed a legitimate bankruptcy case, Defendants made no more money. However, if Defendants filed a "bare bones" or "skeleton" bankruptcy proceeding under Chapter 13, which filing was designed to meet with dismissal by the Bankruptcy Court within 30 to 45 days, defendants could resume "the loan modification process" – i.e. **resume billing the homeowner client**.

Defendants created a network of local counsel, such as Ms. Narcisse who never met with or counseled Mr. Martin. All the while, Mr. Martin believed Ms. Narcisse to be his attorney based upon an agreement he signed. The creation of an attorney network using attorneys who often never met with, represented or spoke with clients – but received compensation – and the failure to disclose the bankruptcy petition preparers on the bankruptcy filings, instructing that the sham bankruptcy filings be *pro se*, all persisted in concealing the true motive of the Defendants.

As stated above, the evidence and testimony at trial showed that Mr. Martin's case was not an isolated incident. UST Exhibit 147 provides a list of 186 cases involving referrals by Defendants to bankruptcy petition preparers nationwide. The exhibit indicates that in the majority of cases, no disclosure, as required by §110, was made by the bankruptcy petition preparer and the cases were filed *pro se*.[276]

However, at the end of the day, the Loan Post System, the emails by and between the defendants and the homeowner clients, the testimony of Mr. Martin and some 10,000 pages of exhibits told the actual story.

Defendants acted in bad faith. The Court finds that all of this is relevant to the Court imposing fines, sanctions, damages and injunctive relief. The evidence is clear and convincing that the bad faith actions of the defendants show that the defendants "engaged in a clear and consistent pattern or practice of violating this section…" 11 U.S.C. 526.

The level of concealment by the Defendants, including:

-the guise of "loan modification services,"
-the absence of "bankruptcy" in their advertising and contracts,
- the undisclosed referrals by NVA and its team to typists of bankruptcy documents,

---

[276] UST Ex. 147, ECF No. 443-1.

- the filing by their homeowner clients of *pro se* bankruptcy petitions listing only the mortgage lender as a creditor,
-the failure to file – or even advise the homeowner to file – additional required bankruptcy documents to prevent the bankruptcy case from being dismissed,
- the failure of the typists to disclose their status as bankruptcy petition preparers,

leads the Court, the Chapter 13 Trustee and any investigative authorities such as the US Trustee, to believe that the bankruptcy case filed is nothing more than a routine *pro se* case of an unsophisticated debtor who cannot comply with the requirements of the Bankruptcy Code.

This "scheme," this "collaboration," this "enterprise" of the defendants – designed to make millions of dollars off of the unsuspecting debtors simply seeking loan modifications to save their homes - was orchestrated to evade detection by the Court, stall the foreclosure with a hastily filed and quickly dismissed "bare bones" petition, all to allow NVA and its team in coordination with each defendant, to resume billing the debtor for loan modification services on a monthly basis.

The Bankruptcy Courts receive hundreds of bankruptcy filings a year.  At the end of July, this Court alone had 5,497 pending Chapter 13 bankruptcy cases assigned to its 2 divisions and the Western District of Louisiana had A total of 12,208 pending Chapter 13 cases assigned among its three Judges. Most *pro se* debtors list – as required – all of their debts, secured and unsecured. The pattern of the cases orchestrated by the Defendants simply list the home mortgage creditor. Neither the referral for Mr. Martin, nor the bulk of the cases reviewed by the Court listed in UST Exhibit 147 and 148, listed any creditor other than the home mortgage lender. Why? Simply because the Defendants possessed no desire to see the homeowner client complete a successful bankruptcy. The Defendants transmitted no financial information to Mr. Giordano or the other preparers used by Defendants other than the home address and the information on the home mortgage creditor.

It would have been difficult, at best for any court or trustee when reviewing a *pro se* Chapter 13 case for dismissal to discern the involvement of the Defendants and realize that the dismissal of the "bare bones" *pro se* Chapter 13 case listing only the mortgage creditor was indeed and in fact clearly part of a scheme by defendants to abuse the bankruptcy process to achieve their goal of billing the homeowner clients for relief, that in Martin's case, never arrived through any effort of the Defendants.

78

Of particular importance to the Court in addressing the concealment and pattern of conduct of the defendants to abuse the Bankruptcy Code is that even after the filing of this Adversary Proceeding and the commencement of pretrial discovery by the UST, the defendants continued the practice and simply stopped using emails and Loan Post Notes for referrals to the petition preparers/typists and instead made the referrals by telephone.

Ms. Kisch testified that there was a discussion with the NVA team and as managing attorney she advised them to cease referrals.[277] Both Mr. Nahas and Mr. Krueger testified that Ms. Kisch informed them that making referrals to bankruptcy Petition preparers was "perfectly legal" and that they did not think they were doing anything wrong.[278] She testified that sometime in 2019, after she moved to Texas and was admitted to the Texas bar, she advised them to stop making BPP referrals, when asked "Did you allow Mr. Krueger to send Texas homeowners to, that were your homeowner clients, to [B]PPs?":

"I think it happened. I did at one point tell them to stop."

When did you do that?

Most likely after I got back to Texas and I had access to counsel and other districts that I wasn't admitted in. And when I got admitted, I didn't want any of that happening anymore.[279]

And later in her testimony, she again claimed she informed Mr. Nahas and Mr. Krueger to stop the process of making referrals to bankruptcy Petition preparers in both phone calls and emails, but failed to disclose those emails to the UST because her "emails were corrupted."[280]

Despite all of this, NVA and its team continued to make referrals for bankruptcy filings and collect fees from homeowner clients. Ms. Kisch continued to collect the Law Pay payments and disburse to NVA, retaining her percentage fees.

Mr. Krueger testified that he received bonus or commission income from NVA based upon client retention and payments from homeowner clients.[281] Obviously he, and all of the defendants,

---

[277] UST Ex. 256, ECF No. 441-22.
[278] *See* Trial transcript (Nahas), ECF No. 494, pp. 215-216; Trial transcript (Krueger), ECF No. 493, pp. 79-82.
[279] Trial transcript (Kisch), ECF No. 495, p. 150, ll. 8-16.
[280] Trial transcript (Kisch), ECF No. 495, p. 169.
[281] Trial transcript (Krueger), ECF No. 496, pp. 58-59; See UST Ex. 204, ECF No. 461.

had a personal incentive to continue the bankruptcy filing referrals and keep loan modification client payments flowing into the coffers without regard to Sections 110, 526, 527 and 528.

## Violations and Damages under §110

Defendants acted as bankruptcy petition preparers in Mr. Martin's case and, the evidence shows a pattern of doing so in other NVA clients' bankruptcy cases, as defined by § 110(a)(1) as they accepted compensation from the Debtor and prepared documents with information necessary for filing a bankruptcy case without complying with § 110. Thus, they are subject to remedies provided therein. Under Counts III, IV and V of the Complaint, the UST seeks the disgorgement of fees under § 110 (h)(3)(B), the imposition of fines under § 110 (l) for each violation of § 110, and actual damages incurred pursuant to § 110(i).

There remains no doubt that defendants acted together, each contributing to the scheme. The defendants argued that they had not dealt directly with Mr. Martin or other debtors, that they did not communicate with Mr. Martin, or interact with other clients who filed bankruptcy at the suggestion of and with the aid of NVA and its team. As stated earlier, all the defendants worked toward one common end in their scheme – utilizing often unwanted bankruptcies to perpetuate billing homeowner clients. To the extent Defendants argue that they did not deal directly with Mr. Martin or any of the other homeowner clients filing bankruptcy,

> While these Defendants may not have dealt directly with the Debtors, they nonetheless effectuated the fraudulent bankruptcy filings for the Debtors, and as BPPs, they are no less culpable than MVP and Mullings for violations of § 110. Under § 110, the Court, in its discretion, can impose a fine on each BPP.

*In re Nina*, 562 BR 585 at 600 (E.D.NY, 2016).

No disclosure of the bankruptcy petition preparer on the filed petition was made as required by §110(b)(1) in Mr. Martin's case. Mr. Giordano testified that the information was purposefully omitted as part of the concealment.[282] Defendants also failed to provide Mr. Martin with the notice required under § 110(b)(2) and did not file the same as required by § 110(b)(2)(iii)(II); and failed to prepare and file the declaration disclosing the fees received required under § 110(h)(2). Therefore, "all fees charged by a bankruptcy petition preparer may be forfeited in a case in which

---

Mr. Krueger testified that he was paid on a bi-weekly basis based on $41,600 salary, but that the income would vary from month to month, and he was paid more based on the volume of business, which peaked at 2019, when NVA paid U.S. Auto Liquidators, LLC $92,000, abut $20,000 over his base salary.

[282] Trial transcript (Giordano), ECF No. 491, p. 131, ll. 9-15; ECF No. 492, p. 69, ll. 5-8.

the bankruptcy petition preparer fails to comply with this subsection or subsection (b), (c), (d), (e), (f) or (g)" under § 110(h)(3)(B).

The evidence shows the Defendants violated subsections under §110: (b)(1)(failure to sign the documents), (b)(2)(failure to provide written notice to debtor), (c)(2)(A)(failure to identify the identifying number of each individual who prepared the document or assisted in its preparation), (c)(2)(B)(failure to disclose the identifying number, officer or principal of each entity of the bankruptcy petition preparer), (e)(2) by providing "legal advice" to Mr. Martin, instructing him to file a bankruptcy petition, and (h)(2)(failure to disclose the fee received from the debtor), all for which the maximum fine for each violation is $500 under Section 110(l)(1), subject to being tripled to $1,500 for each violation under § 110(l)(2)(D). Having found by clear and convincing evidence that the Defendants intentionally and egregiously violated (b)(1), (b)(2), (c)(2)(A), (c)(2)(B), (e)(2), and (h)(2) of § 110 in Mr. Martin's case, the Court will order each Defendant to pay the UST statutory fines in the amount of $500 for each of the 6 violations in Mr. Martin's 2019 bankruptcy case, which is $3,000 per each defendant – which per § 110(1)(2) the Court triples to $9,000 for each defendant, to be paid by the Defendants to the United States Trustee. Pursuant to § 110(h)(3)(B), the Court will also order the fees paid to the Defendants by Mr. Martin disallowed and disgorged in the amount of $5,995 to be paid by the defendants, jointly, severally or individually, to the Chapter 13 Trustee in Mr. Martin's Case No. 19-31260 to be held pending further Order of the Court.

Further, pursuant to the foregoing findings of fact, finding Defendants engaged in patently fraudulent, unfair, and deceptive tactics in Mr. Martin's case, charging him an egregiously excessive initial fee, continuing to charge his account each month while providing no meaningful services, and deceptively attempting to induce him to discontinue the services of the Young Law Firm, which representation could have actually helped the Debtor to cure the default on his mortgage through the Chapter 13 process, the Court may grant relief under § 110(i) to compensate Mr. Martin:

> (A) the debtor's actual damages;
> (B) the greater of—(i) $2,000;
>  or (ii) twice the amount paid by the debtor to the bankruptcy petition preparer for the preparer's services, and
> (C) reasonable attorney fees and costs . . . ."

11 U.S.C. § 110(i).

As to Mr. Martin, the Court finds the foregoing facts sufficiently egregious to Order Defendants to pay the maximum amount permitted under § 110(i)(B). Each defendant will be cast in judgment for a sum of $2,000 each payable to the Chapter 13 Trustee in Mr. Martin's Case No. 19-31260 to be held pending further Orders of this Court in that case. Further under § 110(i)(c) Mr. Martin is entitled to recover reasonable attorney fees and costs incurred on his behalf.  Mr. Moore incurred expenses in remediating the complications caused by the Debtors in Mr. Martin's 2019 bankruptcy case and spent six years assisting Mr. Martin in finally and successfully achieving an Order granting mortgage modification relief.  The Court will Order the Defendants to pay, jointly and severally, attorney fees and costs incurred in the amount of $11,000 by Mr. Moore of the E. Orum Young Law Firm in representing Mr. Martin in the efforts not only to remediate the actual damage caused by the Defendants in his bankruptcy case and pursuing relief for Mr. Martin in mortgage modification but also for his efforts in protecting Mr. Martin's rights and claims for disgorgement leading to this Adversary Proceeding.  The Defendants shall pay the $11,000 award for attorney fees to the Chapter 13 Trustee in Mr. Martin's Case No. 19-31260, to be held pending further Order of the Court, after notice and a hearing on the filing of a fee application by Mr. Moore in that case.

Insomuch as the UST has sought relief from this Court under this section as to "any other similarly victimized Western District of Louisiana residents in the amount determined at trial, the Court cannot at this time grant relief under § 110 as to actual damages, disgorgement or fines as to any debtor other than Mr. Martin as the Debtor in the related bankruptcy case. The Court is not precluded from ruling in any case assigned to this Court upon the filing of appropriate pleadings therein seeking relief under § 110 or on the Court's own motion on the basis of any evidence adduced in this Adversary Proceeding that may pertain to the parties in another bankruptcy case pending before this Court.

Finally, in Count VI of the Complaint, the UST seeks an injunction under § 110 (j)(2)(A), to prevent the recurrence of the conduct in violation of § 110 by the Defendants in the Western District of Louisiana. Mr. Nahas stated that the practice of referring their clients to petition preparers finally ended in December of 2022 or January 2023, "I guess we probably read the

writing on the wall and decided it would be a good idea not to pursue it anymore."[283] Given the facts adduced to the contrary and the repeated inconsistencies in the Defendants' pleadings and testimony, as well as the evidence showing Ms. Kisch and her team simply merged into new entities and venues for the scheme, the Court is not convinced that the defendants will cease their continuing pattern of abuse.  In order to prevent the recurrence of the conduct in violation of § 110 by the Defendants in the Western District of Louisiana, the Court will grant relief under § 110 (j)(2)(A) and issue an Order enjoining each Defendant and each Defendant's employees, independent contractor(s) and any related entities from acting as petition preparers or providing any services under § 110 to any individual eligible to file a bankruptcy case in the Western District of Louisiana.

### Damages, Sanctions and Civil Penalties Under Sections 526, 527 and 528

Pursuant to the foregoing findings the Court addressed and found no merit to the minimal legal defenses urged by Defendants. As for Mr. Martin and given the similarities to 186 other NVA client debtors whom the Defendants advised, solely for the Defendants' continued financial gain, to file incomplete *pro se* Chapter 13 cases, lacking the requisite schedules, statements, plan and other documents   resulting in calculated, rapid dismissals of their cases, the Court finds the Defendants violated § 526. Specifically, each Defendant: (1) deceptively represented to NVA clients that their mortgage relief services would be provided by local attorneys, when in actuality the work was performed by non-attorney NVA staff members without regard to the legal consequences and rights of the clients as bankruptcy debtors or their creditors, violating § 526(a)(3)(A), and (2) misrepresented to these assisted persons the risks of bankruptcy, violating § 526 (a)(3)(B), thereby incurring liability to Mr. Martin pursuant to Section 526(c). The UST sought relief under § 526 for these violations in Count I of the Complaint.  Pursuant to § 526(c)(1), the Agreements between Mr. Martin and the Defendants shall be void and may not be enforced. Further, under § 526(c)(2), (A), (B) and (C), each Defendant shall be liable for the actual damages, for reasonable costs and attorney fees for their intentional disregard of the requirements of the Bankruptcy Code, which will be assigned further herein.  Finally, having found each Defendant

---

[283] Trial transcript (Nahas), ECF No. 494, p. 217, l. 18- p. 218, l. 1.

engaged in a clear and consistent pattern or practice of violating this section, the Court will grant relief under § 526(c)(5) as more specifically discussed herein.

**Defendants Violated Section 528**

Continuing under the findings made herein and the Court having addressed and found no merit to the legal defenses urged, the Court finds each Defendant advertised the services of NVA to Mr. Martin and the public concerning mortgage foreclosure and debt relief, and as to Mr. Martin and 186 other clients of NVA whom they induced to file *pro se* Petitions for the Defendant's financial gain Defendants: (1) failed to give the disclosures required by § 528(b)(2); (2) failed to execute and provide copies of the executed Agreement to Mr. Martin in violation of § 528(a)(2); and (3) in violation of § 528(a)(1), those purported Agreements failed to disclose accurately the services to be provided and who was to provide them. The UST sought relief in Count II of the Complaint for these violations. Defendants, by representing that mortgage relief services would be provided by local attorneys, rather than non-attorney NVA staff, violated § 528 such that any purported contracts between the Defendants and Mr. Martin are declared void and unenforceable by any person other than Mr. Martin pursuant to § 526(c)(1).

**Damages under § 526(c)(2)**

The Court finds each Defendant violated eight sections of § 526 and 528 in addition to § 526(c)(5) for which the Court may award damages to Mr. Martin. Each Defendant shall be liable for damages and for costs for filing the bankruptcy petition.[284] The damages to Mr. Martin are awarded under §526(c)(2)(A), (B) and (C) for the Defendants' intentional disregard of the requirements of the Bankruptcy Code, their deceit and misrepresentations to Mr. Martin. Having considered the evidence of Mr. Martin's continued payments to the Defendants that he thought were "supposed to be payment on [his] house," the Court is convinced that the damages to Mr. Martin are linked to the delay in achieving the very relief he sought when he first called NVA.[285] The legitimate relief that could have been afforded to Mr. Martin was thwarted in exchange for the Defendants' illegitimate pecuniary gain.

---

[284] §526(a)(3)(A); 526(a)(3)(B); 526(c)(2)(A); 526(c)(2)(B); 526(c)(2)(C); 528(a)(1); 528(a)(2); and 528(b)(2).
[285] Trial Transcript (Martin), ECF No. 489, p. 98, l. 20-25.

Had Mr. Martin been properly advised, provided with completed contracts, provided with legitimate legal counsel – not NVA staff committing the unauthorized practice of law – or had Ms. Narcisse actually bothered to earn her retainer by representing Mr. Martin, he would have enjoyed the true benefits of what he thought he paid the defendants to do.

Here, Mr. Martin was induced and pressured into filing a *pro se* bankruptcy case that did not fully and accurately disclose his financial situation or adequately address his debts in a Chapter 13 Plan of repayment. To his detriment this filing forfeited any meaningful extension of time to address his home mortgage arrearages, treat other secured claims and even potentially eliminate or reduce obligations to repay unsecured debts and obtain a discharge under Chapter 13. He believed he was receiving legal advice to file from a local attorney he paid for. His filing was not made in good faith and as the testimony of Giordano and Krueger readily admit, the only intention was to obtain the case number for Defendants' perpetuation of the foreclosure defense scheme.

Given the multiple violations of § 526 and 528 committed by Defendants against Mr. Martin, the Court finds damages in the amount of $1,000.00 per violation for a total of $8,000.00 per each defendant appropriate. As Defendants acted together – in concert – as a team – the total aggregate award of $96,000 (12 defendants x $8,000) shall be payable, jointly and severally, thirty days from the date of the Judgment entered by this Court. The Court finds appropriate guidance from *In re Bowyer* here:

> The Court determined that the filing of the bankruptcy documents and Application for Waiver was done first to stop the sheriff's sale and then to cause the case to be dismissed for failure to pay the filing fee or to comply with the other bankruptcy requirements. The bankruptcy filing was ineffective for saving the home, however, for Mr. Bowyer's real estate was sold at a sheriff's sale on September 28, 2011. (Pl. Ex. 18). The court found that the defendants were using the bankruptcy system to further their "**foreclosure** rescue **scheme**" by filing abusive bankruptcy petitions for the sole purpose of forestalling foreclosure, with no intention of complying with the requirements of the Bankruptcy Code. Moreover, because the defendants provided their services and filed numerous bankruptcy case in the Northern District of Indiana, and because the defendants worked in concert with each other to shield themselves from prosecution under the Bankruptcy Code, the court found that their actions would be viewed as a whole and that judgment would be entered jointly and severally against the defendants.

*In re Bowyer*, 489 B.R. 798, 805 (N.D. Bankr. Ind. 2013).

## Civil Penalties under § 526(c)(5)(B)

Having found that the Defendants intentionally engaged in a "clear and consistent pattern or practice of violating" § 526, the Court turns to the relief sought under this statute.[286]  In Count I, pursuant to § 526(c)(5), the UST seeks both an injunction against all Defendants, including any corporate entities any Defendant may own, operate, or work for in the future, enjoining them from providing any bankruptcy assistance or referral services and any other further violations of the Bankruptcy Code, and civil penalties against Defendants under Section 526(c)(5).  The Court first notes that the subsection provides that upon such a finding the court may—"(A) enjoin the violation of such section; *or* (B) impose an appropriate civil penalty against such person."  11 U.S.C.A. § 526.  The Court encountered rulings in its research that impose both a § 526(c)(5)(A) injunction and a § 526(c)(5)(B) civil penalty, however it recognizes that the plain meaning of "or" is disjunctive. *See In re Cruz*, No. 18-10208, 2020 WL 5083326, at *33 (Bankr. S.D. Tex. Aug. 27, 2020) (Holding the "or" in the phrase just before subsections (A) and (B), "A court may impose sanctions if a person intentionally violated § 526 *or* engaged in a clear and consistent pattern or practice of violating §526" is meant to be read disjunctively.) Practically however, herein, the alternative choice between injunction and civil penalties under § 526(c)(5) does not preclude the imposition of an injunction as allowed on other statutory grounds and the Court has already imposed injunctive relief under § 110 (j)(2)(A). Defendants violated two different Code Sections, each of which provide their own, independent relief.

Given NVA's pattern of paying its profits to its Co-Defendants' corporate shells, any injunction is likely only to inspire the creation of new shells to which an injunction might not apply.[287] *See In re Anderson*, 2017 WL 1066563, at *3 (Bankr. S.D. Tex. Mar. 17, 2017); *In re Bascus,* Misc. No. 15-00307, Docket Entry # 111 (Bankr. S.D. Tex. Apr. 15, 2016).  Moreover, the prior litigation and Orders imposing sanctions which implicate the Defendants in this nationwide scheme in the Northern District of Ohio,[288] the Southern District of Mississippi,[289] and the District of Kansas[290] demonstrate their intent in previously responding to these actions is to

---

[286] The Court further notes that as the "clear and consistent pattern or practice of violating´§ 526 was intentional it logically follows that all defendants "intentionally violated" Section 526 violating either side of the disjunctive "or".
[287] UST Ex. 218, ECF No. 439-2.
[288] UST Ex. 184, ECF No. 437-36, pp. 154-156.
[289] UST Ex. 185, ECF No. 437-37, p. 60-61.
[290] UST Ex. 187, ECF No. 437-39, pp. 51-58.

minimize the impact to their scheme, cut a deal in disgorging fees and/or paying minor fines and to continue the business scheme as usual, or for Ms. Kisch, to also file her own bankruptcy to discharge a judgment awarded in Colorado for a similar scheme.[291] And, despite the request for an injunction to include "any corporate entities any Defendant may own, operate, or work for in the future," this is not the most practicable deterrent for Defendants who frequently change names, addresses and corporate identities.[292] Therefore, this Court has determined that a civil penalty is appropriate in this case to curtail future abuse of the bankruptcy system by these Defendants.

The Court may impose civil penalties in an amount the Court finds necessary to deter Defendants' future abuse of the Bankruptcy Code. Based on the foregoing recitation of the voluminous evidence of the Defendants' repeated and blatant disregard for the bankruptcy system and for creating and perpetuating legal implications and risks to the debtors' home ownership and relationships with their creditors, essentially bullying debtors into filing deficient petitions just to allow defendants to continue charging homeowners for ongoing attempts to repackage another loan modification request, the Court finds the Defendants acted in bad faith, abusing the Bankruptcy Code for their financial gain. The bad faith abuse is compounded by their efforts to disguise their persistence in the scheme outlined above, even after the UST filed this Adversary Proceeding.[293] To attempt to curtail this egregious abuse, a "sanctioning court must use the least restrictive sanction necessary to deter the inappropriate behavior" and narrowly tailor any civil penalty to achieve such purpose. *In re First City Bancorporation of Texas Inc*., 282 F.3d 864, 867

---

[291] The Court noted the prior cases in evidence that demonstrate Ms. Kisch's history of similar fraudulent conduct going back to 2016. Here, the Court takes judicial notice of Bankruptcy Case No. 18-11445 (District of Colorado), the Chapter 7 case of Karen P. Kealy, filed March 1, 2018, demonstrating the ineffectiveness of previous attempts by Courts to deter her fraudulent conduct. Ms. Kisch sought to discharge a Consent Judgment in *State of Colorado v. Karen P. Kealy*, et al (2106cv31094) for $1,250,000 against her individually and $4,000,000 against her two wholly owned entities, Summit Legal Consultants and Summit Law Group, which amounts were deemed civil penalties for violations of the Colorado Consumer Protection Act for advertising mortgage relief services. The Attorney General for the State of Colorado filed an Adversary Complaint (No. 18-1376) under 11 U.S.C. § 523(a)(7), alleging the $1,250,000 judgment was not dischargeable as "a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss," which was dismissed after a Notice of Settlement in an undisclosed amount. The Court takes notice of this case for illustrative purposes.

[292] For example, compare UST Ex. 184, ECF No. 437-36, pp. 86,159, where Karen Kealy filed pleadings in the UST's Ohio litigation cases as "Karen Kealy for the Kealy Law Center, 9300 West Courthouse Rd, Suite 301, Manassas, VA 20110" with her Answer in this Adversary Proceeding at ECF No. 33, p 1, "Karen P. Kisch (f/n/a/ Karen P. Kealy), Kealy Law Firm, PPLC and Kealy Law Center, PLLC (the "Defendant") denies having a previous mailing address of 9300 W. Courthouse Road, Ste. 301 Manassas, VA 20110."

[293] Including for example, changing procedure to verbally transmit their bankruptcy client referrals to Giordano rather than referring by email and posting in loan post, with full knowledge that what they were doing was in violation of the Bankruptcy Code.

(5th Cir. 2002), *See also L. Sols. Chicago LLC v. United States Tr*., 592 B.R. 624, 636 (W.D. La. 2018), aff'd sub nom. *Matter of Banks*, 770 F. App'x 168 (5th Cir. 2019). The Court notes, however, that imposition of a civil penalty herein is not to be construed to be relief in the form of damages to other NVA clients who became *pro se* debtors. Those individual Debtors and the UST have rights to pursue their remedies as may be exercised in their respective cases, before the Bankruptcy courts in districts other than the Western District of Louisiana:

> The Court does not have authority to award relief to other debtors in other cases. *Wells Fargo Bank, N.A. v. Stewart (In re Stewart)*, 647 F.3d 553, 558 (5th Cir.2011) (holding that bankruptcy court lacked jurisdiction to order creditor to audit and, if necessary, to amend all proofs of claim filed in all pending cases). Moreover, the statutory basis for the civil penalty is not to compensate victims for their actual damages because § 526 provides for the recovery of "actual damages" in a separate subsection from the civil penalty provision.

*In re Huffman*, 505 B.R. 726, 765–66 (Bankr. S.D. Miss. 2014).

Further, § 526(c)(5)(B) sets forth no specific amount for the civil penalty as does § 110. "In the absence of explicit statutory factors, the Court finds guidance in provisions in other federal laws relating to the discretionary imposition of civil penalties. *See, e.g., United States v. Gulf Park Water Co*., 14 F.Supp.2d 854, 858 (S.D.Miss.1998) (surveying methodology used by courts in assessing amount of discretionary civil penalties under environmental laws). It appears that civil penalties are largely motivated by factors of deterrence and the culpability of the parties." *Id*, 505 B.R. at 766. Referring to *In re Huffman*, the *Cruz* court notes:

> Section 526(c)(5)(B) does not prescribe any requirements or factors in determining the amount of a civil penalty. In the absence of such statutory guidance, the Court may exercise its broad discretion while taking into account the Fifth Circuit's direction to "use the least restrictive sanction necessary to deter the inappropriate behavior" when imposing disciplinary sanctions. In *In re Huffman*, the bankruptcy court found that a civil penalty under § 526(c)(5) in amount of $28,000, which was roughly four times the fees which a Chapter 7 debtor had paid to the debt relief agency for debt settlement services that it had promised but never provided, was an appropriate civil penalty for the agency's clear and consistent pattern of misconduct. There, the bankruptcy court determined that a penalty in an amount of four times the fees collected was not so burdensome as to be punitive, but sufficient enough to serve as deterrent against the agency's future noncompliance with its obligations as debt relief agency.

*In re Cruz*, No. 18-10208, 2020 WL 5083326, at *34 (Bankr. S.D. Tex. Aug. 27, 2020).

Just as in *Cruz*, supra, the UST did not propose a civil penalty amount to be assessed against each defendant, but rather stated, "The amount of the penalty is entirely at the Court's discretion." The UST further noted the practical dilemma, "But the penalty should not be so low that it could be considered an allowable 'cost of doing business.' Modest sanctions like a simple return of fees have not deterred Defendants' from continuing their knowing violations of the Bankruptcy Code. Any civil penalty imposed against Defendants and the application and 'reasonable' amount of the civil penalty are at the Court's discretion based on the evidence presented."[294]

Among other factors, the Court may consider the following in assessing the appropriate amount of civil penalties: a) the widespread and persistent nature of Defendants' misconduct; b) the number of cases and examples discussed at trial, which is still only a small slice of the overall operation; c) the number of Western District debtors who filed bankruptcy cases at the urging of Defendants; d) the large total quantity of bankruptcy violations likely to have occurred across the nation; e) the number of bankruptcy courts whose time was wasted by Defendants; f) the vulnerability of the homeowners, such as Mr. Martin, who were misled by Defendants; g) that, in prior cases, U.S. Trustees agreed to a mere return of the fees paid by the debtors, yet the business scheme of defendants continued knowingly, operating in violation of the Bankruptcy Code for their own profit; h) Defendants collected fees from ten Western District of Louisiana debtors in 12 cases placed in abusive *pro se* bankruptcies; and i) that the business generated more than $12.62 Million in revenue, from homeowners nationwide, between January 2017 and August 2022.[295] Further, as stated above, Defendants failed to produce records of all homeowner clients during that period, leaving the UST and the Court without the complete records. However, what was produced or discovered by the UST ended up being more than sufficient for this Court's findings.

The summary of homeowner fees deposited into NVA Capital One account alone, not including any amounts paid to other Defendants and members of the scheme before deposit to NVA, shows the average total revenue for the Defendants to be more than $2 million per year in revenue. Defendants did not introduce any evidence of their expenses.[296] During eight days of trial, Defendants offered no testimony or evidence to dispute the facts shown in their Loan Post Notes, claiming at best that any mention of a bankruptcy referral or email to Giordano or others regarding

---

[294] ECF No. 501, pp. 90-91.
[295] UST Ex. 282, ECF No. 442-7.
[296] UST Ex. 282, ECF No. 442-7.

bankruptcy was an isolated incident. The evidence of 186 bare bones bankruptcy filings is certainly more than isolated or random. It shows a pattern of fraud and deceit and abuse of homeowners across multiple states.

Considering the evidence establishes that Defendants collectively generated more than $12.6 Million dollars from NVA clients during the relevant time period of the violations, 2017-2022, which averaged more than $2 Million dollars per year, and given the repeated names and entities utilized by Mr. Nahas, Ms. Kisch and Mr. Krueger over the years and across so many states, it is difficult for this Court to conceive of a civil penalty that is "sufficient enough to serve as a deterrent against future noncompliance by" these Defendants. *In re Huffman*, 505 B.R. at 766. The Court notes that the facts adduced into evidence in this Adversary Proceeding are without equal in terms of the number of *pro se* debtors affected by the wide reach of the Defendants' foreclosure defense scheme.

As discussed above, the evidence shows that NVA, solely owned by Mr. Nahas, received income from homeowner clients from 2017 through August 25, 2022 in the total amount of $12,624,371.88.

Ms. Kisch retained 10% of the Law Pay amounts she collected on behalf of NVA and she received $1,500 per week from NVA for managing the NVA local attorney network. The form 1099s issued by Ms. Kisch to NVA show she collected and transferred a total of $6,854,044.95 during that time frame. These transfers were made after she deducted her 10% collection fee. Her 10% collection fee calculates to be $761,560.55. Her $1,500 weekly fee would be approximately $468,000 over that time frame.

Mr. Krueger received the following from NVA via his shell entity U.S. Auto Liquidators:

| | | |
|---|---|---|
| 2017 | - | $86,604.54 |
| 2018 | - | $74,767.69 |
| 2019 | - | $96,200.00 |
| 2020 | - | $87,600.00 |
| 2021 | - | $82,499.00 |

for a total of $427,671.23.[297]

---

[297] UST Ex. 218, ECF No. 439-2; UST Ex. 204, ECF #461.

Defendants testified that Denise Rodriguez is a former NVA senior case processor who worked remotely in New York as an "independent contractor." As a client processor and supervisor for homeowners applying for home mortgage modifications, her name appears repeatedly in Loan Post Notes regarding bankruptcy filings in Mr. Martin's case notes and in the cases listed in UST Exhibit 147. In 2019 and 2020, NVA paid compensation owed to Rodriguez directly to her corporate entity, All Provizions, LLC.[298] The record indicates she was paid a total of $78,118 over those 2 years.

The defendants charged Mr. Martin $5,600 for loan modification services. Of the 200 plus loan post client records the UST was able to discover – despite the efforts of the defendants to conceal same – 186 cases were identified as abusive bankruptcy filings.[299] The Court reviewed these records and finds they were abusive and clearly fall within a "clear and consistent patter or practice" of violating § 526. Taking the $5,600 fee charged to Mr. Martin as an average, Defendants likely earned $1,041,600 or more from the 186 cases identified.

Defendants offered no evidence as to their success rate for mortgage workouts or any costs or expenses to offset the income. They acted as a team to further their scheme. They profited from vulnerable and financially distressed homeowners who paid dearly for no help. The Defendants failed to offer evidence or explain whether any of the 186 cases placed in bankruptcy actually resulted in a loan modification – or in any successful result for the homeowner client. The Court believes that the defendants do not know the results in all likelihood, as their notes show throughout, they only notate when their monthly billing stopped.[300]

Considering the clear and convincing evidence of the wide spread scope and pattern of abuse across 30 states and reaching hundreds of distressed homeowners in just five years, and the persistent efforts of defendants to elude the oversight of the UST and Bankruptcy Courts throughout the United States and the amount of income received from their scheme and given the guidance of the Fifth Circuit, the Court finds the appropriate civil penalty minimally necessary to deter the future abuse by NVA, Mr. Nahas and Mrs. Kisch and the Kisch entities to be $2,000 for each of the 186 *pro se* cases filed during the relevant time period. Under § 526(c)(5), the

---

[298] UST Ex. 205, ECF No. 438-8; Trial transcript (Nahas), ECF No. 494, p. 163-165; Trial transcript (Krueger), ECF No. 492, p. 219.
[299] UST Exs. 147 and 148.
[300] UST Narcisse Impeachment Ex. 12, ECF No. 474, *passim*; and UST Ex. 148.

Defendants, Nahas and NVA shall be assessed a civil penalty of $372,000 payable jointly and severally; Defendants Kisch and Kisch entities shall be assessed a civil penalty of $372,000, payable jointly and severally.

Given their abuse, deceit and lack of relief provided to Mr. Martin, having prevented him from obtaining any possible bankruptcy success, $22,000 of each penalty is to be paid within 30 days to the Chapter 13 Trustee in Mr. Martin's case number 19-31260. The remaining $350,000 of each penalty is payable within 30 days to United States Trustee.

Given the level of involvement of Mr. Krueger and Ms. Rodriguez in implementing the scheme and supervising the operations on a day to day basis, their actions and abuse cannot escape the imposition of a civil penalty. The emails and loan post notes introduced at trial clearly show an uncontroverted clear and consistent pattern on their parts to ensure that abuse bare bones bankruptcy filings were made by homeowner clients. Both of these defendants profited from this abusive scheme.

The Court finds an appropriate civil penalty to be as follows: Mr. Krueger and U.S. Auto Liquidators, $93,000 (186 x $500) to be paid jointly and severally to the UST; Ms. Rodriguez and All Provizions, Inc., $37,200 (186 x $200) to be paid jointly and severally to the UST.

In addition to the relief granted against Ms. Narcisse herein, the Court finds she was sufficiently involved in the scheme and/or acquiesced in the scheme for profit, to warrant imposition of a civil penalty. UST Exhibit 147 lists 27 abusive cases filed in Louisiana. Testimony at trial indicates she was the only local counsel for NVA in Louisiana. The Court imposes a civil penalty payable by Ms. Narcisse and Law Offices of Halima Narcisse, jointly and severally, in the amount of $20,500 (27 x $750). This amount shall be payable within 30 days to the Chapter 13 Trustee in Mr. Martin's Case No. 19-31260.

As to Mr. Giordano, the evidence reflects that he was the primary petition preparer for cases in Louisiana and the Court imposes a civil penalty payable by Mr. Giordano in the amount of $10,665 (27 x $395). This amount shall be payable within 30 days to the Chapter 13 Trustee in Mr. Martin's Case No. 19-31260.

**Alternative Relief Sought for Abuse of the Bankruptcy Process**

Finally, the Court turns to the UTS's final request for relief for Defendants' intentional bad faith abuse of the bankruptcy system in the widespread and indiscriminate perpetuation of their foreclosure defense scheme. The UST argues that the Defendants have engaged in wrongful and unlawful conduct, hindered the administration of justice, abused the bankruptcy process and in continuing to do so, threaten the integrity of the bankruptcy system.  Under Count VIII, the UST seeks alternative relief asking the Court to exercise its authority under § 105(a) to issue any order, process, or judgment necessary or appropriate to carry out the provisions of the Bankruptcy Code and prevent an abuse of the bankruptcy process or system to find the Defendants in contempt, impose appropriate sanctions award and damages to the Debtor, and to issue a permanent injunction against the Defendants from further abusing the bankruptcy system.

The Court has already granted relief and ordered disgorgement of fees paid by Mr. Martin, imposed fines, damages, civil penalties, sanctions and injunctive relief under §110, §329, and §526, and without discounting the clear and convincing evidence in support of the further finding that the conduct is a severe abuse of the Bankruptcy system and that sanctions are fully justified herein under § 105 and would have been awarded under that section had there not been specific, fully applicable Code sections. The Court relies again on *In re Cruz*:

> "While this Court recognizes that pursuant to § 105(a) and its inherent authority the Court may impose further sanctions, it declines any invitation to do so. This Court exercises the statutory authority and Rules examined herein to effectuate the disgorgement and imposition of civil penalties, and the Court finds that the remaining consequences of the actions taken by counsel in this case are best addressed through referrals to the Texas State Bar and the Chief Judge of the United States District Court of the Southern District of Texas, which will be discussed in greater detail in the following section." *In re Cruz*, No. 18-10208, 2020 WL 5083326, at *35 (Bankr. S.D. Tex. Aug. 27, 2020).

The Court grants relief as prayed for under the specific and applicable provisions of § 110, 349, 526 and 528 and need not utilize its authority under § 105.

**A Word about MARS**

Consumer protection was the prevailing concern of Congress and its enactment of MARS, as explained by the 7th Circuit:

> As desperate people faced the imminent loss of their homes, many for-profit mortgage-assistance relief services (MARS), which promised to obtain loan modifications that would stave off foreclosure, sprang up. The more dubious among these businesses charged consumers thousands of dollars in up-front fees and induced signups through deceptive statements about the quality of their services. **\*700** Mortgage Assistance Relief Services, 75 Fed. Reg. 75092, 75095–96 (Dec. 1, 2010). The money often bought little to nothing. Once a person enrolled, many MARS providers "fail[ed] to perform even the most basic promised services or achieve any beneficial results." *Id.* at 75097. This was doubly unfortunate because, at the same time, many nonprofits and government agencies offered similar services at no cost. *Id.* at 75093–94 & nn.29–35.

> Congress quickly identified mortgage-relief scams as a glaring problem, and it directed the Federal Trade Commission to issue rules relating to "unfair or deceptive acts or practices involving loan modification and foreclosure rescue services." Credit Card Accountability, Responsibility, and Disclosure Act of 2009, Pub. L. No. 111-24, § 511(a), 123 Stat. 1734, 1764; see also Omnibus Appropriations Act of 2009, Pub. L. No. 111-8, § 626(a), 123 Stat. 524, 678 (instructing the FTC to "initiate a rulemaking proceeding with respect to mortgage loans").

> The FTC did so, issuing its final rule on December 1, 2010. See 75 Fed. Reg. 75092 (then-codified at 16 C.F.R. pt. 322, now at 12 C.F.R. pt. 1015). The rule focused on the "widespread" "unfair or deceptive practices of MARS providers" and the harm these actors had inflicted on consumers. *Id.* at 75096. Among other things, the rule prohibited MARS providers from charging upfront fees, telling consumers not to talk to their lenders, and misrepresenting material aspects of their services. See 12 C.F.R. §§ 1015.3, 1015.5.

> The rule also addressed the role of attorneys. It acknowledged that many attorneys and law firms that represent financially distressed persons offer mortgage-relief services in connection with their legal practice. *Id.* at 75095. Recognizing the traditional role that the states play in regulating the attorney-client relationship, the final rule exempted attorneys from most MARS regulations so long as they (1) "provide[ ] mortgage assistance relief service as part of the practice of law," (2) are "licensed to practice law in the state in which the[ir] consumer ... resides," and (3) "compl[y] with state laws and regulations that cover the same type of conduct the rule requires." See 12 C.F.R. § 1015.7(a).

94

*Consumer Financial Protection Bureau v. Consumer First Legal Group*, 6 F.4[th] 694, 699-700 (7th Cir. 2021).

The facts in *Anderson*, supra, bear much similarity to the facts herein:

In 2011, the Federal Trade Commission issued a rule governing Mortgage Assistance Relief Services (the "MARS Rule"). Under the MARS Rule, a firm may not collect fees for providing mortgage assistance until it has successfully obtained mortgage relief on behalf of a client. See 12 C.F.R. § 1015.5. There is a narrow exception to the prohibition against advanced fee collection. A law firm may collect advance fees under certain circumstances. *See id.* at § 1015.7. The evidence in this case reflects that the J. Freeman Law Firm decided to extend the law firm status to a firm conducting mortgage relief services (R.A. Support Services) in order to collect fees in advance of obtaining mortgage relief and retain the fees even if no mortgage relief was achieved. (Case No. 15–307, ECF No. 111 at 3). In re Anderson, No. 15-33603, 2017 WL 1066563, at *5 (Bankr. S.D. Tex. Mar. 17, 2017).

The fact that the bankruptcy fraud and abuse arose out of the Defendants' desire to perpetuate the billing of homeowner clients by filing bare bones bankruptcy cases to halt foreclosures and their, at best, "loose attorney network" performing little or no legal services appear to this Court to be highly questionable under Regulation O. 12 C.F.R. 1015.1, et seq. Mr. Nahas testified that the Defendants' scheme was created to evade the MARS restrictions regarding billing homeowners. The local attorney network and hollow contracts between Ms. Kisch and the attorneys allowed the continued billing.

However, this Court lacks jurisdiction over matters related to MARS and the UST sought no MARS relief herein. Given its concerns about MARS violations arising out of the testimony and evidence at trial, and given that the violations, if any, are related to bankruptcy proceedings, this Court will make referrals to the U.S. Attorney and the Federal Trade Commission. Title 18 U.S.C. 157.

**The Nationwide Pattern of Conduct and Abuse**

The summary UST Exhibit 147 is attached hereto as Appendix 2. This Exhibit admitted into evidence at trial is supported by more than 3,000 pages in UST Exhibit 148 and the universe of Loan Post Notes admitted in UST Narcisse Impeachment Exhibit 12, ECF No. 474.

Section 526(c)(5) provides that the Court, "on its own motion" may raise the issue of § 526(c)(5) violations. Many Courts have done so and this Court attaches the Exhibit so that disclosure of the potential violations in over 30 judicial districts is made. Defendants – as a part of their scheme – took great care to conceal their bankruptcy abuse from the Courts. This Court will provide the Chief Bankruptcy Judge of each Judicial District indicated on Exhibit 147 with a copy of the Exhibit and this Memorandum Opinion.

## Conclusion

This Court echoes the statement made by Chief U.S. Bankruptcy Judge, Eduardo Rodriguez (U.S. Bankruptcy Court, S.D.Tx) when he ruled regarding §110 and bankruptcy petition preparers.

> **This Court writes the instant memorandum opinion as a warning to all persons who recklessly guide vulnerable debtors into bankruptcy without regard for the consequences. Over the past several months, there has been a concerning spike in bankruptcy petition preparer cases before this Court. Here, Rodarius Mitchell repeatedly violated numerous sections of 11 U.S.C. §110, and as a result, has greatly harmed the lives of many. Section 110 provides harsh sanctions for those who fail to comply, and this Court intends to fully enforce such measures when applicable.** (*In re United States Trustee*, 652 B.R. at 731.)

This Court will enter Judgment consistent with this Memorandum Opinion.

# # #

13. While situated in Kansas, Fuller [the client/debtor] conducted business—by telephone or e-mail or both—with ND Processing.

14. He also paid them for bankruptcy assistance.

15. As defined by 11 U.S.C. § 101(3), Fuller is an assisted person.

16. As defined by 11 U.S.C. § 101(4A), Graham; Kealy Law Center; ND Processing; and Friedman Law Associates, P.C. provided bankruptcy assistance to Fuller.

17. As defined by 11 U.S.C. § 101(12A), Graham; ND Processing; Kealy Law Center; and Friedman Law Associates, P.C. are debt relief agencies.

. . .

24. On October 18, 2017, Fuller contacted a telephone number he found on the Internet that offered foreclosure defense.

25. The telephone number he called, 888-774-7741, is linked to a website called "Get-Foreclosure-Defense.com."

26. When Fuller called the number he was directed to Tanya Rivera.

27. Rivera stated that they had an 85% to 90% success rate.

28. On October 18, 2017, at Rivera's request, Fuller sent the initial payment of $1,250 to Kealy Law Center via overnight mail in Manassas, Virginia.

29. Around the same time, Rivera provided Fuller with document for him to sign, which purport to offer representation by David C. Graham, Esquire.

30. Fuller did execute the documents that Rivera provided.

31. These documents included an Application for Foreclosure Defense and Loss Mitigation Services and a Service/Retainer Agreement with David C. Graham, Esquire.

32. The Service/Retainer Agreement provided for an initial retainer of $1,250 to be paid to David C. Graham, Esquire for negotiating a loss mitigation solution, including a loan modification offer.

33. As noted above, the initial retainer was paid to Kealy Law Center rather than to Graham.

34. Moreover, after the initial payment Fuller would have to pay a monthly fee of $900 to David C. Graham, Esquire, due on the 23rd of all subsequent months in order to continue with the loss mitigation services while his file was still active.

35. The Service/Retainer Agreement also stated that, "[A]ll legal services hereunder will be provided by the David C. Graham, Esquire and other (non- legal) services may be provided by outside servicing Agents, all of whom shall be engaged, compensated and supervised by David C. Graham, Esquire."

97

36. Fuller never spoke with David Graham.

37. Fuller also signed a Borrower's Certification and Letter of Authority for the Third Party Authorization.

38. David C. Graham, Esquire is shown at the top of all documents, but on the Borrower's Certification and Letter of Authority for Third Party Authorization, Processing Center: ND Processing, 300 Wheeler Road, Suite 101, Hauppauge, NY 11788, is printed under David C. Graham, Esquire.

39. Based on a Google Search, ND Processing has the same address for Friedman Law Associates, P.C.

40. The website for Friedman Law Associates, P.C. states that it has a nationwide network of attorneys allowing them to successfully help homeowners avoid and stop the foreclosure process.

41. The website further identifies Kansas as one of the states within its national network of attorneys.

42. David Graham is shown as one of two attorneys in Kansas as part of Friedman Law Associates' network.

43. Because Fuller faces imminent foreclosure, Rivera directed Fuller to contact Dallas Evans to assist him in the loss mitigation process.

44. Fuller did call Evans, who instructed Fuller to file for Chapter 7 bankruptcy protection.

45. On October 25, 2017, Fuller paid $249 to Evans via PayPal.

46. On October 26, 2017, Fuller filed for Chapter 7 protection.

47. Evans is shown as the bankruptcy petition preparer on Fuller's petition.

48. In addition to the petition, Fuller filed a mailing matrix which listed only the mortgage creditor.

49. Further, the Form 2800 shows that Fuller paid Evans $249.

50. Evans did not complete the remaining bankruptcy forms.

51. Evans shows his firm name as Chapter 7 in 24.

52. On October 27, 2017, the Court issued an Order to Correct Voluntary Petition in Bankruptcy for Fuller to file the remaining bankruptcy documents.

53. Shortly after filing the bankruptcy, Fuller was contacted by Jennifer Bonilla, a paralegal at ND Processing.

54. Ms. Bonilla said that she was going to handle the beginning stages of Fuller's file for the loan modification process.

98

**Appendix 2**

**UST Ex. 147, ECF No. 443-1**

# Exhibit 147

*Trial date: 2/03/2025*

| Case Name | Case # | District | Date Case Filed | Date Case Dismissed | BPP Disclosure | Exhibit |
|---|---|---|---|---|---|---|
| Camp, Veronica | 18-10329 | WDLA | 3/5/18 | 3/6/18 | No | 148 (pgs. 2-14) |
| Champagne, Penny | 19-50630 | WDLA | 5/22/19 | 6/6/19 | No | 148 (pgs. 15-29) |
| Martin, George | 19-31260 | WDLA | 8/6/19 | 9/17/19 | No | 148 (pgs. 30-49) |
| Morgan, Jerry | 19-31309 | WDLA | 8/13/19 | 9/30/19 | No | 148 (pgs. 50-63) |
| Morgan, Kewanna | 19-30755 | WDLA | 5/15/19 | 5/16/19 | No | 148 (pgs. 64-79) |
| Patin, Mark | 19-51172 | WDLA | 10/1/19 | 11/6/19 | No | 148 (pgs. 80-95) |
| Patin, Mark | 20-50229 | WDLA | 3/9/20 | 5/11/20 | No | 148 (pgs. 96-108) |
| Tanner, Sandra | 17-11962 | WDLA | 12/4/17 | 12/27/17 | Yes – Dallas Xavier Evans (Official Form 101) (no Official Form 119) | 148 (pgs. 109-121) |
| Tanner, Sandra | 18-11268 | WDLA | 8/14/18 | 12/19/18 | Yes – Dallas Xavier Evans (Official Form 101) (no Official Form 119) | 148 (pgs. 122-138) |
| Tanner, Sandra | 19-10079 | WDLA | 1/17/19 | 1/22/19 | No | 148 (pgs 139-153) |
| Tolentino, Bradley | 19-31514 | WDLA | 9/17/19 | 10/2/19 | No | 148 (pgs. 154-169) |
| Wyatt, Jeremy | 19-10064 | WDLA | 1/16/19 | 4/2/19 | No | 148 (pgs. 170-185) |
| Baker, Wallace | 20-10042 | MDLA | 1/15/20 | 3/3/20 | No | 148 (pgs. 186-203) |
| Blake, Joseph | 19-10276 | MDLA | 3/12/19 | 5/1/19 | Yes – Total Petitions, LLC (Official Form 101) (no Official Form 119) | 148 (pgs. 204-221) |
| Bueche, Craig | 18-11203 | MDLA | 10/24/18 | 12/11/18 | No | 148 (pgs. 222-239) |
| Johnson, Allen | 19-10813 | MDLA | 7/16/19 | 8/5/19 | No | 148 (pgs. 240-256) |
| Johnson, James | 18-11019 | MDLA | 9/12/18 | 3/18/19 | Yes – Susan M. Signer (Official Form 101) (no Official Form 119) | 148 (pgs. 257-302) |

| Name | Case No. | District | Date | Date | Disclosure | Exhibit Ref. |
|---|---|---|---|---|---|---|
| Thomas, Lawanna | 18-11078 | MDLA | 9/24/18 | 11/7/18 | Yes – Susan M. Signer (Official Form 101) (no Official Form 119) | 148 (pgs. 303-322) |
| White, Betty | 19-11265 | MDLA | 10/29/19 | 1/9/20 | No | 148 (pgs. 323-340) |
| Aslam, Javid | 19-10328 | EDLA | 2/6/19 | 5/23/19 | | 148 (pgs. 341-354) |
| Bush, Henry, et al | 18-10743 | EDLA | 3/27/18 | 6/6/18 | Yes – Susan M. Signer (B2800 – Disclosure of Compensation of Bankruptcy Petition Preparer and Official Form 119) | 148 (pgs. 355-413) |
| Dumas, Denine | 18-12477 | EDLA | 9/18/18 | 12/26/18 | No | 148 (pgs. 414-429) |
| Flowers, Ellen | 20-11529 | EDLA | 8/31/20 | 11/3/20 | No | 148 (pgs. 430-446) |
| Stevenson, Raynell | 20-11546 | EDLA | 9/1/20 | 1/11/21 | No | 148 (pgs. 447-508) |
| Taylor, Larose | 20-10503 | EDLA | 3/6/20 | 4/15/20 | No | 148 (pgs. 509-525) |
| Vallery, Lawrence | 19-10184 | EDLA | 1/22/19 | 2/7/19 | No | 148 (pgs. 527-540) |
| Vallery, Lawrence | 19-11160 | EDLA | 4/30/19 | 7/25/19 | | 148 (pgs. 541-554) |
| Davis, Terry | 21-01239 | DSC | 5/3/21 | 6/4/21 | No | 148 (pgs. 555-572) |
| Davis, Terry | 21-02024 | DSC | 7/30/21 | 9/16/21 | No | 148 (pgs. 573-591) |
| McCullough, Alberta | 20-03445 | DSC | 9/3/20 | 10/13/20 | No | 148 (pgs. 592-610) |
| Stuart, Dawn | 19-02987 | DSC | 6/3/19 | 7/15/19 | No | 148 (pgs. 611-629) |
| Adams, Trevor | 19-11955 | NDMS | 5/9/19 | 5/28/19 | No | 148 (pgs. 630-644) |
| Presley, Pasvial | 21-10921 | NDMS | 5/11/21 | 5/19/21 | No | 148 (pgs. 645-662) |
| Adams, Maranda | 21-01047 | SDMS | 6/22/21 | 7/9/21 | No | 148 (pgs. 663-680) |
| Brewer, Steven | 19-52242 | SDMS | 11/12/19 | 12/2/19 | No | 148 (pgs. 681-693) |
| Keim, Mary | 19-51066 | SDMS | 6/5/19 | 6/27/19 | No | 148 (pgs. 694-705) |
| Parker, Valentino | 21-50276 | SDMS | 3/8/21 | 4/9/21 | No | 148 (pgs. 706-724) |

| Name | Case No. | District | Date 1 | Date 2 | Debtor Preparer | Exhibit Pages |
|---|---|---|---|---|---|---|
| Harris, Cynthia | 19-04470 | NDAL | 10/30/19 | 12/3/19 | No | 148 (pgs. 725-741) |
| McGhee, Tywanna | 20-00366 | NDAL | 1/28/20 | 2/26/20 | No | 148 (pgs. 742-754) |
| Montgomery, Edward | 20-40054 | NDAL | 1/13/20 | 1/28/20 | No | 148 (pgs. 755-772) |
| Thomas, Frederick | 19-02877 | NDAL | 7/18/19 | 8/15/19 | No | 148 (pgs. 773-788) |
| Thomas, Frederick | 19-04402 | NDAL | 10/25/19 | 11/8/19 | No | 148 (pgs. 789-805) |
| Ford, Betty | 19-03443 | MDFL | 5/24/19 | 6/27/19 | No | 148 (pgs. 806-821) |
| Miley, Tracy | 20-00491 | MDFL | 2/12/20 | 3/19/20 | No | 148 (pgs. 822-836) |
| Rodriguez, Brenda | 21-00213 | MDFL | 1/20/21 | 3/4/21 | No | 148 (pgs. 837-853) |
| Tirado, Raymond | 20-00059 | MDFL | 1/6/20 | 2/11/20 | No | 148 (pgs. 854-869) |
| Wood, Harry | 19-72867 | WDAR | 10/18/19 | 1/8/20 | No | 148 (pgs. 870-886) |
| Fillingim, Steven | 19-30763 | NDFL | 7/9/19 | 8/12/19 | Yes – No Name Listed (Debtor's Statement of Assistance Filed) | 148 (pgs. 887-905) |
| McLendon, Anne | 19-30585 | NDFL | 5/21/19 | 8/6/19 | Yes – Jeffrey Giardano (Debtor's Statement of Assistance Filed) | 148 (pgs. 906-924) |
| Wilbanks, Mark | 19-40275 | NDFL | 5/14/19 | 8/6/19 | Yes – Best Debt Counsel (Debtor's Statement of Assistance Filed) | 148 (pgs. 925-945) |
| Cason, Tiwiana | 19-22471 | NDIN | 9/4/19 | 10/21/19 | No | 148 (pgs. 946-965) |
| Miller, Amy | 19-21859 | NDIN | 7/10/19 | 8/27/19 | No | 148 (pgs. 966-985) |
| Frye, Heather | 22-40453 | SDGA | 7/5/22 | 7/22/22 | No | 148 (pgs. 986-1002) |
| Rooks, Christopher | 21-20161 | SDGA | 7/2/21 | 7/27/21 | No | 148 (pgs. 1003-1020) |

| Name | Case No. | District | Date 1 | Date 2 | Declaration | Exhibit |
|---|---|---|---|---|---|---|
| Grisham, Betty | 20-43887 | NDTX | 12/29/20 | 1/6/21 | No | 148 (pgs. 1021-1043) |
| Ish, Linda | 21-40407 | NDTX | 2/26/21 | 3/4/21 | No | 148 (pgs. 1044-1060) |
| Chang, Jeehyun | 20-70052 | SDTX-McAllen | 2/3/20 | 6/26/20 | No | 148 (pgs. 1061-1078) |
| Chang, Jeehyun | 21-70019 | SDTX-McAllen | 2/24/21 | 5/13/21 | No | 148 (pgs. 1079-1098) |
| Mayo, Kathryn | 19-35578 | SDTX-Houston | 10/1/19 | 11/18/19 | No | 148 (pgs. 1099-1114) |
| Miller, Suzan | 19-80401 | SDTX-Galveston | 12/2/19 | 12/18/19 | No | 148 (pgs. 1115-1130) |
| Mack, Darryl | 20-00807 | NDIL | 1/10/20 | 2/7/20 | Yes – Jeffery Giordano (Official Form 106Dec - Declaration about an Individual Debtor's Schedules) | 148 (pgs. 1131-1149) |
| Cramer, Scotty | 20-90286 | CDIL-Danville | 3/18/20 | 4/27/20 | No | 148 (pgs. 1150-1187) |
| Gordon, Annette | 19-81798 | CDIL-Peoria | 12/9/19 | 12/10/19 | No | 148 (pgs. 1188-1202) |
| Davlin, Stacy | 19-60668 | EDTX-Tyler | 9/30/19 | 11/21/19 | No | 148 (pgs. 1203-1221) |
| Pineda, Osman | 21-40670 | EDTX-Plano | 5/3/21 | 5/25/21 | No | 148 (pgs. 1222-1239) |
| Smith, Erick | 19-41437 | EDTX-Plano | 5/30/19 | 8/14/19 | No | 148 (pgs. 1240-1256) |
| Douglas, Leshon | 20-51700 | WDTX-San Antonio | 10/5/20 | 10/20/20 | Yes – Jeffery Giordano (Pro Se Filing Questionnaire) | 148 (pgs. 1257-1268) |
| Esquivel, Mary Jane | 20-50507 | WDTX-San Antonio | 3/2/20 | 3/17/20 | Yes – No Name Listed (Pro Se Filing Questionnaire) | 148 (pgs. 1269-1287) |
| Garcia, Arthur | 20-50415 | WDTX-San Antonio | 2/26/20 | 3/17/20 | No | 148 (pgs. 1288-1302) |
| Guerrero, Gilbert | 19-52397 | WDTX-San Antonio | 10/1/19 | 10/21/19 | Yes – Jeffery Giordano | 148 (pgs. 1303-1317) |

| Name | Case No. | District | Date | Date | | 148 (pgs.) |
|---|---|---|---|---|---|---|
| Hunter, Gladys | 19-10847 | WDTX-Austin | 6/28/19 | 8/7/19 | Yes – Jeffery Giordano (Pro Se Filing Questionnaire) | 148 (pgs. 1318-1332) |
| Hunter, Gladys | 19-11512 | WDTX-Austin | 11/4/19 | 12/4/19 | Yes – No Name Listed (Pro Se Filing Questionnaire) | 148 (pgs. 1333-1351) |
| Luma, Jacqueline | 19-52877 | WDTX-San Antonio | 12/3/19 | 12/30/19 | Yes – Jeffery Giordano (Pro Se Filing Questionnaire) | 148 (pgs. 1352-1366) |
| Stein, Donna | 17-50812 | WDTX-San Antonio | 4/4/17 | 4/26/17 | Yes – Jeffery Giordano (Official Form 101 and Pro Se Filing Questionnaire) | 148 (pgs. 1367-1381) |
| Stein, Donna | 17-51343 | WDTX-San Antonio | 6/6/17 | 7/12/17 | No | 148 (Pgs. 1382-1395) |
| Glanton, Lillie | 19-11159 | MDAL | 7/16/19 | 8/23/19 | No | 148 (pgs. 1396-1412) |
| Norris, Mary | 20-11091 | MDAL | 8/31/20 | 9/8/20 | No | 148 (pgs. 1413-1431) |
| Wood, Anna | 20-40013 | WDNC | 1/14/20 | 3/2/20 | No | 148 (pgs. 1432-1451) |
| Bogan, Jr., John | 19-40550 | MDGA-Columbus | 7/1/19 | 8/1/19 | Yes – Brittany Tonju Williams (Official Form 101, Official Form 119, B2800 and Disclosure of Compensation of | 148 (pgs. 1452-1469) |

| Name | Case No. | District | | | Bankruptcy Petition Preparer? | |
|---|---|---|---|---|---|---|
| Bogan, Jr., John | 19-40837 | MDGA-Columbus | 9/27/19 | 10/22/19 | No | 148 (pgs. 1470-1487) |
| Bogan, Jr., John | 19-41052 | MDGA-Columbus | 12/2/19 | 2/11/20 | Yes – Jeffrey R. Giordano (Pro Se Debtor's Statement of Assistance Received in Connection with the Filing of this Case) And Kealy Law Center (Pro Se Debtor's Statement of Assistance Received in Connection with the Filing of this Case) | 148 (pgs. 1488-1508) |
| Kelley, David | 19-51226 | MDGA-Macon | 7/1/19 | 7/24/19 | No | 148 (pgs. 1509-1530) |
| Knight, Christine | 21-10429 | MDGA-Albany | 8/2/21 | 8/25/21 | No | 148 (pgs. 1531-1549) |
| Marshall, Sheila | 19-52113 | MDGA-Macon | 11/5/19 | 12/5/19 | Yes – No Name Listed (Pro Se Debtor's Statement of Assistance Received in Connection with the Filing of this Case) | 148 (pgs. 1550-1573) |
| Brown, Patricia | 19-62217 | NDGA-Atlanta | 8/5/19 | 8/22/19 | Yes – No Name Listed (Pro Se Affidavit to Accompany Petition for Order of Relief) | 148 (pgs. 1574-1588) |
| Flemister, Nena | 20-63765 | NDGA-Atlanta | 3/2/20 | 4/8/20 | Yes – No Name Listed | 148 (pgs. 1589-1604) |

| Name | Case No. | District | | | (Pro Se Affidavit to Accompany Petition for Order of Relief) | |
|---|---|---|---|---|---|---|
| Hilson, Tracie | 19-60274 | NDGA-Atlanta | 7/1/19 | 7/25/19 | No | 148 (pgs. 1605-1623) |
| McCullough, April | 19-67778 | NDGA-Atlanta | 11/5/19 | 12/2/19 | Yes – No Name Listed (Pro Se Affidavit to Accompany Petition for Order of Relief) | 148 (pgs. 1624-1641) |
| Nance, Kenneth | 19-58557 | NDGA-Atlanta | 6/3/19 | 7/3/19 | No | 148 (pgs. 1642-1658) |
| Nance, Kenneth | 19-99003 | NDGA-Atlanta | 9/30/19 | 11/14/19 | No | 148 (pgs. 1659-1675) |
| Smith-Weston, Peggy | 19-57126 | NDGA-Atlanta | 5/6/19 | 6/3/19 | No | 148 (pgs. 1676-1689) |
| Watson, Gregory | 19-21101 | NDGA-Gainesville | 6/3/19 | 7/1/19 | Yes – No Name Listed (Pro Se Affidavit to Accompany Petition for Order of Relief) | 148 (pgs. 1690-1708) |
| Wilson, Matthew | 19-42264 | NDGA-Rome | 9/30/19 | 10/16/19 | No | 148 (pgs. 1709-1725) |
| Fetters, Todd | 19-02655 | SDIA | 11/12/19 | 12/28/19 | No | 148 (pgs. 1726-1742) |
| Job, Chad | 20-00023 | SDIA | 1/6/20 | 2/21/20 | No | 148 (pgs. 1743-1760) |
| Phillips, Todd | 21-01432 | SDIA | 11/1/21 | 12/17/21 | No | 148 (pgs. 1761-1778) |
| Brown, Larry | 20-02698 | DAZ-Tucson | 3/13/20 | 4/23/20 | No | 148 (pgs. 1779-1794) |
| Thompson, Ian | 19-10573 | DAZ-Tucson | 8/21/19 | 9/6/16 | No | 148 (pgs. 1795-1805) |
| Anderson, Ernestine | 19-02851 | EDNC | 6/21/19 | 7/26/19 | No | 148 (pgs. 1806-1823) |
| Jefferson, Elijah | 19-02529 | EDNC | 6/3/19 | 7/19/19 | No | 148 (pgs. 1824-1841) |
| Gillespie, Bonita | 21-10717 | DDE | 4/19/21 | 5/7/21 | No | 148 (pgs. 1842-1858) |
| Jamison, Marietta | 22-10014 | DDE | 1/10/22 | 2/2/22 | No | 148 (pgs. 1859-1872) |
| Wisneski, Charlene | 20-10070 | DDE | 1/14/20 | 8/24/20 | No | 148 (pgs. 1873-1887) |

| Name | Case No. | District | Filing Date | Date | Yes/No | Page Reference |
|---|---|---|---|---|---|---|
| Bonner, Tony | 19-07467 | SDIN-Indianapolis | 10/7/19 | 10/22/19 | No | 148 (pgs. 1888-1904) |
| Bruce, William | 20-90241 | SDIN-New Albany | 2/24/20 | 3/11/20 | No | 148 (pgs. 1905-1921) |
| Jordan, Marcus | 19-09299 | SDIN-Indianapolis | 12/20/19 | 1/7/20 | No | 148 (pgs. 1922-1936) |
| Thomas, Jennie | 19-09166 | SDIN-Indianapolis | 12/16/19 | 12/31/19 | No | 148 (pgs. 1937-1954) |
| Bishop, Robert | 20-50128 | SDOH | 1/10/20 | 2/27/20 | No | 148 (pgs. 1955-1970) |
| Flack, Kenneth | 22-10799 | SDOH | 5/11/22 | 6/22/22 | No | 148 (pgs. 1971-1988) |
| Pauley, Betsy | 19-33465 | SDOH | 11/7/19 | 12/24/19 | No | 148 (pgs. 1989-2003) |
| Pauley, Betsy | 20-30689 | SDOH | 3/12/20 | 4/27/20 | No | 148 (pgs. 2004-2019) |
| St. John, Andrew | 23-10100 | SDOH | 1/23/23 | 3/8/23 | No | 148 (pgs. 2020-2035) |
| Whitaker, James | 19-57790 | SDOH | 12/5/19 | 12/30/19 | No | 148 (pgs. 2036-2051) |
| Coy, Billy | 19-30461 | WDMO | 8/29/19 | 9/16/19 | No | 148 (pgs. 2052-2068) |
| Godde, Debra | 19-20928 | WDMO | 10/7/19 | 10/16/19 | No | 148 (pgs. 2069-2084) |
| Smith, Anita | 19-41668 | WDMO | 6/28/19 | 7/17/19 | No | 148 (pgs. 2085-2103) |
| Colston, Paula | 20-10172 | NDOH | 1/10/20 | 2/28/20 | Yes – Jeffrey (Attention, All Debtors Filing Bankruptcy Without an Attorney) | 184 (pgs. 1-20) |
| Danko, Donald | 17-51741 | NDOH | 7/24/17 | Discharged 11/14/17 | Yes – Dallas Xavier Evans (Official Form 101, Attention, All Debtors Filing Bankruptcy Without an Attorney, Official Form 119 and B2800 and Disclosure of Compensation of Bankruptcy Petition Preparer) | 184 (pgs. 21-95) |
| Dorsey, Curtis | 17-14799 | NDOH | 8/15/17 | 10/17/17 | Yes – | 184 (pgs. 97-123) |

21-03017 - #443-1  File 01/26/25  Enter 01/26/25 19:17:41  Exhibit Ex. 147  U.S. Trustees

| Name | Case No. | District | Date | Date | Description | Page reference |
|---|---|---|---|---|---|---|
| Fedor, Joel | 20-50080 | NDOH | 1/13/20 | 2/25/20 | Dallas Xavier Evans (Official Form 101, Official Form 119, Attention, All Debtors Filing Bankruptcy Without an Attorney, and B2800 and Disclosure of Compensation of Bankruptcy Petition Preparer) Yes – Karen Miller (Attention, All Debtors Filing Bankruptcy Without an Attorney) | 148 (pgs. 2104-2127) |
| Jones, Richard | 17-51866 | NDOH | 8/7/17 | 11/22/17 | Yes – Dallas Xavier Evans (Official Form 101, B2800 Disclosure of Compensation of Bankruptcy Petition Preparer, Official Form 119, and Attention, All Debtors Filing Bankruptcy Without an Attorney) | **184 (pgs. 124-158)** |
| Brine, Allen | 19-21550 | DCT | 9/5/19 | 9/25/19 | No | 148 (pgs. 2128-2144) |
| O'Neil, Michelle | 22-20020 | DCT | 1/14/22 | 2/3/22 | No | 148 (pgs. 2145-2161) |
| Engledow, Lonny | 19-00973 | NDIA | 7/22/19 | 8/19/19 | No | 148 (pgs. 2162-2177) |
| Alexander, Alan | 19-52422 | EDTN | 11/25/19 | 1/7/20 | No | 148 (pgs. 2178-2193) |

| Name | Case No. | Court | Date | Date | Amended? | Page Ref. |
|---|---|---|---|---|---|---|
| Beck, Alexander | 19-31446 | EDTN | 5/9/19 | 7/2/19 | No | 148 (pgs. 2194-2211) |
| Langley, Jamison | 20-10426 | EDTN | 2/3/20 | 4/9/20 | No | 148 (pgs. 2212-2233) |
| Steffey, Raymond | 21-51794 | EDTN | 8/30/19 | 10/22/19 | No | 148 (pgs. 2234-2250) |
| Surcey, Tammy | 21-50347 | EDTN | 3/22/21 | 5/12/21 | No | 148 (pgs. 2251-2265) |
| Wade, Earnestine | 21-11209 | EDTN | 7/1/21 | 9/9/21 | No | 148 (pgs. 2266-2288) |
| | | | | | | |
| Holman, Jerome | 21-22197 | WDTN | 7/7/21 | 7/30/21 | No | 148 (pgs. 2289-2298) |
| Holman, Jerome | 21-24037 | WDTN | 12/7/21 | 1/5/22 | No | 148 (pgs. 2299-2313) |
| Shipp, Carlos | 19-29915 | WDTN | 12/17/19 | Open | No | 148 (pgs. 2314-2330) |
| Wilson, Timothy | 19-29975 | WDTV | 12/19/19 | 1/7/20 | No | 148 (pgs. 2331-2344) |
| | | | | | | |
| Cyr, James | 20-10446 | DMA | 2/18/20 | 8/9/22 | No | 148 (pgs. 2345-2363) |
| Jones, Sylvester | 19-11729 | DMA | 5/20/19 | 6/4/19 | Yes – Jeffery (Official Form 101) | 148 (pgs. 2364-2380) |
| | | | | | | |
| Echibe, Anthony | 19-25596 | DMD-Greenbelt | 11/22/19 | 1/2/20 | No | 148 (pgs. 2381-2398) |
| Gay, Thomas | 19-18395 | DMD-Baltimore | 6/20/19 | 7/29/19 | No | 148 (pgs. 2399-2414) |
| | | | | | | |
| Glass, Roxann | 19-16579 | DMD-Greenbelt | 5/14/19 | 5/16/19 | No | 148 (pgs. 2415-2429) |
| Joyce, James | 22-10104 | DMD-Baltimore | 1/10/22 | 3/22/22 | No | 148 (pgs. 2430-2447) |
| Legagneux, Michael | 19-23500 | DMD-Greenbelt | 10/9/19 | 11/14/19 | No | 148 (pgs. 2448-2464) |
| Perry, Eula | 19-22996 | DMD-Baltimore | 9/30/19 | 11/6/19 | No | 148 (pgs. 2465-2482) |
| Poist, Gary | 21-16756 | DMD-Baltimore | 10/27/19 | 12/15/21 | No | 148 (pgs. 2483-2499) |
| | | | | | | |
| Poole, Lisa | 19-12485 | NDOK | 12/6/19 | 1/14/20 | No | 148 (pgs. 2500-2518) |
| | | | | | | |
| Jensen, Rebecca | 19-03173 | WDMI | 7/25/19 | 8/14/19 | No | 148 (pgs. 2519-2536) |
| Persing, Walter (Tracey) | 19-03768 | WDMI | 9/4/19 | 10/17/19 | No | 148 (pgs. 2537-2553) |
| Post, Anthony | 20-02268 | WDMI | 7/6/20 | 8/10/20 | No | 148 (pgs. 2554-2570) |
| Sheedlo, Walter | 20-90161 | WDMI | 9/17/20 | 10/19/20 | No | 148 (pgs. 2571-2588) |

| Name | Case No. | District | Date | Date | 106Dec | Pages |
|---|---|---|---|---|---|---|
| Berkobien, Michael | 20-20376 | EDMI-Detroit | 2/27/20 | 4/9/20 | No | 148 (pgs. 2589-2608) |
| Miller-Freeman, Sandra | 21-41966 | EDMI-Detroit | 3/9/21 | 3/17/21 | No | 148 (pgs. 2609-2625) |
| | | | | | | |
| Buxton, Jeremy | 21-42975 | EDMO | 8/12/21 | 8/27/21 | No | 148 (pgs. 2626-2643) |
| Herl, Calvin | 19-20182 | EDMO | 8/1/19 | 8/12/19 | No | 148 (pgs. 2644-2659) |
| Hurst, John | 19-46098 | EDMO | 9/30/19 | 10/16/19 | No | 148 (pgs. 2660-2676) |
| Love, Tyisaiah | 20-41133 | EDMO | 3/2/20 | 3/17/20 | No | 148 (pgs. 2677-2694) |
| Orth, Barbara | 20-41678 | EDMO | 3/23/20 | 4/7/20 | No | 148 (pgs. 2695-2710) |
| Trotter, Cynthia | 19-45369 | EDMO | 8/27/19 | 9/12/19 | Yes – Jeffrey Giordano (Official Form 106Dec - Declaration about an Individual Debtor's Schedules) | 148 (pgs. 2711-2727) |
| | | | | | | |
| Boreson, John | 19-50990 | DMN | 12/11/19 | 12/27/19 | No | 148 (pgs. 2728-2743) |
| Sheppheard, Sean | 19-32819 | DMN | 9/6/19 | 9/16/19 | No | 148 (pgs. 2744-2756) |
| | | | | | | |
| Matthews, Patrick | 19-42017 | DNE | 12/10/19 | 12/18/19 | No | 148 (pgs. 2757-2771) |
| Matthews, Patrick | 20-40186 | DNE | 2/10/20 | 3/11/20 | No | 148 (pgs. 2772-2786) |
| | | | | | | |
| Harris, Michael | 19-30293 | DNJ-Camden | 10/28/19 | 11/20/19 | No | 148 (pgs. 2787-2804) |
| Harris, Michael | 20-10261 | DNJ-Camden | 1/8/20 | 2/5/20 | No | 148 (pgs. 2805-2821) |
| | | | | | | |
| Bond, Raymond | 19-74539 | EDVA | 12/11/19 | 1/16/20 | No | 148 (pgs. 2822-2840) |
| Delisle, Carl | 19-36454 | EDVA | 12/12/19 | 1/22/20 | No | 148 (pgs. 2841-2859) |
| Johnson, Arthur | 19-74648 | EDVA | 12/18/19 | 1/28/20 | No | 148 (pgs. 2860-2876) |
| Rose, Terry | 19-36137 | EDVA | 11/21/19 | 1/10/20 | No | 148 (pgs. 2877-2892) |
| Thompson, Dacian | 19-34776 | EDVA | 9/13/19 | 11/15/19 | No | 148 (pgs. 2893-2913) |
| | | | | | | |
| Fiske, Carl | 19-50419 | WDVA-Harrisonburg | 5/14/19 | 6/3/19 | No | 148 (pgs. 2914-2929) |

21-03017 - #443-1  File 01/26/25  Enter 01/26/25 19:17:41  Exhibit Ex. 147  U.S. Trustees

| Name | Case No. | District | Date | Date | Date | | Page Ref |
|---|---|---|---|---|---|---|---|
| Lamb, Christopher | 19-61922 | WDVA-Lynchburg | 9/12/19 | 9/30/19 | | No | 148 (pgs. 2930-2946) |
| Timmers, Lisa | 20-20348 | EDWI | 1/17/20 | 2/3/20 | | No | 148 (pgs. 2947-2962) |
| Morgan, Stephen | 21-10195 | WDWI | 2/2/21 | 3/12/21 | | No | 148 (pgs. 2963-2981) |
| Xiong, Yia | 20-10642 | WDWI | 3/3/20 | 4/15/20 | | Yes – Jeffrey Giordano (Official Form 106Dec - Declaration about an Individual Debtor's Schedules) | 148 (pgs. 2982-2999) |
| Graham, Chevala | 20-50007 | MDNC | 1/6/20 | 2/7/20 | | No | 148 (pgs. 3000-3015) |
| Ancir, Irena | 21-10678 | DNH | 11/29/21 | 1/14/22 | | No | 148 (pgs. 3016-3033) |
| Ascani, Steven | 19-11280 | DNH | 9/16/19 | 11/1/19 | | No | 148 (pgs. 3034-3048) |
| Bourque, Linda | 20-10823 | DNH | 9/21/20 | 10/7/20 | | No | 148 (pgs. 3049-3066) |
| Boyd, Charles | 20-10099 | WDKY | 1/30/20 | 2/14/20 | | No | 148 (pgs. 3067-3084) |
| Brown, Helen | 20-40526 | WDKY | 8/17/20 | 9/1/20 | | No | 148 (pgs. 3085-3103) |
| Gueye, Oumy | 22-10112 | DRI | 2/28/22 | 3/21/22 | | No | 148 (pgs. 3104-3120) |
| Guisse, Atmane | 22-10427 | DRI | 7/20/22 | 8/2/22 | | No | 148 (pgs. 3121-3134) |
| Benning, Norris | 19-13021 | EDPA-Reading | 5/9/19 | 6/4/19 | | No | 148 (pgs. 3135-3152) |
| Brown, Eugene | 19-13198 | EDPA-Philadelphia | 5/16/19 | 6/3/19 | | No | 148 (pgs. 3153-3168) |
| DiSandro, Enrico | 19-14007 | EDPA-Philadelphia | 6/24/19 | 7/12/19 | | No | 148 (pgs. 3169-3187) |
| Pollitt, Andrew | 21-12095 | EDPA-Philadelphia | 7/27/21 | 8/5/21 | | No | 148 (pgs. 3188-3200) |
| Trinkle, Thomas | 20-10243 | EDPA-Philadelphia | 1/14/20 | 2/4/20 | | Yes – No Name Listed (L.B.F. 2016-4 Statement of Pro Se Debtor) | 148 (pgs. 3201-3219) |

21-03017 - #443-1  File 01/26/25  Enter 01/26/25 19:17:41  Exhibit Ex. 147  U.S. Trustees

| | | | | | 187 (pgs. 1-26) |
|---|---|---|---|---|---|
| Fuller, James | 17-22086 | DKS | 10/26/17 | Discharged 5/2/23 | Yes – Dallas Xavier Evans (Official Form 101, B2800 Disclosure of Compensation of Bankruptcy Petition Preparer, Official Form 119, Bankruptcy Petition Preparer's Notice, Declaration and Signature) |
| Fuller, James (adversary) | 18-06004 | DKS | | | | 187 (pgs. 27-58) |

21-03017 - #443-1 File 01/26/25 Enter 01/26/25 19:17:41 Exhibit Ex. 147 U.S. Trustees